# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ST. JOSEPH PARISH ST. JOHNS,

     *Plaintiff,*

  v.

DANA NESSEL, in her official capacity as Attorney General of Michigan; JOHN E. JOHNSON, JR., in his official capacity as Executive Director of the Michigan Department of Civil Rights; POR-TIA L. ROBERSON, ZENNA FA-RAJ ELHASON, GLORIA E. LARA, REGINA GASCO-BENT-LEY, ANUPAMA KOSARAJU, RICHARD CORRIVEAU, DAVID WORTHAMS, and LUKE R. LONDO, in their official capacities as members of the Michigan Civil Rights Commission,

     *Defendants.*

Civil No.  1:22-cv-1154

**COMPLAINT**

1

## INTRODUCTION

1.    St. Joseph Catholic Church ("St. Joseph") is a Catholic parish in the Roman Catholic Diocese of Lansing, located in St. Johns, Michigan. The parish's roots go back to 1857, beginning with Mass in a village home that blossomed into a full parish by 1871. It is the only Catholic Church in St. Johns, Michigan—making it the spiritual home to around 900 Catholic families in the area. Here, these families receive access to the sacraments, formation in the faith, and religious education.

2.    Since 1924, St. Joseph has operated an elementary school, called St. Joseph Catholic School, to provide children in the St. Johns area with a Catholic education.

3.    Crucial to St. Joseph's ability to advance its religious mission is its employment of teachers and staff who support and advance that mission, and its ability to ensure both employees and students follow its religiously-motivated conduct standards in its school.

4.    Like Catholic schools around the country, St. Joseph Catholic School asks all teachers to uphold Catholic teachings in word and deed. This requirement is rooted in Catholic theology, which calls on teachers

to "reveal the Christian message not only by word but also by every gesture of their behaviour." Sacred Congregation for Catholic Education, *The Catholic School*, at ¶ 43 (1977). And this requirement is regularly communicated to teachers in employment contracts, faculty handbooks, and a code of ethics.

5.    In a series of actions culminating in a Michigan Supreme Court decision from July 2022, the Michigan Attorney General, the Michigan Department of Civil Rights, and the Michigan Civil Rights Commission ("Defendants") reinterpreted the Elliott-Larsen Civil Rights Act ("ELCRA") such that provisions which previously prohibited conduct based only on biological sex now also apply to distinctions made based on sexual orientation and gender identity. *See Rouch World, LLC v. Department of Civil Rights*, No. 162482, 2022 WL 3007805, at *15 (Mich. July 28, 2022).

6.    As the Court explained, Defendant Michigan Civil Rights Commission concluded in 2018—four years before the Michigan Supreme Court's ruling—that it "'would itself be discriminatory'" to continue understanding "sex" as distinct from sexual orientation and gender identity. *Rouch World*, 2022 WL 3007805, at *4 (cleaned up).

3

7.   The ELCRA does not contain a religious exemption that would cover St. Joseph's hiring decisions and enforcement of its code of conduct as to both employees and students. *See, e.g.*, *id.* at *43 (Viviano, J., dissenting) (contrasting ELCRA with Title VII).

8.   Michigan's reinterpretation of the ELCRA threatens St. Joseph's freedom to continue its religious mission of cultivating a Catholic community faithful to Church teaching in both word and deed.

9.   That's because the ELCRA's broad provisions impose overlapping non-discrimination requirements on St. Joseph—as an educator, as an employer, and as a public accommodation.

10.  As a result, Michigan's new understanding of "sex" discrimination deems it unlawful for St. Joseph's to follow the 2,000-year-old teachings of the Catholic Church, including its teaching that marriage is a lifelong commitment between one man and one woman, that sexual relations are limited to marriage, and that human beings are created as either male or female.

11.  Michigan's reinterpretation poses an imminent threat to St. Joseph. St. Joseph needs to hire new employees and to publicize its job openings. St. Joseph's advertisements would note, as they have in the

past, that applicants must be "practicing Catholic[s] with the ability to infuse Catholic faith and teaching throughout the curriculum." Ex. A. And those new employees would be required to abide by St. Joseph's code of conduct, where they agree to "not teach, advocate, model, or in any way encourage beliefs or behaviors that are contrary to the teaching of the Catholic Church." Ex. B. This can't be done under Michigan's new interpretation of the ELCRA.

12.  St. Joseph is also reviewing applications for new families seeking to send their children to its school. And families at St. Joseph Catholic School enter a "Family – School Agreement." This agreement requires, among other things, that parents and students agree "to live their lives in a way that supports, rather than opposes, the mission of our school and our faith beliefs." Ex. C. Similarly, the Diocese of Lansing's Family-School Agreement requires a child's legal guardian(s) to pledge "full cooperation with the school to prepare our child(ren) to be disciple(s) of Jesus Christ," including "supervis[ing] our child(ren)" to ensure "a Catholic-based education to our child(ren)." DOL Family-School Agreement.Final.2.9.21.pdf (https://perma.cc/Z9YB-N38Z). Yet none of this can be done without violating Michigan's new interpretation of the ELCRA.

13. Also at stake is St. Joseph's ability to rent its facilities—like its gymnasium and soccer fields—and whether it can carry out its parish activities open to all, like attending Mass, without being held liable as a public accommodation.

14. Further still, St. Joseph's freedom to participate on equal footing in public programs is now at risk too, such as St. Joseph's use of St. Johns Public Schools staff and the Clinton County Regional Educational Service Agency ("CCRESA" or "RESA").

