# Exhibit 1

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ST. JOSEPH PARISH ST. JOHNS,

    *Plaintiff,*

    v.

DANA NESSEL, in her official capacity as Attorney General of Michigan; JOHN E. JOHNSON, JR., in his official capacity as Executive Director of the Michigan Department of Civil Rights; POR-TIA L. ROBERSON, ZENNA FA-RAJ ELHASON, GLORIA E. LARA, REGINA GASCO-BENT-LEY, ANUPAMA KOSARAJU, RICHARD CORRIVEAU, DAVID WORTHAMS, and LUKE R. LONDO, in their official capacities as members of the Michigan Civil Rights Commission,

    *Defendants.*

Civil No.  1:22-cv-1154

**SECOND AMENDED COMPLAINT**

1

## INTRODUCTION

1.    St. Joseph Catholic Church ("St. Joseph") is a Catholic parish in the Roman Catholic Diocese of Lansing, located in St. Johns, Michigan. The parish's roots go back to 1857, beginning with Mass in a village home that blossomed into a full parish by 1871. It is the only Catholic Church in St. Johns, Michigan—making it the spiritual home to around 900 Catholic families in the area. Here, these families receive access to the Sacraments, formation in the faith, and religious education.

2.    Since 1924, St. Joseph has operated an elementary school, called St. Joseph Catholic School, to provide children in the St. Johns area with a Catholic education.

3.    Crucial to St. Joseph's ability to advance its religious mission is its employment of teachers and staff who support and advance that mission. Accordingly, St. Joseph must retain its ability to ensure its employees, volunteers, students, and parishioners uphold its Catholic identity.

4.    Like Catholic schools around the country, St. Joseph Catholic School asks all teachers to uphold Catholic teachings in word and deed. This requirement is rooted in Catholic theology, which calls on teachers

to "reveal the Christian message not only by word but also by every gesture of their behaviour." *The Catholic School*, Sacred Congregation for Catholic Education, ¶ 43 (1977), https://perma.cc/8QLY-XHRZ. At St. Joseph, this requirement is regularly communicated to teachers and staff in employment contracts, faculty handbooks, the hiring process, and a code of ethics.

5.    In a series of actions culminating in a Michigan Supreme Court decision from July 2022, the Michigan Attorney General, the Michigan Department of Civil Rights, and the Michigan Civil Rights Commission (collectively, "Defendants") reinterpreted the Elliott-Larsen Civil Rights Act ("ELCRA") such that provisions that previously prohibited conduct based only on biological sex now also apply to distinctions made based on sexual orientation and gender identity. *See Rouch World, LLC v. Dep't of C.R.*, No. 162482, 2022 WL 3007805, at *15 (Mich. July 28, 2022).

6.    As the Michigan Supreme Court explained, Defendant Michigan Civil Rights Commission concluded in 2018 that it "would itself be discriminatory" to continue understanding "sex" as distinct from sexual orientation and gender identity. *Rouch World*, 2022 WL 3007805, at *4 (cleaned up).

3

7.    On March 17, 2023, Michigan Governor Gretchen Whitmer signed into law an amendment to the Elliott Larson Civil Rights Act ("ELCRA" or "Michigan's civil rights law") that codified Defendants' reinterpretation of the ELCRA, adding "sexual orientation" and "gender identity or expression" to the ELCRA's list of protected characteristics. MCL §§ 37.2102-2103, 37.2202, 37.2203-2205, 37.2206-2207, 37.2209, 37.2301-2302a, 37.2402, 37.2501-2502, 37.2504-2506, as amended by 2023 Mich. Pub. Acts 6. https://perma.cc/G36K-Y3FX.

8.    This amendment to the ELCRA, as Attorney General Nessel explained when the Bill was introduced, is intended to "enshrine" the holding from *Rouch World* into Michigan law "to help [it] withstand future legal attacks." This is "imperative," according to Nessel, because "high courts have succumbed to political pressure and overturned long-standing and even court-tested decisions like Roe v. Wade[.]" Press Release, AG Nessel, Statement from Michigan Attorney General Dana Nessel on the Proposed Expansion of the Elliot-Larsen Civil Rights Act (Jan. 11, 2023), https://perma.cc/AT64-ND55.

9.    The amended ELCRA, however, does not contain a religious exemption that would cover St. Joseph's hiring decisions, the enforcement

of its code of conduct, or its religious decisions at the school or parish. MCL §§ 37.2102-2103, 37.2202, 37.2203-2205, 37.2206-2207, 37.2209, 37.2301-2302a, 37.2402, 37.2501-2502, 37.2504-2506, as amended by 2023 Mich. Pub. Acts 6. *See, e.g.*, *Rouch World*, 2022 WL 3007805, at *43 (Viviano, J., dissenting) (contrasting the ELCRA with Title VII).

10.  Instead, the legislature pursued—contrary to the approach taken in 22 other States and dismissive of the requests of a broad coalition of religious groups—a maximalist approach in amending the ELCRA that applies "sexual orientation" and "gender identity or expression" nondiscrimination requirements to religious employers like Plaintiff.

11.  The amended ELCRA therefore threatens St. Joseph's freedom to continue its religious mission of cultivating a Catholic community faithful to Church teaching in both word and deed.

12.  That's because the ELCRA's broad provisions impose overlapping non-discrimination requirements on St. Joseph—as an educator, as an employer, and as a public accommodation.

13.  Michigan's newly amended civil rights law therefore makes it unlawful for St. Joseph to follow the 2,000-year-old teachings of the Catholic Church, including its teaching that marriage is a lifelong commitment

between one man and one woman, that sexual relations are limited to marriage, and that human beings are created as either male or female.

14.  The amended ELCRA also poses an imminent threat to St. Joseph. For the upcoming academic year, St. Joseph's school needs to hire a new first-grade teacher. And St. Joseph's parish has discovered that some of its children who are not in the parish school need help learning to read, and it plans to hire tutors as a service to the parish children that are preparing for Sacraments. The parish also needs a faith formation director. But despite these needs, the risk of liability has led St. Joseph to hold off on hiring or expanding its services, while having to restructure its teacher hiring process to protect the school's Catholic identity when confronted with secular challenges.

15.  The amended ELCRA is thereby chilling St. Joseph's normal religious expression. Start with advertising these openings. Were St. Joseph to issue its standard hiring advertisement for its first-grade teacher opening, that advertisement would note—as they have in the past—that applicants must be "practicing Catholic[s] with the ability to infuse Catholic faith and teaching throughout the curriculum." Ex. A. And that new teacher, or any new St. Joseph employee—including new tutors or school

aides—would be required to abide by St. Joseph's code of conduct and to agree to "not teach, advocate, model, or in any way encourage beliefs or behaviors that are contrary to the teaching of the Catholic Church." Ex. B. But St. Joseph is holding off on hiring, as this can't be done under the amended ELCRA.

16. In January 2023, the Diocese of Lansing issued hiring guidelines for its Catholic schools. Ex. C. The comprehensive process aims to preserve "a vision for Catholic schools" "[i]n the wake of a secular culture." *Id.* at 4. St. Joseph's ability to follow this vision and make internal religious decisions is chilled by the amended ELCRA.

17. St. Joseph is also reviewing applications for new families seeking to send their children to its school. And families at St. Joseph Catholic School enter a "Family – School Agreement." This agreement requires, among other things, that parents and students agree "to live their lives in a way that supports, rather than opposes, the mission of our school and our faith beliefs." Ex. D. Similarly, the Diocese of Lansing's Family-School Agreement requires a child's legal guardian(s) to pledge "full cooperation with the school to prepare our child(ren) to be disciple(s) of Jesus Christ," including "supervis[ing] our child(ren)" to ensure "a Catholic-

based education to our child(ren)." *Diocesan Family-School Agreement*, Diocese of Lansing, https://perma.cc/Z9YB-N38Z. Yet none of this can be done without violating Michigan's amended ELCRA.