15. St. Joseph's religious decisions regarding how to advance its mission and ministry are protected by the First and Fourteenth Amendments to the U.S. Constitution. Michigan cannot force the Catholic Church to compromise its religious character simply as a function of its doors being open to all.

## IDENTIFICATION OF PARTIES

16. Plaintiff St. Joseph Parish St. Johns is a Michigan nonprofit corporation with charitable and religious purposes. St. Joseph St. Johns operates St. Joseph Catholic School in St. Johns, Michigan.

17.  Dana Nessel is Attorney General of Michigan and has the authority to administer, enforce, and prosecute Michigan's criminal laws, including Michigan's public accommodations law. MCL § 761.1(r), MCL § 767.40.

18. Attorney General Nessel also represents the Michigan Department of Civil Rights (Department) and Michigan Civil Rights Commission (Commission) in any lawsuit filed under Michigan's civil rights law. MCL § 37.2602(b).

19.  John E. Johnson, Jr., is the Executive Director of the Department and is responsible for executing the Commission's policies. MCL § 37.2602(a).

20.  Director Johnson has authority to receive, initiate, investigate, and file complaints alleging violations of Michigan's civil rights law and administers, enforces, and prosecutes the law. *See, e.g.,* MCL § 37.2602, MCL § 37.2603; MDCR Rules 37.4(2), 37.12, 37.16. 12.

21.  Portia L. Roberson, Zenna Faraj Elhasan, Gloria E. Lara, Regina Gasco-Bentley, Anupama Kosaraju, Richard Corriveau, Luke Londo, and David Worthams are members of the Commission.

22. Commissioners have authority to initiate and file complaints alleging violations of Michigan's civil rights law and administer, enforce, and prosecute the law. *See, e.g.*, MCL § 37.2601.

23. The Attorney General, Department, and Commission have offices in Grand Rapids.

24. All Defendants are named in their official capacities.

## JURISDICTION AND VENUE

25. This action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

26. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

27. This Court has authority to award the requested (1) declaratory relief under 28 U.S.C. § 2201-02 and Fed. R. Civ. P. 57; (2) injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and (3) costs and attorneys' fees under 42 U.S.C. § 1988.

28. Venue is proper here under 28 U.S.C. § 1391(b) because the events and omissions giving rise to the claims substantially occur within the Western District of Michigan; the effects of the challenged laws are felt

here; Plaintiff resides in this district; Defendants can and do perform official duties here; and Defendants reside here.

## FACTUAL ALLEGATIONS

### St. Joseph Parish

29.  St. Joseph Parish is a Michigan nonprofit corporation in the Catholic Diocese of Lansing and subject to the authority of the Bishop of Lansing. St. Joseph's earliest roots trace back to 1857, beginning with Mass in a village home, and its school opened in 1924. Today, St. Joseph has around 900 registered families.

30.  As a parish of the Roman Catholic Diocese of Lansing, St. Joseph is "a sacramental community of Christians guided by the Holy Spirit." As part of its mission statement, St. Joseph affirms that it is "called to worship God and proclaim God's Word by living the Good News of Our Lord Jesus Christ," and "accept the responsibility to serve, rather than be served, in our parish, community, and beyond."

31. As part of the parish community, St. Joseph operates St. Joseph Catholic School. St Joseph Catholic School enrolls just under 200 students each year between kindergarten and sixth grade.

32.  St. Joseph Catholic School believes "that a relationship with God should be fully integrated into the life of every student," and that the school operates "to assist parents in the spiritual, social, and intellectual development of their child within the framework of Catholic teachings and moral values." The school's pledge, which is recited daily by the entire school, includes a "promise to live my life today knowing that God surrounds me and all those I meet," to "do my best to see Christ in all people and treat them with respect and dignity," and to "answer the call to reach out to those in need and to be a light for the Kingdom." *See* https://perma.cc/48Q8-EM7F.

33.  In addition to the school pledge, faith and education are interwoven in a variety of ways: the Catholic faith is "interspersed throughout the classroom curriculum," students are "prepared to receive the Sacraments of Reconciliation and the Eucharist" and "participate in regular celebrations of a weekday Mass," and students "participate in activities that lend themselves to fulfilling the Lord's call to love our neighbor as ourselves" such as "food drives and outreach to the local retirement homes."

34.  In accordance with the Diocese of Lansing, and in keeping with its Catholic identity, St. Joseph requires parish and school staff to affirm the tenants of the Catholic faith. Every employee at St. Joseph—from kindergarten teachers to part-time bookkeepers—must be a practicing Catholics. The Diocese of Lansing's Code of Conduct further requires that employees must "exemplify the moral teachings of the Catholic Church" and "not teach, advocate, model, or in any way encourage beliefs or behaviors that are contrary to the teaching of the Catholic Church," which includes the Church's teaching on gender, sexuality, and marriage between one man and one woman. Ex. B.

35.  In addition, every family that sends a child to St. Joseph Catholic School must enter a "Family – School Agreement" in which parents affirm: "that this is a Catholic value-based program that shares and fosters the seeds of our faith in the lives of our student body. Parents whose religious practices and beliefs do not align to Church teaching might experience conflicts as we follow our mission. We welcome opportunities to answer your questions and expand your understanding of our faith, but openly hostile or persistent defiance of Catholic truths or morality are a violation of what our school stands for. We expect our families to live their

11

lives in a way that supports, rather than opposes, the mission of our school and our faith beliefs." Ex. C.