18. Also at stake is St. Joseph's ability to rent its facilities and whether it can conduct parish activities open to all without being held liable as a public accommodation. These concerns extend to St. Joseph's gymnasium and soccer fields, its public Masses and faith formation activities, and its desire to invite private tutors onto the property for its parish students.

19. Further still, St. Joseph's freedom to participate on equal footing in public programs is at risk too. St. Joseph uses St. Johns Public Schools staff to teach classes at its school via "shared time" arrangements, and the Clinton County Regional Educational Service Agency ("CCRESA" or "RESA") provides St. Joseph with other special services to its students. But under the amended ELCRA, St. Joseph could be excluded from such programs due to its religious beliefs on human sexuality.

20. Finally, St. Joseph is chilled by Defendants' efforts to aggressively advance this new theory of "sex" discrimination. Consider two (of several) recent actions. First, new regulations from the Michigan Civil Rights

Commission show that Defendants are poised for aggressive prosecution. Around January, the Commission announced new regulations. These regulations: (1) make it easier to file complaints, (2) would limit to five years any BFOQ exemption to the ELCRA's discrimination provisions; and (3) would allow a majority of Commissioners to "revoke" any granted exemption within 21 days of its issuance. Ex. E at 7. Second, Attorney General Nessel and the Commission encouraged the Michigan legislature to "enshrine" into statute the *Rouch World* decision without any religious accommodation. As the Commission explained, the expansion of the ELCRA should be passed "without any amendments that would seek to reduce their scope or impact." Ex. F. This is exactly what happened. The Michigan legislature—breaking from the practice in at least 22 other States—refused to include any religious accommodations in its March 2023 amendment to the ELCRA.

21.  St. Joseph's religious decisions regarding how to advance its mission and ministry are protected by the First and Fourteenth Amendments to the U.S. Constitution. Michigan cannot force the Catholic Church to compromise its religious character simply as a function of its doors being open to all.

9

## IDENTIFICATION OF PARTIES

22.  Plaintiff St. Joseph Parish St. Johns is a Michigan nonprofit corporation with charitable and religious purposes. St. Joseph St. Johns operates St. Joseph Catholic School in St. Johns, Michigan.

23.  Dana Nessel is Attorney General of Michigan and has the authority to administer, enforce, and prosecute Michigan's criminal laws, including the amended ELCRA. MCL §§ 761.1(r), 767.40.

24.  Attorney General Nessel also represents the Michigan Department of Civil Rights and Michigan Civil Rights Commission in any lawsuit filed under Michigan's civil rights law. MCL § 37.2602(b).

25.  John E. Johnson, Jr., is the Executive Director of the Department and is responsible for executing the Commission's policies. MCL § 37.2602(a).

26.  Director Johnson has authority to receive, initiate, investigate, and file complaints alleging violations of Michigan's civil rights law and administers, enforces, and prosecutes the law. *See, e.g.,* MCL §§ 37.2602, 37.2603; MDCR Rules 37.4(2), 37.12, 37.16.

27.  Portia L. Roberson, Zenna Faraj Elhasan, Gloria E. Lara, Regina Gasco-Bentley, Anupama Kosaraju, Richard Corriveau, Luke Londo, and David Worthams are members of the Commission.

28.  Commissioners have authority to initiate and file complaints alleging violations of Michigan's civil rights law and administer, enforce, and prosecute the law. *See, e.g.*, MCL § 37.2601.

29.  The Attorney General, Department, and Commission have offices in Grand Rapids.

30.  All Defendants are named in their official capacities.

### JURISDICTION AND VENUE

31.  This action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

32.  This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

33.  This Court has authority to award the requested (1) declaratory relief under 28 U.S.C. §§ 2201-02 and Fed. R. Civ. P. 57; (2) injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and (3) costs and attorneys' fees under 42 U.S.C. § 1988.

34.  Venue is proper here under 28 U.S.C. § 1391(b) because the events and omissions giving rise to the claims substantially occur within the Western District of Michigan; the effects of the challenged laws are felt here; Plaintiff resides in this district; Defendants can and do perform official duties here; and Defendants reside here.

## FACTUAL ALLEGATIONS

### St. Joseph Parish and School

35.  St. Joseph Parish is a Michigan nonprofit corporation in the Roman Catholic Diocese of Lansing and subject to the authority of the Bishop of Lansing. St. Joseph's earliest roots trace back to 1857, beginning with Mass in a village home, and its school opened in 1924. Today, St. Joseph has around 900 registered families.

36.  As a parish of the Diocese of Lansing, St. Joseph is "a sacramental community of Christians guided by the Holy Spirit." *Welcome,* St. Joseph Catholic Church, https://perma.cc/ZN52-NL88. As part of its mission statement, St. Joseph affirms that it is "called to worship God and proclaim God's Word by living the Good News of Our Lord Jesus Christ" and to "accept the responsibility to serve, rather than be served, in our parish, community, and beyond." *Id.*

37. As part of the parish community, St. Joseph operates St. Joseph Catholic School. St Joseph Catholic School enrolls just under 200 students each year between kindergarten and sixth grade.

38. St. Joseph Catholic School believes "that a relationship with God should be fully integrated into the life of every student." *See Mission Statement and Pledge,* St. Joseph Catholic School, https://perma.cc/48Q8-EM7F. The school operates "to assist parents in the spiritual, social, and intellectual development of their child within the framework of Catholic teachings and moral values." *Id.* The school's pledge, which is recited daily by the entire school, includes a "promise to live my life today knowing that God surrounds me and all those I meet," to "do my best to see Christ in all people and treat them with respect and dignity," and to "answer the call to reach out to those in need and to be a light for the Kingdom." *Id.*

39. In addition to the school pledge, faith and education are interwoven in a variety of ways. The Catholic faith is interspersed throughout the classroom curriculum. For example, "[s]tudents have an opportunity to attend Mass weekly," while "[a]ll-school Masses for grades K-6 are planned for First Fridays, holy days, and other special occasions." *Mass*

13

*and Daily Prayer,* St. Joseph Catholic School, https://perma.cc/2Z28-H3CB. "Monthly, each classroom spends time with the Blessed Sacrament during the parish's First Friday Eucharistic Adoration." *Id.* "[S]tudents also take part in seasonal prayer celebrations such as Stations of the Cross, May Crowning, and praying the Rosary." *Id.*

40.  In accordance with the Diocese of Lansing, and in keeping with its Catholic identity, St. Joseph requires parish and school staff to affirm the tenants of the Catholic faith. Every employee at St. Joseph—from kindergarten teachers to part-time bookkeepers—must be practicing Catholics. The Diocese of Lansing's Code of Conduct further requires that employees must "exemplify the moral teachings of the Catholic Church" and "not teach, advocate, model, or in any way encourage beliefs or behaviors that are contrary to the teaching of the Catholic Church," which includes the Church's teaching on gender, sexuality, and marriage between one man and one woman. Ex. B.

41.  In addition, every family that sends a child to St. Joseph Catholic School must enter a "Family – School Agreement" in which parents affirm:

[T]his is a Catholic value-based program that shares and fosters the seeds of our faith in the lives of our student body. Parents whose religious practices and beliefs do not align to Church teaching might experience conflicts as we follow our mission. We welcome opportunities to answer your questions and expand your understanding of our faith, but openly hostile or persistent defiance of Catholic truths or morality are a violation of what our school stands for. We expect our families to live their lives in a way that supports, rather than opposes, the mission of our school and our faith beliefs.

Ex. D at 3-4.

42.  As a Catholic parish within the Diocese of Lansing, St. Joseph is obligated to comply with and uphold the teachings and requirements set forth by the Diocese.