36.  As a Catholic parish within the Diocese of Lansing, St. Joseph is obligated to comply with and uphold the teachings and requirements set forth by the Diocese.

37.  These include Bishop Boyea's *Policy on the Human Body as a Constitutive Aspect of the Human Person*. ("the Policy") Ex. D. This policy was put in place by the Diocese of Lansing following the February 2, 2019 document issued by the Congregation for Catholic Education entitled *Male and Female He Created Them: Toward a Path of Dialogue on the Question of Gender Theory in Education*.

38.  In light of the Catholic Church's clear guidance on this issue, the Diocese released both the Policy and the *Theological Guide: The Human Person and Gender Dysphoria*, to help guide the faithful and ensure the flock understands the Catholic Church's teaching on human sexuality. Ex. E.

39.  The Policy requires, among other things, that "all Catholic parishes, schools, . . . and any subdivision thereof, shall respect the biological sex of the human person as given by God and shall apply all policies and

procedures in relation to that person according to that person's God-given biological sex." Ex. D.

40.  This Policy further requires that "[s]tudents [who attend Diocesan schools] and [their] parents (or legal guardians) shall conduct themselves in accord with their God-given biological sex." *Id.*

41.  St. Joseph Parish complies fully with the Policy and its requirements.

42.  In its educational activities, St. Joseph teaches and practices that men and women, boys and girls, should be treated according to their biological sex, including in dress, personal pronouns, participation in sports teams, and use of bathrooms, locker rooms, or other single-sex spaces.

43.  When hiring new employees, St. Joseph publicizes the requirement that all new hires must be practicing Catholics and that they must comply with Diocesan policies that, among other things, require them to agree to abide by Catholic Church teaching in word and deed.

44.  Making information about St. Joseph's hiring requirements available upfront to employees helps inform prospective applicants of the requirements of the job at the outset.

45.  Similarly, when St. Joseph allows sports teams to use its gymnasium and recreational fields, or when it hosts RESA staff in its school, or when it welcomes all to its public Masses, St. Joseph expects that it can enter these arrangements without surrendering its Catholic identity—and that those who make use of its facilities will respect the Catholic environment.

## Defendants and Michigan's Supreme Court redefine "sex" in the Elliott-Larsen Civil Rights Act

46.  Michigan's civil rights law prohibits, among other things, discrimination "because of . . . religion, . . . sex, . . . or marital status" by employers, places of public accommodation, and educational facilities. MCL § 37.2102(1).

47.  In May 2018, the Commission reinterpreted the law's prohibition on discrimination "because of sex" to include sexual orientation and gender identity. *See* Interpretative Statement 2018-1, https://perma.cc/U8F8-DHFU. It then began investigations of two businesses that operate according to their owners' religious beliefs. Complaint, *Rouch World, LLC v. Mich. Dep't of C.R.*, No. 20-000145-MZ (Mich. Ct. Cl. July 28, 2020).

48. The Michigan Court of Claims held that "sex" includes gender identity, but not sexual orientation. *Rouch World, LLC v. Mich. Dep't of C.R.*, No. 20-000145-MZ (Mich. Ct. of Claims Dec. 7, 2020).

49. The Michigan Supreme Court reversed that decision, holding that "discrimination on the basis of sexual orientation necessarily involves discrimination because of sex in violation of [Michigan civil rights law]." *Rouch World*, 2022 WL 3007805, at *11.

50. While *Rouch World* did not formally decide that discrimination based on gender identity is proscribed by Michigan's civil rights law, the Commission's Interpretative Statement 2018-1 and the Court of Claims holding that "sex" includes gender identity remain in place.

51. A dissenting justice explained that the Court's reinterpretation was reached "without any concern for whether that interpretation violates constitutional protections of religious liberty." *Rouch World*, 2022 WL 3007805, at *43 (Viviano, J., dissenting). In particular, Justice Viviano explained that ELCRA is broader than its federal analogue (Title VII), because it "covers all employers"—regardless of size—and ELCRA neither "contains exemptions for religious organizations" nor is limited by Michigan "statutory provisions" protecting religious liberty. *Id*. Thus,

15

the dissenting justice criticized the majority for rewriting ELCRA before determining "whether [its] interpretation raises grave constitutional doubts." *Id.* As the U.S. Supreme Court put it when similarly reinterpreting Title VII's "sex" discrimination prohibition, "the promise of the free exercise of religion enshrined in our Constitution; that guarantee lies at the heart of our pluralistic society." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1753-54 (2020).

52.  This determination makes Michigan an outlier, since federal Title VII and most state nondiscrimination laws have broad exemptions for religious employers. *See, e.g.*, 42 U.S.C. § 2000e-1(a), 2000e-2(e); *see also Bostock*, 140 S. Ct. at 1754 (explaining that "the First Amendment can bar the application of employment discrimination laws" in certain cases, and that the Religious Freedom Restoration Act "operates as a kind of super statute, displacing the normal operation of other federal laws, [so] it might supersede Title VII's commands in appropriate cases."); *cf. Ciurleo v. St. Regis Parish*, 214 F. Supp. 3d 647, 652 (E.D. Mich. 2016) ("Plaintiff's claims under the ADEA and the ELCRA are barred by the First Amendment's ministerial exception.").