43.  These include Bishop Boyea's *Policy on the Human Body as a Constitutive Aspect of the Human Person* (the Policy). Ex. G. This policy was put in place by the Diocese of Lansing following the February 2019 document issued by the Congregation for Catholic Education entitled *Male and Female He Created Them: Towards a Path of Dialogue on the Question of Gender Theory in Education.*

44.  In light of the Catholic Church's clear guidance on this issue, the Diocese released both the Policy and the *Theological Guide: The Human Person and Gender Dysphoria*, to help guide the faithful and ensure the flock understands the Catholic Church's teaching on human sexuality. Ex. H.

45.  The Policy requires, among other things, that "all Catholic parishes, schools, . . . and any subdivision thereof, shall respect the biological sex of the human person as given by God and shall apply all policies and procedures in relation to that person according to that person's God-given biological sex." Ex. G.

46.  The Policy further requires that "[s]tudents [who attend Diocesan schools] and [their] parents (or legal guardians) shall conduct themselves in accord with their God-given biological sex." Ex. G.

47.  St. Joseph complies fully with the Policy and its requirements.

48.  In January 2023, the Diocese of Lansing updated its guidelines for hiring Catholic school teachers. Ex. C. These guidelines apply to all teachers St. Joseph would hire, including the first-grade teacher it plans to hire before the upcoming academic year.

49.  The Diocese updated these guidelines in response to the growing hostility to Catholic beliefs in Michigan. Ex. C at 4; *see also, e.g.*, *Buck v. Gordon*, 429 F. Supp. 3d 447, 467 (W.D. Mich. 2019) ("These statements [from Attorney General Nessel] raise a strong inference of a hostility toward a religious viewpoint."); *St. Vincent Catholic Charities v. Ingham Cnty. Bd. of Comm'rs*, No. 1:19-cv-01050 PageID.2096 (W.D. Mich. Mar. 7, 2022), ECF No. 74 ("[T]he Board has singled out St. Vincent . . . to punish St. Vincent for its religious beliefs.").

50.  Under the updated guidelines, hiring teachers is a seven-step process, with Catholic identity being a key feature of every stage. For example, any candidate called for an in-person interview will be presented with a "morality clause" that says, "I will uphold the teachings of the Catholic Church in my public and private life." Ex. C at 13. The interviewer is to "[a]sk, if hired, would you be able to uphold this clause?" *Id.* The "[f]inal decision [is made] by [the] principal and pastor." *Id.* at 6.

51.  Moreover, "[t]he hiring process needs to be systematic and consistent across applicants." Ex. C at 6. So whether St. Joseph is hiring (as it soon must) a first-grade teacher (whose tasks include teaching religion)—or hiring aides to classrooms, the library, the playground, before

school care, computer technology, lunch, or the front office—every one of them must sign a Diocesan agreement specifying that their behavior must be consistent with Catholic teaching.

52. In its educational activities, St. Joseph teaches and practices that men and women, boys and girls, should be treated according to their biological sex, including in dress, personal pronouns, participation in sports teams, and use of bathrooms, locker rooms, or other single-sex spaces.

53. This is the expectation for the public-school teachers "[p]rovided through shared time with St. Johns Public Schools." *See Faculty and Staff – 2021-22,* St. Joseph Catholic School, https://perma.cc/H8BA-WZP3. It would also be the expectation for the private tutors that St. Joseph's parish is looking to recruit by September for the public-school students that attend its parish and need remedial assistance in reading and writing to receive Catholic sacraments. These private tutors would use parish facilities for public school students that need to improve their reading and writing skills. Improving these skills is instrumental in helping a person prepare to receive Catholic Sacraments, such as the Sacrament of Penance. This Sacrament requires a Catholic to know and say an "Act of Contrition." But in the experience of St. Joseph's pastor, some

public-school children at the parish are not able to read at grade-level. They are therefore unable to read this prayer or participate in sacramental preparation. The private tutors would bring these public-school students up to grade-level reading, using St. Joseph's parish facilities and resources.

54.  Similarly, when St. Joseph allows sports teams to use its gymnasium and recreational fields, or when it hosts RESA staff in its school, or when it welcomes all to its public Masses, St. Joseph expects that it can enter these arrangements without surrendering its Catholic identity— and that those who make use of its facilities will respect the Catholic environment.

## Defendants and the Michigan Supreme Court redefine "sex" in the Elliott-Larsen Civil Rights Act.

55.  Before 2018, Michigan civil rights law prohibited, among other things, "discrimination because of religion, . . . sex, . . . or marital status" by employers, places of public accommodation, and educational facilities. MCL § 37.2102(1).

56.  In May 2018, the Commission reinterpreted the law's prohibition on discrimination "because of sex" to include sexual orientation and gender identity.  *See*  Interpretative  Statement  2018-1,

https://perma.cc/U8F8-DHFU. "*The following day,* [the Commission] began accepting and investigating complaints of discrimination on the basis of gender identity and sexual orientation." *See 2018-2019 Annual Report*, Michigan Civil Rights Commission, 13, https://perma.cc/WRQ7-TCR6 (emphasis added).

57.  Those investigations began even as the then-Attorney General of Michigan concluded that the Commission's interpretive statement "is invalid because it conflicts with the original intent of the Legislature as expressed in the plain language of the Act, and as interpreted by Michigan's courts." OAG, 2017-2018, No. 7305, p 76, 2018 WL 3577672 (July 20, 2018). The Commission promptly responded, claiming that it "is not bound by the opinion of the Attorney General" and "[t]he only recourse is for the courts to determine if issuing the interpretive statement was within the scope of the Commission's authority, and that is the appropriate venue for resolving this issue." *See 2018-2019 Annual Report* at 13.

58.  Complaints for sexual orientation and gender identity then skyrocketed. "From the time of the Commission's vote through the end of 2019, [the Michigan Department of Civil Rights] ha[d] taken 73 complaints on the basis of sexual orientation and gender identity." *2018-2019*

*Annual Report* at 13. In 2017, the year before the Commission's interpretive statement, there were 299 complaints of sex discrimination. After "sex" discrimination was expanded to include sexual orientation and gender identity by the interpretive statement, the number increased to 424 in FY2018, 489 in FY2019, 632 in FY2020, 573 in FY2021, and 905 in FY2022—the highest number on record.

59. That height was reached after a five-figure settlement was announced in a "sex" discrimination case in the Commission's 2020-2021 annual report—and after the Commission began investigations of two businesses that operate according to their owners' religious beliefs. Complaint, *Rouch World, LLC v. Mich. Dep't of C.R.*, No. 20-000145 (Mich. Ct. Cl. Aug. 5, 2020).

60. The Michigan Court of Claims held that "sex" includes gender identity but not sexual orientation. *Rouch World, LLC v. Mich. Dep't of C.R.*, No. 20-000145-MZ (Mich. Ct. of Claims Dec. 7, 2020).

61. The Michigan Supreme Court reversed that decision, holding that "discrimination on the basis of sexual orientation necessarily involves discrimination because of sex in violation of [Michigan civil rights law]." *Rouch World*, 2022 WL 3007805, at *11.

21

62. While *Rouch World* did not formally decide that discrimination based on gender identity is proscribed by Michigan's civil rights law, the Commission's Interpretative Statement 2018-1 and the Court of Claims' holding that "sex" includes gender identity remain in place.

63. Although religious beliefs were at issue in *Rouch World*, the Michigan Supreme Court reinterpreted the ELCRA "without any concern for whether that interpretation violates constitutional protections of religious liberty." *Rouch World*, 2022 WL 3007805, at \*43 (Viviano, J., dissenting). This puts all manner of religious exercise under a cloud of potential liability—while putting the ELCRA's judicial expansion under a cloud of constitutional doubt.