53. And like the Michigan Department of Civil Rights, Attorney General Nessel has also taken the position that anti-discrimination laws that prohibit discrimination "because of sex" likewise prohibit discrimination based on sexual orientation and gender identity. *See* Br. for Ill. et al as Amici Curiae in Support of Employees 3-4, *Bostock v. Clayton County*, 2019 WL 2915040 (Nos. 17-1618, 17-1623, 18-107) (July 2019).

54. What's more, Defendants argued zealously for the Michigan Supreme Court to hear *Rouch World* and redefine "sex." For example, Defendants Nessel and Michigan Department of Civil Rights "filed a bypass application in the Michigan Supreme Court, seeking a prompt review of this matter." Press Release, *AG Nessel, Department of Civil Rights File to Protect Citizens from Sexual Orientation Discrimination Before Michigan Supreme Court* (Oct. 25, 2021), https://perma.cc/FE8Y-DVTV.

55. Once before the Supreme Court, General Nessel did not dispute that this redefinition put "sincerely held religious beliefs" about marriage and sexuality at risk of legal liability. *See* Br. at 5-6 (https://perma.cc/2R8L-3HGL). And Michigan's brief went on to argue that "MDCR properly opened its investigation into Rouch World's refusal to host a same-sex wedding ceremony." *Id.* at 27; *but see Masterpiece*

*Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018) ("This refusal would be well understood in our constitutional order as an exercise of religion, an exercise that gay persons could recognize and accept without serious diminishment to their own dignity and worth.").

56.  And after the Supreme Court's decision, Nessel celebrated the ruling because Michigan should "reject the notion that our own civil rights law could be used as a tool of discrimination." Press Release, *AG Nessel Prevails in ELCRA Case* (Jul. 28, 2022), https://perma.cc/JA55-CK6V. "Now is the time," Nessel said, that "no person in this state ever experiences barriers to employment, housing, education, or public accommodations and services because of who they are or whom they love." *Id.*

## Michigan's redefinition of "sex" would hold St. Joseph's liable as a public accommodation.

57.  Michigan's broad definition of public accommodation could extend to St. Joseph simply because its doors are open to all. *See* MCL § 37.2301(a) (defining public accommodation to include an "institution of any kind . . . whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public.").

58.  The ELCRA applies to "the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of . . . sex." MCL § 37.2102(1). And it is illegal for any "public accommodation" to "[d]eny an individual the full and equal enjoyment of [its] goods, services, facilities, privileges, advantages, or accommodations . . . or public service because of . . . sex." *Id.* at § 37.2302(a). Because of Michigan's new interpretation of ELCRA, St. Joseph could be held liable as a "public accommodation" whenever it opens its facilities to the public.

59.  For example, St. Joseph's church is open to all; anyone—Catholic or not—is free to attend Mass. St. Joseph also participates in sports leagues that make use of its fields and gymnasium, and those leagues are open to all.

60.  In this way, St. Joseph may be held liable for "sex" discrimination whenever, for example, biologically male students desire to use the female locker room or play on a female sports team, or whenever a biological male Mass attendee wants to use the female restroom. The same could be true whenever someone would want to host a same-sex wedding at St.

Joseph, or have a wedding reception at the Knights of Columbus Hall, with which St. Joseph is related and is only a mile from the parish.

61.  Moreover, the public is free to attend activities on St. Joseph's recreational fields and in its gymnasium—but they would need to be used in accordance with Catholic teaching on human sexuality, which includes separate bathrooms and changing rooms for men and women. The same would be true for the several public events held by St. Joseph's Knights of Columbus chapter at its nearby facility—from Lent Fish Fries, Sportsman Raffles, Wine & Cheese Socials, a Tootsie Role Drive and more. *See* https://perma.cc/4WJJ-WC69. At any one of those or other events at the Knights of Columbus facility, the same risk of liability exists under Michigan's new definition of "sex" discrimination.

62. What's more, under Michigan's new understanding of "sex," St. Joseph is prohibited from "publish[ing] a statement . . . which indicates" its religious teachings on human sexuality in relation to its "goods, services, facilities, privileges, advantages, or accommodations." MCL § 37.2302(b). Also prohibited are any statements that "indicate[]" "an individual's patronage of or presence . . . is," among other things, "unwelcome" because of St. Joseph's religious teachings on human sexuality. *Id.*

Those prohibitions are on top of it being illegal for St. Joseph to "[d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations . . . because of" its views on human sexuality. *Id.* § 37.2302(a).

63.  This means St. Joseph is prohibited from making "statements" that "indicate" either St. Joseph's Catholic teachings might limit a person's participation in certain parish activities, or statements that "indicate" to someone a perception of being "unwelcome" because of St. Joseph's Catholic teachings. *See* MCL § 37.2302(b).

64.  Many "statements" that St. Joseph makes could create that "indicat[ion]." For example, a potential parish volunteer (like a lector, Eucharistic minister, or altar server) could feel "unwelcome" when St. Joseph's asks him to adhere to the moral teachings of the Church in the Diocesan Code of Conduct. Ex. B. Statements regarding the Church's teachings on homosexuality or transgenderism, whether in the church or in the classroom may also make a person feel unwelcome. Statements St. Joseph would make to uphold modesty in attire at Mass, as they are based in biological sex, could make someone feel unwelcome. *See, e.g.*, 1 Timothy 2:9-10 (RHE) ("In like manner, women also decent in apparel . .