64. In particular, Justice Viviano explained that the ELCRA is broader than its federal analogue (Title VII), because it "covers all employers"—regardless of size—and the ELCRA neither "contains exemptions for religious organizations" nor is limited by Michigan "statutory provisions" protecting religious liberty. *Rouch World*, 2022 WL 3007805, at \*43. Thus, the dissenting justice criticized the majority for rewriting the ELCRA before determining "whether [its] interpretation raises grave

constitutional doubts." *Id.* As the U.S. Supreme Court put it when similarly reinterpreting Title VII's "sex" discrimination prohibition, "the promise of the free exercise of religion enshrined in our Constitution . . . lies at the heart of our pluralistic society." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1753-54 (2020).

65.  This determination makes Michigan an outlier, since federal Title VII and most state non-discrimination laws have broad exemptions for religious employers. *See, e.g.*, 42 U.S.C. §§ 2000e-1(a), 2000e-2(e); *see also Bostock*, 140 S. Ct. at 1754 (explaining that "the First Amendment can bar the application of employment discrimination laws" in certain cases and that the Religious Freedom Restoration Act "operates as a kind of super statute, displacing the normal operation of other federal laws, [so] it might supersede Title VII's commands in appropriate cases"); *cf. Ciurleo v. St. Regis Par.*, 214 F. Supp. 3d 647, 652 (E.D. Mich. 2016) ("Plaintiff's claims under the ADEA and the ELCRA are barred by the First Amendment's ministerial exception.").

66.  And like the Department, Attorney General Nessel has also taken the position that anti-discrimination laws that prohibit discrimination

"because of sex" likewise prohibit discrimination based on sexual orientation and gender identity. *See* Br. for Ill. et al. as Amici Curiae in Support of Employees, *Bostock*, 140 S. Ct. 1731 (Nos. 17-1618, 17-1623, 18-107), 2019 WL 2915040, at *3-4. She continues to advocate for that position's maximum application nationwide.

67.  For example, Attorney General Nessel joined a multi-state amicus brief supporting federal guidance documents that would permit, among other things, "[p]olicies that protect transgender students' right to use bathrooms, other facilities, and activities consistent with their gender identity." Br. for Cal. et al. as Amici Curiae at 23, *Tennessee v. Dep't of Educ.*, No. 22-5807 (6th Cir. Dec. 22, 2022), 2022 WL 18027407, at *23. The brief argued that such policies "help to create school climates that enhance all students' well-being and facilitate their ability to learn." *Id.*

68.  At no point has Attorney General Nessel ever suggested that these changes would still permit religious schools or other religious organizations to operate consistently with their religious teachings on human sexuality. Rather, she has said the opposite.

69.  For example, Attorney General Nessel disparaged concerns that this reinterpretation would infringe religious liberty: "People who choose

to demean others or deny them employment, housing, educational opportunities, medical treatment or goods and services simply because of that persons [sic] sexual orientation or gender identity are not religious heroes, they are bigots." Kate Opalewski, *AG Nessel to Reconsider Predecessor's Opinion on LGBTQ Protections*, Pride Source (Feb. 2, 2019), https://perma.cc/D93J-BRV3. Nessel's imputation of bad faith to religious beliefs she dislikes is no isolated incident. *See, e.g.*, *Buck*, 429 F. Supp. 3d at 451 ("[S]he described proponents of [a law to protect religious foster care] as 'hate-mongers' who disliked gay people more than they cared about children."). In addition to expressing hostility toward Catholic beliefs, Attorney General Nessel has also denigrated Catholics and their efforts to reform internal church governance: "If an investigator comes to your door and asks to speak with you, please ask to see their badge and not their rosary." *See, e.g.*, Niraj Warikoo, *Nessel warns Catholic Church: Let state investigate clergy sexual abuse,* Detroit Free Press (Feb. 21, 2019), https://perma.cc/D7YQ-GX5K.

70. What's more, Nessel and the other Defendants argued zealously for the Michigan Supreme Court to hear *Rouch World* and redefine "sex." For example, Nessel and the Department "filed a bypass application in

the Michigan Supreme Court, seeking a prompt review of this matter."
Press Release, AG Nessel, Department of Civil Rights File to Protect Cit-
izens from Sexual Orientation Discrimination Before Michigan Supreme
Court (Oct. 25, 2021), https://perma.cc/FE8Y-DVTV.

71.  Once before the Michigan Supreme Court, Nessel did not dispute
that this redefinition put "sincerely held religious beliefs" about marriage
and sexuality at risk of legal liability. *See* Br. on Appeal at 5-6, *Rouch
World,* No. 162482 (Mich. Oct. 22, 2021), https://perma.cc/2R8L-3HGL.
And Michigan's brief went on to argue that "MDCR properly opened its
investigation into Rouch World's refusal to host a same-sex wedding cer-
emony." *Id.* at 27. That insistence came even after the U.S. Supreme
Court had already upheld the religious freedom rights of those who, for
religious reasons, cannot celebrate a same-sex wedding *See Masterpiece
Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018) ("This
refusal would be well understood in our constitutional order as an exer-
cise of religion, an exercise that gay persons could recognize and accept
without serious diminishment to their own dignity and worth.").

72.  And after *Rouch World*, Nessel celebrated the ruling. She claimed
Michigan should "reject[] the notion that our own civil rights law could

26

be used as a tool of discrimination." Press Release, AG Nessel Prevails in ELCRA Case (Jul. 28, 2022), https://perma.cc/2R8L-3HGL. "Now is the time," Nessel said, that "no person in this state ever experiences barriers to employment, housing, education, or public accommodations and services because of who they are or whom they love." *Id.*

73.  Like Nessel, the Commission also praised *Rouch World*. The decision was a reason for the Commission to congratulate itself for making the "courageous decision" to expand "sex" discrimination in its interpretive statement. *See 2022 Annual Report*, Michigan Civil Rights Comm'n, 22, https://perma.cc/KJC8-7PX3. The Commission said that it "knew the ultimate test could come in the courts" and *Rouch World* was vindication. *Id.*

74.  At the same time, the Commission also said, "we cannot rely on court precedent alone." *2022 Annual Report* at 22. Since *Rouch World*, the Commission significantly changed its complaint process to make it both easier to bring complaints and harder to secure exemptions from the ELCRA's discrimination prohibitions. For example, unnotarized complaints and emailed complaints are now accepted. Ex. E at 2-3.

75.  In addition, any employer seeking a "bona fide occupational qual-ification" (BFOQ) exemption from the ELCRA's discrimination prohibi-tions must re-apply for an exemption at five-year increments. Ex. E at 7. In a similar vein, the Commission also changed its regulations to allow a majority of Commissioners to rescind a granted BFOQ exemption within 21 days of the Commission granting it. *Id.*

## The Michigan legislature enshrines Defendants' reinterpreta-tion of the ELCRA into law.

76.  Beyond these regulatory changes, the Commission (and Nessel) lobbied the Michigan legislature to expressly add sexual orientation and gender identity to the ELCRA—without any religious accommodations. In January 2023, when Michigan's Senate introduced legislation that would add these categories into the ELCRA's discrimination prohibition, the Commission passed a resolution saying this legislation should be passed "without any amendments that would seek to reduce their scope or impact." Ex. F at 2. And Nessel urged passing the legislation "to help [these new prohibitions] withstand future legal attacks." Ex. I.

77.  The Michigan Senate passed this legislation and consistently re-jected calls for religious accommodations. As the lead Senate sponsor put it, "I don't think it is appropriate to allow the government to let religion

discriminate against someone because of their sexual orientation or gen-der identity." Samuel Robison, *Michigan business groups push for LGBTQ+ protections,* Axios Detroit (Feb. 16, 2023), https://perma.cc/QE9W-WL5A. Another Senator, when commenting on a proposed religious accommodation, said "[i]t represents a license to dis-criminate" and "[t]hat's what we've seen from folks time and time again, from folks who have tried to say that they should have a religious exemp-tion from the law that protects people against discrimination, . . . I just think that's fundamentally wrong." Anna Gustafson, *In 'historic' vote, Senate civil rights committee passes bill to protect LGBTQ+ Michigan-ders*, Michigan Advance (Feb. 9, 2023), https://perma.cc/HV3E-8NS4. Other Senators made similar claims, insisting that religious accommoda-tions could be refused because, as one put it, "[d]iscrimination is never okay." *See* Senator Kevin Hertel (@Hertelforsenate), Twitter (Feb. 18, 2023), https://bit.ly/420rqKf.