. as it becometh women professing godliness, with good works."). Further, St. Joseph's refusal to make a requested statement—like approving a biological female as a "Godfather" or a biological male as a "Godmother"—could also make someone feel unwelcome. Michigan's reinterpretation of "sex" threatens St. Joseph with enforcement actions for adhering to these religious obligations and this religious exercise.

**Michigan's redefinition of "sex" could deprive St. Joseph of the right to participate equally in public programs.**

65.  By subjecting St. Joseph's to the full force of the ELCRA, St. Joseph could be excluded from participating on equal terms with non-religious agencies for the same public benefits and contracting arrangements.

66.  For example, Clinton County's RESA program—by which St. Joseph obtains needed teacher and staff support at its school—has a "policy" prohibiting "discriminatory practices based on . . . sexual orientation . . . or any other status covered by federal, state, or local law," and that "[a]ny person suspecting a discriminatory practice should contact the Special Education Director." https://perma.cc/4SLY-CASH.

**Michigan's redefinition of "sex" interferes with St. Joseph's ability to hire employees based on their willingness to abide by Catholic Church teachings**

67.  Under Michigan civil rights law, an employer is any person who employs one or more individuals. MCL § 37.2201(a). St. Joseph is therefore an employer under and subject to the law.

68.  There are two clauses in Michigan's civil rights law that prohibit employment discrimination: the Employment Clause and the Notice Clause.

69.  Under the Employment Clause, St. Joseph is prohibited from failing or refusing to hire or recruit, discharging, or otherwise discriminating "against an individual with respect to employment, compensation, or a term, condition, or privilege of employment" because of religion, sexual orientation, or gender identity. MCL § 37.2202(1)(a).

70.  The Employment Clause also prohibits St. Joseph from limiting, segregating, or classifying employees or applicants in a way that adversely affects their employment or application status "because of" religion, sex, sexual orientation, marital status, or gender identity. MCL § 37.2202(1)(b).

71.  Under Michigan's new interpretation of "sex" discrimination, the Employment Clause prohibits St. Joseph Parish from:

a.   Hiring employees who share St. Joseph Parish's Catholic beliefs and who agree to abide by those beliefs by signing the Diocesan Code of Conduct and who agree to uphold the Policy.

b.   Hiring teachers and other employees at St. Joseph Catholic School who agree to abide by the Diocesan Code of Conduct and who agree to uphold the Policy.

c.   Making employment-related decisions with respect to current employees based on their continued agreement to abide by the Diocesan Code of Conduct and uphold the Policy.

d.   Enforcing the Policy in the workplace by conforming to the Code of Conduct and reflecting Catholic teaching in the operation of the Parish and School.

72.  St. Joseph's religious freedom is also unlawfully restricted by the Notice Clause.

73.  Under the Notice Clause, St. Joseph can neither post nor publish a statement related to employment "which indicates a preference, limitation, specification, or discrimination, based on religion, . . . sex, . . . marital status," sexual orientation, or gender identity. MCL § 37.2206(1).

74.  The Notice Clause also prohibits St. Joseph from "elicit[ing] or attempt[ing] to elicit information" concerning a prospective employee's religion, or that "expresses a preference, limitation, specification, or discriminated based on religion, . . . sex, . . . marital status," sexual orientation, or gender identity, or that keeps records of that information. MCL § 37.2206(2).

75.  Under Michigan law's reinterpretation of "sex" discrimination, the Notice Clause prohibits St. Joseph Parish from:

a.  Publicly posting job openings for its Parish office or school because those postings explain that all St. Joseph job openings require applicants to be practicing Catholics who agree to abide by the Diocesan Code of Conduct and related policies.

b.  Asking applicants whether they are Catholic and whether they agree to abide by and uphold the Catholic Church's teachings.

76.  Further, Michigan's civil rights law further prohibits St. Joseph from maintaining a "pattern or practice of discrimination." MCL § 37.2605(1).

77.  St. Joseph's written and unwritten policies of hiring only people who agree with, affirm, and follow the Parish's religious beliefs, and of requiring employees to affirm the religious beliefs on an annual basis, may constitute—in Michigan's view—a "pattern and practice" of discrimination in violation of the Employment and Notice Clauses under Michigan law.

78.  As described above, the Employment and Notice Clauses interfere with St. Joseph's ability to uphold and hand down its Catholic faith.

79.  This interference comes even while the Employment and Notice Clauses make several exemptions.

80.  For example, they contain exemptions for certain instances in which age discrimination is permitted and complete exemptions when the employer and employee are family. *See, e.g.,* MCL § 37.2404 (MCL § 37.2202(2) ("This section does not prohibit the establishment or implementation of a bona fide retirement policy or system that is not a subterfuge to evade the purposes of this section."), MCL § 37.2211 (exempting

"bona fide seniority or merit system"), MCL § 37.2202(3) ("This section does not apply to the employment of an individual by his or her parent, spouse, or child.").

81. And the Department may make individualized exemptions for employers who "apply to the commission for an exemption" and make a "sufficient showing" "that religion, national origin, age, height, weight, or sex" or sexual orientation or gender identity "is a bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise." MCL § 37.2208.

82. St. Joseph has not applied for such an exemption. But its constitutional rights don't turn on asking for one. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021) ("misapprehends the issue" to argue that "the Commissioner has never granted" a certain exception; "[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable.").