78. When the Michigan House followed suit, Nessel went and cele-brated on the House floor. The goal of this new legislation, her office ex-plained, was to "solidify[]" *Rouch World*, so its conclusions "cannot be easily overturned by a future court." Press Release, AG Nessel Celebrates

the Expansion of Michigan's Elliot Larsen Civil Rights Act to Protect LGBTQ+ Residents Against Discrimination (Mar. 8, 2023), https://perma.cc/6HYN-WSDL.

79.  On March 16, 2023, Governor Gretchen Whitmer signed this legislation into law. Press Release, Gov. Whitmer Signs Bipartisan Legislation Expanding Rights and Freedoms for LGBTQ+ Michiganders (March 16, 2023), https://perma.cc/GV8T-9D4H.

80.  These amendments to the ELCRA make it unlawful to distinguish on the basis of either "sexual orientation" or "gender identity or expression" in employment, public accommodations, and educational facilities. Sec. 102(1).

81.  The Act defines "[g]ender identity or expression" as "having or being perceived as having a gender-related self-identity or expression whether or not associated with an individual's assigned sex at birth." MCL § 37.2103(f), as amended by 2023 Mich. Pub. Acts 6.

82.  The Act defines "[s]exual orientation" as "an orientation for heterosexuality, homosexuality, or bisexuality or having a history of such an orientation or being identified with such an orientation." Sec. 103 (k).

83. Consistent with Defendants' efforts, the amended ELCRA contains no religious accommodation that would cover St. Joseph's hiring decisions, the enforcement of its code of conduct, or its religious decisions at the school or parish.

84. By adopting Defendants' preferred maximalism, this amendment to the ELCRA confirms the outlier status that *Rouch World* already brought to Michigan: In the 22 States that have legislatively expanded civil rights discrimination prohibitions to include sexual orientation and gender identity, the legislatures protected religious liberty at least in employment. Not Michigan.

## **Michigan's redefinition of "sex" would hold St. Joseph liable as a public accommodation.**

85. Michigan's broad definition of public accommodation could extend to St. Joseph simply because its doors are open to all. *See* MCL § 37.2301(a) (defining public accommodation to include an "institution of any kind . . . whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public").

86.  The ELCRA applies to "the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of . . . sex." MCL § 37.2102(1). And it is illegal for any "public accommodation" to "[d]eny an individual the full and equal enjoyment of [its] goods, services, facilities, privileges, advantages, or accommodations . . . or public service because of . . . sex." *Id*. § 37.2302(a). Because of Michigan's amended ELCRA, St. Joseph could be held liable as a "public accommodation" whenever it opens its facilities to the public.

87.  For example, St. Joseph's church is open to all; anyone—Catholic or not—is free to attend Mass. St. Joseph also participates in sports leagues that make use of its fields and gymnasium, and those leagues are open to all. St. Joseph school participates in "shared time" arrangements for local public-school teachers to teach St. Joseph students in St. Joseph classrooms. And St. Joseph is planning to host private tutors at the parish to help the public-school children that attend its parish get to improve their reading skills as they prepare for Sacraments.

88.  Yet in any of these—or other—situations, St. Joseph may be held liable for "sexual orientation" and "gender identity or expression" discrimination whenever, for example, biologically male students desire to

use the female locker room or play on a female sports team. Or whenever a biological male Mass attendee wants to use the female restroom. Or when a public-school "shared time" teacher, or a private tutor, wants to dress and act inconsistently with his or her biological sex. Or when those same teachers or tutors want to take down the religious imagery where he or she teaches. The same could be true whenever someone would want to host a same-sex wedding at St. Joseph, or have a wedding reception at the Knights of Columbus Hall, with which St. Joseph is related and is only a mile from the parish.

89.  Moreover, the public is free to attend activities on St. Joseph's recreational fields and in its gymnasium—but they would need to be used in accordance with Catholic teaching on human sexuality. The same would be true for the several public events held by St. Joseph's Knights of Columbus chapter at its nearby facility—Lent Fish Fries, Sportsman Raffles, Wine & Cheese Socials, a Tootsie Roll Drive, and more. *See Knights of Columbus,* St. Joseph Catholic Church, https://perma.cc/4WJJ-WC69. At any of these or other events at the Knights of Columbus facility, the same risk of liability exists under Michigan's amended ELCRA.

90. What's more, this statutory amended means that St. Joseph is prohibited from "publish[ing] a statement . . . which indicates" its religious teachings on human sexuality in relation to its "goods, services, facilities, privileges, advantages, or accommodations." MCL § 37.2302(b). Also prohibited are any statements that "indicate[]" "an individual's patronage of or presence . . . is," among other things, "unwelcome" because of St. Joseph's religious teachings on human sexuality. *Id.* Those prohibitions are on top of it being illegal for St. Joseph to "[d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations . . . because of" its views on human sexuality. *Id.* § 37.2302(a).

91. This means St. Joseph is prohibited from making "statements" that "indicate" either (a) St. Joseph's Catholic teachings might limit a person's participation in certain parish activities or (b) statements that "indicate" to someone a perception of being "unwelcome" because of St. Joseph's Catholic teachings. *See* § 37.2302(a).

92. Many "statements" that St. Joseph makes could create that "indicat[ion]." For example, a potential parish volunteer (like a lector, Eu-

34

charistic minister, or altar server) could feel "unwelcome" when St. Joseph asks him to adhere to the moral teachings of the Church in the Diocesan Code of Conduct. Ex. B. The same could happen when St. Joseph interviews candidates for a faith formation director, a new first-grade teacher, private tutors, or school aides. Statements regarding the Church's teachings on homosexuality or transgenderism, whether in the church or in the classroom, may also make a person feel unwelcome. Statements St. Joseph would make to uphold modesty in attire at Mass, based in biological sex, could make someone feel unwelcome. *See, e.g.*, 1 *Timothy* 2:9-10 (RHE) ("In like manner, women also decent in apparel . . . as it becometh women professing godliness, with good works."). Further, St. Joseph's refusal to make a requested statement—like approving a biological female as a "Godfather" or a biological male as a "Godmother"—could also make someone feel unwelcome. Michigan's reinterpretation of "sex" threatens St. Joseph with enforcement actions for adhering to these religious obligations and this religious exercise.

**Michigan's redefinition of "sex" could deprive St. Joseph of the right to participate equally in public programs.**

93.  By subjecting St. Joseph to the full force of the amended ELCRA, St. Joseph could be excluded from participating on equal terms with non-

religious agencies for the same public benefits and contracting arrangements.

94.  For example, Clinton County's RESA program—by which St. Joseph obtains needed teacher and staff support at its school—has a "policy" prohibiting "discriminatory practices based on . . . sexual orientation . . . or any other status covered by federal, state or local law" and directing "[a]ny person suspecting a discriminatory practice [to] contact the Special Education Director." *Clinton County RESA,* https://perma.cc/4SLY-CASH.

## **Michigan's redefinition of "sex" interferes with St. Joseph's ability to hire employees based on their willingness to abide by Catholic Church teachings.**

95.  Under Michigan civil rights law, an employer is any person who employs one or more individuals. MCL § 37.2201(a). St. Joseph is therefore an employer under and subject to the law.

96.  There are two clauses in Michigan civil rights law that prohibit employment discrimination: the Employment Clause and the Notice Clause.

97.  Under the Employment Clause, St. Joseph is prohibited from failing or refusing to hire or recruit, discharging, or otherwise discriminating

"against an individual with respect to employment, compensation, or a term, condition, or privilege of employment" because of religion, sexual orientation, and gender identity or expression. MCL § 37.2202(1)(a).