## Michigan's redefinition of "sex" infringes on St. Joseph's ability to enforce a code of conduct requiring students to abide by Catholic Church teachings at school

83. Michigan law similarly threatens to restrict St. Joseph's ability recruit and select students based on agreement with Catholic religious

beliefs and adherence to conduct requirements consistent with those be-
liefs.

84.  The ELCRA's Education Provision makes it unlawful for "educa-
tional institution[s]," which includes private elementary schools, to
"[e]xclude, expel, limit, or otherwise discriminate against an individual
seeking admission as a student or an individual enrolled as a student in
the terms, conditions, or privileges of the institution, because of religion,
race, color, national origin, or sex." MCL § 37.2402.

85.  Michigan law similarly prohibits schools "[f]or purposes of admis-
sion only, [to] make or use a written or oral inquiry or form of application
that elicits or attempts to elicit information concerning the religion, race,
color, national origin, age, sex, or marital status of a person." MCL §
37.2402.

86.  And Michigan law makes it unlawful to "[p]rint or publish or cause
to be printed or published a catalog, notice, or advertisement indicating
a preference, limitation, specification, or discrimination based on the re-
ligion, race, color, national origin, or sex of an applicant for admission to
the educational institution." MCL § 37.2402.

87.  Michigan law exempts "religious educational institution[s]" from the "provisions of section 402 *related to religion*," MCL § 37.2403 (emphasis added), but not from the provisions of section 402 (MCL § 37.2402) related to "sex," which the Department and Attorney General have interpreted to include sexual orientation and gender identity.

88.  Michigan law also exempts "a private educational institution not exempt under section 403, which now or hereafter provides an education to persons of 1 sex" from "the provisions of section 402 relating to sex." MCL § 37.2404.

89.  Michigan law also allows public schools to maintain single-gender programs without violating the ELCRA. MCL § 37.2404a ("This article does not prohibit the board of a school district or intermediate school district or the board of directors of a public school academy from establishing and maintaining a single-gender school, class, or program within a school"); MCL § 380.475 ("[T]he board of a first class school district may establish and maintain a school, class, or program within a school in which enrollment is limited to pupils of a single gender").

90. As interpreted by Defendants, the Education Provision prohibits St. Joseph Parish from:

a.   Requiring that students and families not only agree with St. Joseph's Catholic beliefs, but agree to abide by those beliefs in word and deed.

b.   Asking prospective students and families questions about their adherence to Catholic Church teaching, especially regarding marriage, family, and human sexuality, necessary to determine whether applicants and their families are willing and able to abide by St. Joseph's "Family – School Agreement."

c.   Including in promotional materials for St. Joseph's School information about the expectations and requirements St. Joseph has for students and families who seek to join its religious community.

d.   Maintaining and enforcing the Policy and Code of Conduct, which require students and families to conduct themselves in accordance with Catholic teaching.

e. Maintaining and enforcing the Policy and Code of Conduct, which require the School to have different standards of dress, address, and separate bathrooms, locker rooms, and sports teams for girls and boys.

**Michigan aggressively enforces its laws with severe penalties.**

91. Charged with the responsibility of investigating and enforcing Michigan's civil rights law, the Commission and the Department have several ways in which they can prosecute potential violators.

92. One way is simply seizing on the fact that an entity asked for an individual accommodation. That fact alone can trigger an investigation.

93. Another way is for either the Department, the Commission, the Director, or any of their agents to initiate and file a complaint on their own authority. MCL § 37.2602(c); MDCR Rule 37.4(2).

94. In addition, "[a]ny person claiming to be aggrieved by unlawful discrimination" may file a complaint with the Department. MDCR Rule 37.4(1).

95. "Person" includes individuals, associations, advocacy organizations, legal or commercial entities, and Michigan, its subdivisions, and its agencies. MDCR Rule 37.2(m).

96. The Department and Commission may also pursue cases alleging discrimination based on a policy or a "pattern or practice of discrimination." MCL § 37.2605(1); *Whirlpool Corp. v. C.R. Comm'n*, 390 N.W.2d

31

625, 626, 628-29 (Mich. 1986). This can happen even when a lawsuit alleging the same would be "technically moot."; *Whitman v. Mercy-Mem'l Hosp.*, 339 N.W.2d 730, 731 (Mich. Ct. App. 1983).

97.  Once the Department receives a complaint, a burdensome investigation begins. *See* MCL § 37.2602(c).

98.  The investigation is itself adversarial, as the Department would prosecute any charge on the complainant's behalf.  *See* MDCR Rule 37.12(6).

99.  If liability is found, substantial damages can be awarded for mental distress, "humiliation, embarrassment, outrage, disappointment, and other forms of mental anguish that result [from] discrimination"—with only the complainant's testimony as evidence. *Mich. Dep't of C.R. v. Suburban Mobility Auth. for Regional Transp.*, No. 325610, at 3 (Mich. C.R. Comm'n May 25, 2012) ($150,000 for mental and emotional distress); *Mich. Dep't of C.R. v. Royalwood Coop. Apartments, Inc.*, No. 268485, at 4 (Mich. C.R. Comm'n Feb. 2, 2004) ($58,000 in attorney's fees and costs).

100.    Nor has the Department and the Commission waited for the Michigan Supreme Court to include sexual orientation and gender identity within Michigan's civil rights law.