98. The Employment Clause also prohibits St. Joseph from limiting, segregating, or classifying employees or applicants in a way that adversely affects their employment or application status "because of" religion, sex, sexual orientation, marital status, and gender identity or expression. MCL § 37.2202(1)(b).

99. The Employment Clause of Michigan's amended civil rights act prohibits St. Joseph from:

a. Hiring employees who share St. Joseph's Catholic beliefs, who agree to abide by those beliefs by signing the Diocesan Code of Conduct, and who agree to uphold the Policy.

b. Hiring teachers and other employees at St. Joseph Catholic School who agree to abide by the Diocesan Code of Conduct and who agree to uphold the Policy.

c. Making employment-related decisions with respect to current employees based on their continued agreement to abide by the Diocesan Code of Conduct and uphold the Policy.

37

d. Enforcing the Policy in the workplace by conforming to the Code of Conduct and reflecting Catholic teaching in the operation of the Parish and School.

e. Conforming the hiring at St. Joseph to the Diocese's January 2023 guidelines, where there are repeated evaluations of a potential candidate in light of Catholic identity and the candidate's ability to uphold it.

100.  St. Joseph's religious freedom is also unlawfully restricted by the Notice Clause.

101.  Under the Notice Clause, St. Joseph can neither post nor publish a statement related to employment "which indicates a preference, limitation, specification, or discrimination, based on religion, . . . sex, . . . marital status," sexual orientation, or gender identity. MCL § 37.2206(1).

102.  The Notice Clause also prohibits St. Joseph from "elicit[ing] or attempt[ing] to elicit information" concerning a prospective employee's religion, or that "expresses a preference, limitation, specification, or discrimination based on religion, . . . sex, sexual orientation, gender identity or expression, . . . or marital status," or that keeps records of that information. MCL § 37.2206(2), as amended by 2023 Mich. Pub. Acts 6.

103.  Under Michigan's newly expanded civil rights law, the Notice Clause prohibits St. Joseph from:

a.  Publicly posting job openings for its parish or school because those postings explain that all St. Joseph job openings require applicants to be practicing Catholics who agree to abide by the Diocesan Code of Conduct and related policies.

b.  Asking applicants whether they are Catholic and whether they agree to abide by and uphold the Catholic Church's teachings.

c.  Conforming the hiring at St. Joseph to the Diocese's January 2023 guidelines.

104.  Further, the Michigan civil rights law prohibits St. Joseph from maintaining a "pattern or practice of discrimination." MCL § 37.2605(1).

105.  St. Joseph's policies of hiring only people who will follow the Catholic Church's religious beliefs, and of requiring employees to reaffirm that commitment, may constitute—in Michigan's view—a "pattern and practice" of discrimination in violation of the Employment and Notice Clauses under Michigan law.

106.  The concerns posed by Michigan's amended civil rights law acutely affect St. Joseph's immediate hiring needs. The school needs a

new first-grade teacher for the upcoming academic year. But St. Joseph is afraid to advertise for that opening. These concerns are also chilling St. Joseph from recruiting a faith formation employee at the parish, despite its need. And St. Joseph is also refraining from recruiting private tutors to assist the public-school children at its parish out of a similar fear—despite the immediate need of educational assistance for these children. *E.g., Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 285 (6th Cir. 1997) ("A statute prohibiting activity protected by the First Amendment leads to 'self-censorship, a harm that can be realized even without an actual prosecution.'").

107.  As described above, the Employment and Notice Clauses interfere with St. Joseph's ability to uphold and hand down its Catholic faith.

108.  This interference comes even while the Employment and Notice Clauses make several exemptions.

109. For example, they contain exemptions for certain instances where age discrimination is permitted and when the employer and employee are family. *See, e.g.*, MCL § 37.2202(2) ("This section does not prohibit the establishment or implementation of a bona fide retirement pol-

icy or system that is not a subterfuge to evade the purposes of this section."), *id.* § 37.2211 (exempting "bona fide seniority or merit system"), *id.* § 37.2202(3) ("This section does not apply to the employment of an individual by his or her parent, spouse, or child.").

110.   And the Department may make individualized exemptions for employers who "apply to the commission for an exemption" and make a "sufficient showing" "that religion, national origin, age, height, weight, or sex" or sexual orientation or gender identity "is a bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise." MCL § 37.2208. This is the BFOQ exemption system discussed above.

111.   St. Joseph has not applied for these BFOQ exemptions. But its constitutional rights don't turn on asking for one. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021) ("misapprehends the issue" to argue that "the Commissioner has never granted" a certain exception; "[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable"). And in any event, the new changes that the Commission announced to the BFOQ exemption process—especially the requirement to reapply for the same exemption every five years—

make applying impractical and burdensome. These changes would mean that every five years almost the entire staff of St. Joseph would need a renewed BFOQ exemption. For ministerial employees, insisting on this process violates the Religion Clauses. *See Hosanna-Tabor v. EEOC*, 565 U.S. 171, 188 (2012). For those non-staff members of St. Joseph who still interact with students—like "shared time" teachers, RESA staff, or private tutors to parish children—the BFOQ process wouldn't clarify anything about St. Joseph's freedoms. What's more, the process itself could trigger an investigation into St. Joseph's internal religious decisions, as any material submitted for an application can become the basis for a complaint.

### Michigan's amended civil rights law infringes on St. Joseph's ability to enforce a code of conduct requiring students to abide by Catholic Church teachings at school.

112.  Michigan law similarly threatens to restrict St. Joseph's ability to recruit and select students based on agreement with Catholic religious beliefs and adherence to conduct requirements consistent with those beliefs.

113.  The ELCRA's Education Provision makes it unlawful for "educational institution[s]," which includes private elementary schools, to

"[e]xclude, expel, limit, or otherwise discriminate against an individual seeking admission as a student or an individual enrolled as a student in the terms, conditions, or privileges of the institution, because of religion, race, color, national origin, sex, sexual orientation, or gender identity or expression." MCL § 37.2402(b), as amended by 2023 Mich. Pub. Acts 6.

114.  Michigan law similarly prohibits schools "[f]or purposes of admission only, [to] make or use a written or oral inquiry or form of application that elicits or attempts to elicit information concerning the religion, race, color, national origin, age, sex, sexual orientation, gender identity or expression, or marital status of an individual." MCL § 37.2402(c), as amended by 2023 Mich. Pub. Acts 6.

115.  And Michigan law makes it unlawful to "[p]rint or publish or cause to be printed or published a catalog, notice, or advertisement indicating a preference, limitation, specification, or discrimination based on the religion, race, color, national origin, sex, sexual orientation, or gender identity or expression, of an applicant for admission to the educational institution." MCL § 37.2402(d), as amended by 2023 Mich. Pub. Acts 6.

116. Michigan law exempts "religious educational institution[s]" from the "provisions of section 402 *related to religion*," MCL § 37.2403 (emphasis added), but not from the provisions of section 402 (MCL § 37.2402, as amended by 2023 Mich. Pub. Acts 6) related to "sex, sexual orientation, or gender identity or expression." Accordingly, Defendants may take the position that St. Joseph's religious freedom is protected simply because it may prefer to admit, in its case, Roman Catholic students. But any such protection says nothing about St. Joseph's ability to make religious governance decisions that reflect its understanding of human sexuality.

117. Michigan law also exempts "a private educational institution not exempt under section 403, which now or hereafter provides an education to persons of 1 sex" from "the provisions of section 402 relating to sex." MCL § 37.2404. But this doesn't apply to St. Joseph, as the school is co-educational.