101.    On information and belief, between May 2018 and December 2019, the Department and the Commission received, investigated, and processed 73 complaints alleging sexual orientation and gender-identity discrimination. This occurred despite neither Michigan nor federal civil rights law supporting their legal position at the time. See *Barbour v. Dep't of Soc. Servs.*, 497 N.W.2d 216, 217-18 (Mich. Ct. App. 1993) ("discrimination based upon a person's sexual orientation is not an activity proscribed by the act").

102.    For the fiscal year ending in 2023, the Department and the Commission have a $7 million budget to investigate and prosecute complaints. Executive Budget Bill FY 2023-2024 36 (2022), *available at* https://perma.cc/TGU3-UYLF.

103.    The ELCRA also permits any person alleging a violation of the law to file a civil action for injunctive relief, damages, and attorney fees and costs in an appropriate circuit court. MCL § 37.2801(1)-(2).

104.    St. Joseph does not have an adequate monetary or legal remedy for the loss of its constitutional rights.

105.    Unless Defendants are enjoined, St. Joseph will continue to suffer irreparable harm.

33

## CLAIMS

### Count I
### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Church Autonomy

106.    St. Joseph incorporates by reference all preceding paragraphs.

107.    Under the Free Exercise and Establishment Clauses of the First Amendment, religious groups—including churches and their schools—have a "sphere" of "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). This autonomy gives churches the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952). And it protects religious schools from the "entanglement . . . and denominational favoritism" that follow when the government "scrutiniz[es] whether and how a religious school pursues its educational mission." *Carson v. Makin*, 142 S. Ct. 1987, 2001 (2022); *see also Hosanna-Tabor v. EEOC*, 565 U.S. 171, 200-201 (2012) (Alito, J., concurring) (explaining that a religious

school's "very existence is dedicated to the collective expression and propagation of shared religious ideals").

108.    St. Joseph is a church with its own parish school. In both roles, it is tasked with making decisions of internal governance, religious formation, and the application of Catholic teachings.

109.    Michigan's redefinition of "sex" infringes on St. Joseph's First Amendment right to govern itself according to religious principles, frame its policies and doctrine, create and maintain a parish and school environment that is faithful its religious beliefs, and to select its employees according to those religious principles without government interference. This violates the Religion Clauses. *See Our Lady*, 140 S. Ct. at 2060.

110.    Moreover, this redefinition of "sex" means that the Commission, the Department—and inevitably federal and Michigan courts—will be sitting in judgment of "whether and how [St. Joseph's] purses its educational mission" at its parish school. *See Carson*, 142 S. Ct. at 2001.

111.    Defendants are persons within the meaning of 42 U.S.C. § 1983.

112.    Absent injunctive and declaratory relief, St. Joseph will be irreparably harmed.

**Count II**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**General Applicability**

113.    Plaintiffs incorporate by reference all preceding paragraphs.

114.    "A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022) (quoting *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021)).

115.    The first sign of lacking general applicability—when other exemptions that undermine the government's interest exist—is triggered "whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).

116.    The second sign of lacking general applicability—a mechanism for individualized exemptions—is triggered simply by the existence of that system, "regardless whether any exceptions have been given." *Fulton*, 141 S. Ct. at 1879; *see also Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 734 (6th Cir. 2021) ("The University's policy says it evaluates

36

whether to grant religious exemptions 'on an individual basis,' thereby rendering the policy not generally applicable regardless of whether the University has granted any exemptions.").

117.    If either sign of lacking general applicability is triggered, the government's policy "must run the gauntlet of strict scrutiny." *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012).

118.    As construed by the Department and Attorney General, the ELCRA gives Defendants discretion to grant exemptions from the ELCRA's requirements and categorically exempts certain organizations and individuals from the ELCRA's requirements for secular but not religious reasons.

119.    The ELCRA's Employment and Notice Clauses, as well as the Education Provision are therefore subject to strict scrutiny.

120.    Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise in order to further their interests.

121.    Defendants are persons within the meaning of 42 U.S.C. § 1983.

122.     Absent injunctive and declaratory relief against Defendants,

St. Joseph will be irreparably harmed.

## Count III
## 42 U.S.C. § 1983
## Violation of the First Amendment to the U.S. Constitution
## Free Exercise Clause
## Status and use discrimination

123.     Plaintiffs incorporate by reference all preceding paragraphs.

124.     The Free Exercise Clause "protect[s] religious observers

against unequal treatment." *Trinity Lutheran Church of Columbia, Inc.

v. Comer*, 137 S. Ct. 2012, 2019 (2017). This includes the "basic principle"

that the government may not bar "participat[ion] in a . . . benefit pro-

gram" based on an applicant's religious "status," *id.* at 2019-22, or "exer-

cise," *Carson*, 142 S.Ct. at 1998; *see also Espinoza v. Mont. Dep't of Rev.*,

140 S.Ct. 2246, 2255-56 (2020). In other words, if "a wide range of" or-

ganizations can participate in a public benefits program, but religious

ones are excluded—either because of the organization's religious "status"

or because of "religious 'uses' of public funds," then the exclusion is un-

constitutional. *Carson*, 142 S. Ct. at 1998 ("Neither of these formal dis-

tinctions suffices to distinguish [earlier cases] or to affect the application

of the free exercise principles outlined above.").