118. Michigan law also allows public schools to maintain single-gender programs without violating the ELCRA. MCL § 37.2404a(1) ("This article does not prohibit the board of a school district or intermediate school district or the board of directors of a public school academy from establishing and maintaining a single-gender school, class, or program

within a school."); MCL § 380.475(2) ("[T]he board of a first class school district may establish and maintain a school, class, or program within a school in which enrollment is limited to pupils of a single gender."). But as a Catholic, coeducational school, St. Joseph is not encompassed by this exemption.

119.  The Education Provision prohibits St. Joseph from:

a.  Requiring that students and families not only agree with St. Joseph's Catholic beliefs but also agree to abide by those beliefs in word and deed.

b.  Asking prospective students and families questions about their adherence to Catholic Church teaching, especially regarding marriage, family, and human sexuality, necessary to determine whether applicants and their families are willing and able to abide by St. Joseph's Family – School Agreement.

c.  Including in promotional materials information about the expectations and requirements St. Joseph has for students and families who seek to join its religious community.

d.  Maintaining and enforcing the Policy and Code of Conduct, which require students and families to conduct themselves in accordance

with Catholic teaching and the school to have different standards of dress, address, and separate bathrooms, locker rooms, and sports teams for girls and boys.

**Michigan aggressively enforces its laws with severe penalties.**

120.   Charged with the responsibility of investigating and enforcing Michigan civil rights law, the Commission and the Department have several ways in which they can prosecute potential violators.

121.   One way is simply seizing on the fact that an entity asked for an individual accommodation. That fact alone can trigger an investigation. MCL § 37.2602(c); MDCR Rule 37.4(2).

122.   In addition, "[a]ny person claiming to be aggrieved by unlawful discrimination" may file a complaint with the Department. MDCR Rule 37.4(1). This significantly increases the threat of future prosecution. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("The credibility of that threat is bolstered by the fact that authority to file a complaint with the Commission is not limited to a prosecutor or an agency. Instead, the false statement statute allows 'any person' with knowledge of the purported violation to file a complaint.").

123.  "Person" includes individuals, associations, advocacy organizations, legal or commercial entities, and Michigan, its subdivisions, and its agencies. MDCR Rule 37.2(m).

124.  The Department and Commission may also pursue cases alleging discrimination based on a policy or a "pattern or practice of discrimination." MCL § 37.2605(1); *Whirlpool Corp. v. C.R. Comm'n*, 390 N.W.2d 625, 626, 628-29 (Mich. 1986). This can happen even when a lawsuit alleging the same would be "technically moot." *Whitman v. Mercy-Mem'l Hosp.*, 339 N.W.2d 730, 731 (Mich. Ct. App. 1983).

125.  Once the Department receives a complaint, a burdensome investigation begins. *See* MCL § 37.2602(c).

126.  The investigation is itself adversarial, as the Department would prosecute any charge on the complainant's behalf. *See* MDCR Rule 37.12(6).

127.  If liability is found, substantial damages can be awarded for mental distress, "humiliation, embarrassment, outrage, and disappointment which have resulted from such discrimination"—with only the complainant's testimony as evidence. Opinion at 26, *Mich. Dep't of C.R. v. Royalwood Coop. Apartments, Inc.*, No. 268485 (Mich. C.R. Comm'n Jan.

26, 2004); Order at 4, *Royalwood*, No. 268485 (Mich. C.R. Comm'n Feb. 2, 2004) ($58,000 in attorney's fees and costs); Opinion and Final Order at 3, *Mich. Dep't of C.R. v. Suburban Mobility Auth. for Regional Transp.*, No. 325610 (Mich. C.R. Comm'n May 25, 2012) ($150,000 for mental and emotional distress).

128.   Nor did the Department and the Commission wait for the Michigan Supreme Court to include sexual orientation and gender identity in Michigan civil rights law or for the Michigan legislature to amend the ELCRA. As discussed *supra* ¶ 58, the Department and the Commission were investigating 73 complaints of alleged sexual orientation and gender identity discrimination years before either the U.S. Supreme Court or the Michigan Supreme Court held that such conduct could be read into "sex" discrimination. These investigations accompanied a massive rise in "sex" discrimination claims, *supra* ¶ 58, and were conducted when the then-Michigan Attorney General said that such an interpretation was legally "invalid," *supra* ¶ 57. But for Defendants' zeal, *Rouch World* and the corresponding redefinition of "sex" discrimination may not have happened. And it happened in a case involving religious objections. This is

chilling to St. Joseph but no issue to Attorney General Nessel. *Supra* ¶ 66 (objectors "are not religious heroes, they are bigots").

129. With "sexual orientation" and "gender identity or expression" protections now enshrined in the ELCRA, St. Joseph faces an immediate threat of enforcement. There is no question that St. Joseph's conduct is "proscribed by [the] statute," or that its conduct is "arguably affected with a constitutional interest." *Susan B. Anthony List*, 573 U.S. at 161-62. Nor is there any doubt, given the actions and comments of Defendants, that the "threat of future enforcement [of the amended ELCRA] is substantial." *Id.* at 164.

130. For the fiscal year ending in 2023, the Department and the Commission have a $7 million budget to investigate and prosecute complaints. FY 2023-2024 Executive Recommendation, General Omnibus Budget Bill, 36 (2022), https://perma.cc/TGU3-UYLF.

131. The ELCRA also permits any person alleging a violation of the law to file a civil action for injunctive relief, damages, and attorney fees and costs in an appropriate circuit court. MCL § 37.2801(1)-(2).

132. St. Joseph does not have an adequate monetary or legal remedy for the loss of its constitutional rights.

133.  Unless Defendants are enjoined, St. Joseph will continue to suffer irreparable harm.

## CLAIMS

### Count I
### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Church Autonomy

134.  St. Joseph incorporates by reference all preceding paragraphs.

135.  Under the Free Exercise and Establishment Clauses of the First Amendment, religious groups—including churches and their schools—have a "sphere" of "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). This autonomy gives churches the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). And it protects religious schools from the "entanglement . . . and denominational favoritism" that follow when the government "scrutiniz[es] whether and how a religious school pursues its educational mission." *Carson v. Makin*, 142 S. Ct. 1987,

2001 (2022); *see also Hosanna-Tabor*, 565 U.S. at 200-01 (Alito, J., concurring) (explaining that a religious school's "very existence is dedicated to the collective expression and propagation of shared religious ideals").

136.  St. Joseph is a church with its own parish school. In both roles, it is tasked with making decisions of internal governance, religious formation, and the application of Catholic teachings.

137.  Michigan's amended civil rights law infringes on and chills St. Joseph's First Amendment right to govern itself according to religious principles, frame its policies and doctrine, create and maintain a parish and school environment that is faithful to its religious beliefs, and select its employees according to those religious principles without government interference. This violates the Religion Clauses. *See Our Lady*, 140 S. Ct. at 2060.

138.  Moreover, amended civil rights law means that the Commission, the Department, and inevitably federal and Michigan courts will be sitting in judgment of "whether and how [St. Joseph] pursues its educational mission" at its parish school. *See Carson*, 142 S. Ct. at 2001.

139.  Defendants are persons within the meaning of 42 U.S.C. § 1983.

140.  Absent injunctive and declaratory relief, St. Joseph will be irreparably harmed.

**Count II**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**General Applicability**

141.  Plaintiffs incorporate by reference all preceding paragraphs.

142.  "A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022) (quoting *Fulton*, 141 S. Ct. at 1877).

143.  The first sign of lacking general applicability is triggered "whenever [the government] treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).

144.  The second sign of lacking general applicability is simply the existence of a system with individualized exemptions, "regardless of whether any exceptions have been given." *Fulton*, 141 S. Ct. at 1879; *see*

*also Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 734 (6th Cir. 2021) ("The University's policy says it evaluates whether to grant religious exemptions 'on an individual basis,' thereby rendering the policy not generally applicable regardless of whether the University has granted any exemptions.").

145.  If either sign of lacking general applicability is triggered, the government's policy "must run the gauntlet of strict scrutiny." *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012).