125.    Here, Michigan's redefined understanding of "sex" discrimination could exclude St. Joseph from the Clinton County RESA program—as well as other public benefits programs—because St. Joseph may use those program resources consistent with the now-illegal, Catholic understanding of sex discrimination. Simply for being a Catholic school in word and in deed, RESA teachers or staff could, for example, file complaints with Clinton County, the Commission, or the Department of Civil Rights to investigate whether St. Joseph has violated ELCRA, and correspondingly, lose its access to RESA benefits. *See, e.g.*, https://perma.cc/PHE7-84GA ("Any person suspecting a discriminatory practice should contact the Special Education Director [giving contact information].") St. Joseph is therefore forced to choose between accessing needing RESA teachers and support staff and upholding Catholic teachings on human sexuality with its school faculty and staff.

126.    The same choice confronts St. Joseph every time it contracts with an organization to use its gym and outdoor fields (and may not want to use locker rooms in accordance with an individual's biological sex), rent out parish spaces, or when its affiliated Knights of Columbus facility is used for events open to all.

127.     Putting St. Joseph to this choice is unconstitutional under *Carson*, *Espinoza*, and *Trinity Lutheran*.  But it is the necessary result of redefining "sex" discrimination under ELCRA to make Catholic teachings illegal. And absent injunctive and declaratory relief against Defendants, St. Joseph will be irreparably harmed by being forced to make that choice.

128.     Defendants are persons within the meaning of 42 U.S.C. § 1983.

**Count IV**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Speech Clause**

129.     Plaintiffs incorporate by reference all preceding paragraphs.

130.     "[T]he fundamental rule of protection under the First Amendment [is] that a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Bos.,* 515 U.S. 557, 573 (1995). To that end, the judiciary "must give deference to an association's view of what would impair its expression." *Boy Scouts of America v. Dale*, 530 U.S. 640, 653 (2000).

131.    St. Joseph engages in speech and expressive association by hiring employees who share its religious beliefs and by ensuring that employees, students, and families do not take actions which are contrary to its religious beliefs and teaching.

132.    The ELCRA, as interpreted by Defendants, would require St. Joseph to speak a message contrary to its beliefs and to associate with others in a way that is contrary to its religious beliefs and message.

133.    The ELCRA's prohibition on various "statements" means that St. Joseph's job postings and agreements with faculty, staff, parents, and students to uphold its Catholic identity have "expressive character"— making it "apparent that [Defendants'] application of the statute ha[s] the effect of declaring"  St. Joseph's "speech itself to be [a] public accommodation." *Hurley*, 515 U.S. at 573. This is well beyond Michigan's police power, and violates St. Joseph's freedom of speech.

134.    St. Joseph's speech and expressive association are, and will continue to be, chilled by Defendants' actions and the threat of enforcement.

135.    Defendants are persons within the meaning of 42 U.S.C. § 1983.

136.     Absent injunctive and declaratory relief, St. Joseph will be irreparably harmed.

## Count V
## 42 U.S.C. § 1983
## Violation of the First Amendment to the U.S. Constitution
## Free Speech & Assembly Clauses

137.     Plaintiffs incorporate by reference all preceding paragraphs.

138.     St. Joseph assembles with others for the purpose of speech and religious exercise that furthers its Catholic faith, not the zeitgeist. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) ("Freedom of association . . . plainly presupposes a freedom not to associate."); *see also Hosanna-Tabor*, 565 U.S. at 200-01 (Alito, J., concurring) (religious school's "very existence is dedicated to the collective expression and propagation of shared religious ideals").

139.     The ELCRA, as interpreted by Defendants, would require St. Joseph to assemble with those who do not share its religious beliefs, or prohibit it from assembling with those who do share its religious beliefs. But engaging in expressive activity that would be transformed by forced inclusion is exactly what the freedom of association prohibits. *See Dale*, 530 U.S. at 643, 658-69.

42

140.     St. Joseph's speech and assembly rights are, and will continue to be, chilled by Defendants' actions and the threat of enforcement.

141.     Defendants are persons within the meaning of 42 U.S.C. § 1983.

142.     Absent injunctive and declaratory relief, St. Joseph will be irreparably harmed.

## PRAYER FOR RELIEF

Wherefore, St. Joseph requests that the Court:

a.     Declare that the First and Fourteenth Amendments to the United States Constitution protect St. Joseph's ability to maintain religious policies and codes of conduct for employees, students, and families.

b.     Issue preliminary and permanent injunctions prohibiting Defendants from enforcing the ELCRA in a manner that would require the St. Joseph to hire employees who do not share its beliefs, to make—or refrain from making—statements contrary to its religious teachings, or to use its goods, services, facilities, privileges, advantages, or accommodations that are extended, offered, sold, or otherwise made available to the public in a manner that would violate its religious autonomy rights.

43

c.   Issue preliminary and permanent injunctions prohibiting Defend-

ants from enforcing the ELCRA in a manner that would require the St.

Joseph to admit students or administer its school in any manner that

would violate its religious autonomy rights.

d.   Award St. Joseph's the costs of this action and reasonable attor-

ney's fees.

e.   Award such other and further relief as the Court deems equitable

and just.

Dated: December 5, 2022

Respectfully submitted,

s/ William J. Haun
Lori H. Windham
William J. Haun
Nicholas R. Reaves
The Becket Fund for Religious Liberty
1919 Penn. Ave. NW, Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

William R. Bloomfield (P68515)
Catholic Diocese of Lansing
Lansing, Michigan 48933-1122
(517) 342-2522
wbloomfield@dioceseoflansing.org

*Counsel for Plaintiff*