146.  The amended ELCRA gives discretion to grant exemptions from its sex, sexual orientation, and gender identity or expression discrimination prohibitions and categorically exempts certain organizations and individuals from the ELCRA's requirements for secular but not religious reasons. This is chilling St. Joseph's free exercise of religion.

147.  The ELCRA's Employment and Notice Clauses, as well as the Education Provision, are therefore subject to strict scrutiny.

148.  Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise to further their interests.

149.  Defendants are persons within the meaning of 42 U.S.C. § 1983.

150.  Absent injunctive and declaratory relief against Defendants, St. Joseph will be irreparably harmed.

**Count III**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**Status and use discrimination**

151.  Plaintiffs incorporate by reference all preceding paragraphs.

152.  The Free Exercise Clause "protect[s] religious observers against unequal treatment." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017). This includes the "basic principle" that the government may not bar "participat[ion] in a . . . benefit program" based on an applicant's religious "status," *id.* at 2019-22, or "exercise," *Carson*, 142 S. Ct. at 1998; *see also Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2255-56 (2020). In other words, if "a wide range of" organizations can participate in a public benefits program, but religious ones are excluded—either because of the organization's religious "status" or because of "religious 'uses' of public funds," then the exclusion is unconstitutional. *Carson*, 142 S. Ct. at 1997-98 ("Neither of these formal distinctions suffices to distinguish [earlier cases] or to affect the application of the free exercise principles outlined above.").

153.  Here, Michigan's amended civil rights law would exclude St. Joseph from the Clinton County RESA program—as well as other public benefits programs, including St. Joseph's "shared time" arrangements with public schools—because St. Joseph would use those program resources consistent with the now-illegal, Catholic understanding of sex discrimination. Simply for being a Catholic school in word and in deed, RESA staff could, for example, file complaints with Clinton County, the Commission, or the Department of Civil Rights to investigate whether St. Joseph has violated the ELCRA, and correspondingly, lose its access to RESA benefits. *See, e.g.*, *Clinton County RESA*, https://perma.cc/PHE7-84GA ("Any person suspecting a discriminatory practice should contact the Special Education Director [giving contact information]."). St. Joseph is therefore forced to choose between accessing needed staff and upholding Catholic teachings on human sexuality.

154.  The same choice confronts St. Joseph every time it contracts with an organization to use its gym and outdoor fields (and may not want to use locker rooms in accordance with an individual's biological sex), it rents out parish spaces, or its affiliated Knights of Columbus facility is used for events open to all. Or when St. Joseph opens its doors to private

tutors for its public-school parishioners. Or when it allows public school teachers to teach in its religious classrooms. Or when St. Joseph brings in aides or computer technology teaching through Title I services or other shared time arrangements.

155.  Putting St. Joseph to these choices chills St. Joseph's free exercise of religion and is unconstitutional under *Carson*, *Espinoza*, and *Trinity Lutheran*. But that unconstitutional predicament is the necessary result of the amended civil rights law's deliberate decision to take a maximalist approach and reject religious accommodations that would protect the sincere religious exercise of St. Joseph. Absent injunctive and declaratory relief against Defendants, St. Joseph will be irreparably harmed by being forced to make those choices.

156.  Defendants are persons within the meaning of 42 U.S.C. § 1983.

**Count IV**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Speech Clause**

157.  Plaintiffs incorporate by reference all preceding paragraphs.

158.  "[T]he fundamental rule of protection under the First Amendment [is] that a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.,* 515

56

U.S. 557, 573 (1995). To that end, the judiciary "must . . . give deference to an association's view of what would impair its expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000).

159.   St. Joseph engages in speech and expressive association by hiring employees who share its religious beliefs and by ensuring that employees, students, and families do not take actions that are contrary to its religious beliefs and teaching.

160.   The ELCRA, as interpreted by Defendants, would require St. Joseph to speak a message contrary to its beliefs and to associate with others in a way that is contrary to its religious beliefs and message.

161.   The ELCRA's prohibition on various "statements" means that St. Joseph's job postings and agreements with faculty, staff, parents, and students to uphold its Catholic identity have "expressive character"—making it "apparent that [Defendants'] application of the statute ha[s] the effect of declaring" St. Joseph's "speech itself to be [a] public accommodation." *Hurley*, 515 U.S. at 573. This is well beyond Michigan's police power, and it violates St. Joseph's freedom of speech.

162.   St. Joseph's speech and expressive association are, and will continue to be, chilled by Defendants' actions and the threat of enforcement.

163.  Defendants are persons within the meaning of 42 U.S.C. § 1983.

164.  Absent injunctive and declaratory relief, St. Joseph will be irreparably harmed.

### Count V
### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Free Speech & Assembly Clauses

165.  Plaintiffs incorporate by reference all preceding paragraphs.

166.  St. Joseph assembles with others for the purpose of speech and religious exercise that furthers its Catholic faith, not the zeitgeist. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) ("Freedom of association . . . plainly presupposes a freedom not to associate."); *see also Hosanna-Tabor*, 565 U.S. at 200-01 (Alito, J., concurring) (religious school's "very existence is dedicated to the collective expression and propagation of shared religious ideals").

167.  The ELCRA, as interpreted by Defendants, would require St. Joseph to assemble with those who do not share its religious beliefs or prohibit it from assembling with those who do share its religious beliefs. But engaging in expressive activity that would be transformed by forced inclusion is exactly what the freedom of association prohibits. *See Dale*, 530 U.S. at 643, 658-69; *see also Slattery v. Hochul*, No. 21-911, 2023 WL

2229676, at *5-6 (2d. Cir. Feb. 27, 2023) ("severe burden[]" on association right to force associations to retain members that "would 'undermine or transform their values and message'"); *id.* at *7 (claiming an organization could simply engage in counter-speech "could always justify a state's forcing an association to accept members it does not desire, [and] devalues [an association's] interest in expressive association").

168.   St. Joseph's speech and assembly rights are, and will continue to be, chilled by Defendants' actions and the threat of enforcement.

169.   Defendants are persons within the meaning of 42 U.S.C. § 1983.

170.   Absent injunctive and declaratory relief, St. Joseph will be irreparably harmed.

## PRAYER FOR RELIEF

Wherefore, St. Joseph requests that the Court:

a.   Declare that the First and Fourteenth Amendments to the United States Constitution protect St. Joseph's ability to maintain religious policies and codes of conduct for employees of any kind, students, and families, and guarantees St. Joseph's freedom to participate equally in public

benefit programs without discrimination against its religious status, conduct, or autonomy, or its free exercise, free speech, association, or assembly rights.

b.  Issue preliminary and permanent injunctions prohibiting Defendants from enforcing the amended ELCRA in a manner that would require St. Joseph to hire employees of any kind who do not share its beliefs, to make—or refrain from making—statements contrary to its religious teachings, or to use its goods, services, facilities, privileges, advantages, or accommodations that are extended, offered, sold, or otherwise made available to the public in a manner that would violate its religious status, conduct, or autonomy, or its free exercise, free speech, association, or assembly rights.

c.  Issue preliminary and permanent injunctions prohibiting Defendants from enforcing the amended ELCRA in a manner that would require the St. Joseph to admit students or administer its parish or school in any manner that would violate its religious status, conduct, or autonomy, or its free exercise, free speech, association, or assembly rights.

d.  Award St. Joseph the costs of this action and reasonable attorneys' fees.

e.   Award such other and further relief as the Court deems equitable

and just.

Dated: March 30, 2023

Respectfully submitted,

/s/ *William J. Haun*
Lori H. Windham
William J. Haun
Nicholas R. Reaves
The Becket Fund for Religious Liberty
1919 Penn. Ave. NW, Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

William R. Bloomfield (P68515)
Catholic Diocese of Lansing
Lansing, Michigan 48933-1122
(517) 342-2522
wbloomfield@dioceseoflansing.org

*Counsel for Plaintiff*