## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ST. JOSEPH PARISH ST.
JOHNS,

    *Plaintiff,*

    v.

DANA NESSEL, in her official ca-
pacity as Attorney General of
Michigan; JOHN E. JOHNSON,
JR., in his official capacity as Ex-
ecutive Director of the Michigan
Department of Civil Rights; POR-
TIA L. ROBERSON, ZENNA FA-
RAJ ELHASON, GLORIA E.
LARA, REGINA GASCO-BENT-
LEY, ANUPAMA KOSARAJU,
RICHARD CORRIVEAU, DAVID
WORTHAMS, and LUKE R.
LONDO, in their official capaci-
ties as members of the Michigan
Civil Rights Commission,

    *Defendants.*

Civil No.  1:22-cv-1154

**BRIEF IN SUPPORT OF
MOTION FOR LEAVE TO
AMEND COMPLAINT**

## BACKGROUND

This case arises out of Defendants' five-year-long effort to expand the Elliott-Larsen Civil Rights Act ("ELCRA") to prohibit discrimination against sexual orientation and gender identity—without any regard to religious liberty. That disregard poses a distinct threat to St. Joseph, a Roman Catholic parish and school in St. Johns, Michigan.

Defendants' campaign became Michigan law on March 16, 2023. On that day, Michigan Governor Gretchen Whitmer signed into law an amendment to the ELCRA that codified Defendants' reinterpretation of the ELCRA, adding "sexual orientation" and "gender identity or expression" to the ELCRA's list of protected characteristics. *See, e.g.*, Ex. A to ECF No. 31 (proposed Second Amended Complaint, hereinafter "SAC") ¶¶ 79-80. The law does not include any religious accommodations from this new understanding of discrimination. This is not a surprise.

Even before the ELCRA's text was expanded, Defendants sued religious objectors under the theory that the ELCRA's ban on "sex" discrimination already included sexual orientation and gender identity. *See Rouch World, LLC v. Dep't of C.R.*, No. 162482, 2022 WL 3007805 (Mich. July 28, 2022); *see also* SAC ¶ 56 (Commission's May 2018 Interpretive

Statement). After announcing this theory, related complaints with the Commission skyrocketed—despite the then-Michigan Attorney General calling the theory "invalid." *Id.* ¶ 57-59. Undeterred, the Michigan Civil Rights Commission said "[t]he only recourse is for the courts to determine" the issue. *Id.* And when Defendant Nessel became Attorney General, her office joined the Commission's effort against the "bigots." *Id.* ¶ 69 (cataloguing this and other examples of Defendant Nessel's hostility); *id.* ¶ 49 (lawsuits spawned by Nessel's religious hostility). Working together, Defendants used *Rouch World* to change how to interpret the ELCRA—obtaining a bypass petition to the Michigan Supreme Court, where they persuaded the Court to redefine "sex" discrimination in the ELCRA to include sexual orientation and leave religious liberty unmentioned. SAC ¶¶ 5-7, 60-64, 70-73.

Still, Defendants knew they "cannot rely on court precedent alone" (SAC ¶ 74 (quoting the Michigan Civil Rights Commission)), so after they prevailed in *Rouch World*, they lobbied the Michigan legislature to add the textual amendment that was signed into law on March 16. *Id.* ¶ 76. As Defendant Nessel put it, these amendments would "help" *Rouch World* "withstand future legal attacks." *Id.* Those "legal attacks" are from

churches like St. Joseph, seeking to defend their First Amendment rights.

Defendants urged that the ELCRA be expanded "without any amendments that would seek to reduce their scope or impact." SAC ¶ 76 (quoting Michigan Civil Rights Commission). As Defendant Attorney General Nessel put it, "[p]eople who choose to demean others or deny them employment, housing, educational opportunities, medical treatment or goods and services simply because of that persons [sic] sexual orientation or gender identity are not religious heroes, they are bigots." *Id.* ¶ 69.

Defendants' maximalism prevailed in the Michigan legislature and was signed into law. Now, the ELCRA expressly prohibits discrimination because of sexual orientation and gender identity. As Defendants urged, proposed religious accommodations to this expansion of the ELCRA were consistently rejected by the Michigan legislature. The lead Senate sponsor said it is not "appropriate to allow the government to let religion discriminate against someone because of their sexual orientation or gender identity." SAC ¶ 77. Another called religious accommodations a "license to discriminate" that is "fundamentally wrong." *Id.* A third Senator made

4

the same point: "[d]iscrimination is never okay," so religious accommodation is not okay. *Id.* After celebrating the law's passage on the House floor, Defendant Nessel reiterated that this legislation's goal is to "solidify[]" *Rouch World* so its conclusions "cannot be easily overturned by a future court." *Id.* ¶ 78. To Nessel, it was "imperative" to "enshrine" *Rouch World* expressly in the ELCRA, because "high courts have succumbed to political pressure and overturned long-standing and even court-tested decisions like Roe v. Wade[.]" *Id.* ¶ 8. This goal meant Michigan must depart from Title VII and the laws of 22 States and expressly refuse to accommodate religious entities. *See id.* ¶ 84.

As a Roman Catholic parish and school, St. Joseph expects all its parishioners, employees, school families and students, and contracting partners to respect and uphold St. Joseph's Catholic identity. SAC ¶¶ 35-54. St. Joseph safeguards its Catholic identity by imbuing it in everything it does. Its identity is part of what families and students must agree to if they wish to attend St. Joseph's school. *See id.* ¶ 17. St. Joseph's Catholic identity is integral to its hiring of teachers, parish and school support staff, and its use of volunteers. *Id.* ¶¶ 35-54. The expectation to uphold

Catholic identity is relayed by St. Joseph to its partners in the community, such as with public school teachers that come to St. Joseph through "shared time" arrangements or with Clinton County RESA staff. *See id.* ¶¶ 53-54. And that expectation governs the use of St. Joseph's facilities, along with the related Knights of Columbus Hall, located a mile from the parish. *See id.* ¶¶ 88-89.

The amended ELCRA makes all this unlawful. Not only does the ELCRA's text fail to include religious accommodations, other ELCRA carveouts from the discrimination prohibitions fail to account for the scope of threats to St. Joseph's religious liberty. For example, the ELCRA's "BFOQ" process allows for an employer to exempt certain employees from antidiscrimination requirements if doing so is "reasonably necessary to the normal operation of the business." MCL § 37.2208. But exempting a limited number of *employees* does not extend to the myriad religious *policy* decisions that St. Joseph can and must make on issues of human sexuality at its parish and its school. Nor does that limited reach extend to the many non-employees that St. Joseph still expects to uphold Catholic identity at St. Joseph, like parish and school families, public school teachers participating in "shared time" arrangements, Clinton

6

County RESA staff, private tutors, or volunteers. And that's setting aside the First Amendment problems of conditioning religious exercise on a government permission slip good for only five-year increments. *See* SAC ¶ 111. Nor, similarly, does the ELCRA's separate protection of St. Joseph's ability to make religious-based preference decisions in school admissions reach these widespread policy concerns. *See id.* at ¶ 116.

Instead, the express language of the ELCRA now prohibits St. Joseph from upholding the 2,000-year-old teachings of the Catholic Church on marriage, family, and the human person. Consequently, the amended ELCRA threatens St. Joseph's freedom to continue its religious mission of cultivating a Catholic community faithful to Church teaching in both word and deed. St. Joseph should be given the leave needed to plead its First Amendment rights.

## LEGAL STANDARD

Motions for leave to amend a pleading are governed by Fed. R. Civ. P. 15(a). Where, as here, a party wishes to amend its pleadings after 21 days of service, Rule 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave," and that "[t]he court should freely give leave when justice so requires." *Id.*

7

The Sixth Circuit has emphasized that this rule should be construed liberally—"the case law in this Circuit manifests liberality in allowing amendments to a complaint." *Parchman v. SLM Corp.*, 896 F.3d 728, 736 (6th Cir. 2018) (internal quotation marks omitted) (quoting *Newberry v. Silverman*, 789 F.3d 636, 645 (6th Cir. 2015)). "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.— the leave sought should, as the rules require, be 'freely given.'" *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## ARGUMENT

Leave to amend is granted freely, and ought to be granted here. St. Joseph is challenging a newly enacted statute and has acted promptly to amend its complaint accordingly. Leave is only denied when unusual factors are present, and none are present here. Therefore, the Court should grant St. Joseph's motion for leave to amend.

***No undue delay***. It is impossible to claim that St. Joseph's motion creates undue delay. Governor Whitmer signed into law the amendment

8

to the ELCRA on March 16—two weeks ago. It was therefore impossible for St. Joseph to plead these allegations either when its initial complaint was filed or within the time to freely amend its complaint. Indeed, St. Joseph pled as much as it could when freely amending its complaint—raising the proposed legislation to amend the ELCRA and Defendants' lobbying. *See, e.g.*, Doc. No. 29 (First Amended Complaint) ¶¶ 73-76.

Moreover, St. Joseph's motion comes well before the commencement of discovery or any "key deadlines," nor is the amendment at a "late stage" in the proceeding. *Cf. Crestwood Farm Bloodstock v. Everest Stables, Inc.*, 751 F.3d 434, 445 (6th Cir. 2014) (undue delay where party moved to amend complaint "two months *after* the court granted summary judgment to [Defendant] and almost a year after the close of discovery"). No scheduling order has been issued. No discovery deadlines have been set or passed. And as evidenced by the Certificate of Nonconcurrence, St. Joseph was—and remains—willing to afford Defendants a reasonable extension of their deadline to respond to the proposed Second Amended Complaint. There's no basis to claim undue delay here.

***No bad faith or deficiency.*** Nothing in St. Joseph's proposed Second Amended Complaint suggests bad faith or a failure to cure deficiencies in

prior complaints. Plaintiff is not "seeking to prolong the litigation by adding new but baseless legal theories." *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 881 (9th Cir. 1999). Instead, St. Joseph is responding to new legislation about its original complaint. And there's no basis to claim that St. Joseph's request is premised on a repeated failure to cure deficiencies by amendments previously allowed. Rather, the proposed Second Amended Complaint adds new legislation that could not have been included in the original Complaint or First Amended Complaint, since it had not yet become law at the time those were filed.

***No prejudice***. For similar reasons, St. Joseph's proposed amendment would inflict no prejudice on Defendants. Amendments may be prejudicial when "among other things, [they] would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725-26 (2d Cir. 2010) (cleaned up). Here, nothing like that can be plausibly claimed. Discovery has not yet begun, and no responsive pleading has been filed, so Defendants remain in the same position. The new allegations demonstrate the culmination of Defendants' aggressive efforts to expand the

ELCRA without regard to religious liberty. Indeed, failing to allow St. Joseph leave to allege the culmination of those already pleaded efforts would undermine the purpose of Rule 15—a rule designed "to reinforce the principle that cases should be tried on their merits rather than the technicalities of pleadings." *Moore v. City of Paducah*, 790 F.2d 557, 561 (6th Cir. 1986). "[R]ejection of the amendment would preclude plaintiff's opportunity to be heard on the merits on facts which are well known to the parties and which were pleaded at the outset" as much as possible. *See id.* at 562. Such a result would prejudice St. Joseph, not Defendants.

***Futility is not implicated***. "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Parchman*, 896 F.3d at 738 (quoting *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017)).[1] Here, however, St. Joseph's proposed Second Amended Complaint only underscores why it has pleaded plausible claims.

---

[1]  Accordingly, "where the district court denies leave to amend because the complaint, as amended, would not withstand a motion to dismiss, that denial is reviewed de novo." *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 918 (6th Cir. 2017) (citing *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 596 (6th Cir. 2013).

The expansion of the ELCRA—without any religious accommodations—means that all manner of religious life at St. Joseph is now susceptible to liability, including: St. Joseph's ability to enforce a Family-Student Agreement at its Catholic school; the ability to hire non-ministerial employees and expect them to not violate Catholic beliefs; its ability to expect the same from the public school teachers on campus via "shared time" or RESA programs; its ability to expect the same from private tutors to parish school children; and the ability to ensure its facilities are used consistent with its Catholic beliefs. *E.g.*, SAC ¶¶ 88-106, 112-119.

No provision of the ELCRA—not its BFOQ process, nor its protection for St. Joseph to privilege Catholic students in admissions—resolves these issues. *See id.* ¶¶ 110-111, 117. Neither of those provisions speak to St. Joseph's ability to make internal religious *policy decisions* regarding human sexuality at both the parish and the school. Moreover, the limited category of *employees* to which the BFOQ process even applies (*see* MCL § 37.2208) does not, definitionally, include non-St. Joseph employees that are still expected to uphold the parish's Catholic beliefs (like "shared time" teachers, RESA staff, or private tutors). And that problem

is separate from the other constitutional problems plaguing the BFOQ process, such as (1) conditioning the existence of ministerial personnel on government approval given at five-year increments (*see Hosanna-Tabor v. EEOC*, 565 U.S. 171, 188 (2012) ("Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs")); or (2) limiting St. Joseph's First Amendment rights to whether it first asks the government for permission to exercise them. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021) ("[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable"); *see also Heffron v. International Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981) ("such discretion has the potential for becoming a means of suppressing a particular point of view.").

Nor, finally, does this Court's ruling in *Christian Healthcare Centers, Inc. v. Nessel* affect the analysis. There, this Court found the issue of standing "dispositive," and thus declined to rule on Defendants' 12(b)(6) motion. *Christian Healthcare Centers, Inc. v. Nessel*, et al., No. 1:22-cv-00787 PageID.866 (W.D. Mich. March 29, 2023), ECF No. 28. Conse-

quently, *Christian Healthcare* has no bearing on this Court's futility analysis here. *See Marchese v. Milestone Sys., Inc.*, No. 12-12276, 2013 WL 12182680, at *4-5 (E.D. Mich. June 21, 2013) ("the standard for futility is whether the proposed amendment can survive a Rule 12(b)(6) motion to dismiss; not the standard of review applied to a Rule 12(b)(1) factual, as opposed to facial, challenge to the Court's subject-matter jurisdiction." (citing *Apex Digital, Inc. v. Sears Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009)).

Even if *Christian Healthcare* were appropriate to consider here, it does not show futility. *Christian Healthcare* did not analyze what is at the core of St. Joseph's proposed amendments: newly enacted legislation. Rather, *Christian Healthcare* analyzed the now superseded ELCRA text. On that basis, it claimed that "[t]he Michigan statutes do not 'arguably' provide that religious freedoms will not be considered" (*Christian Healthcare*, No. 1:22-cv-00787 PageID.870, Doc. 28), and that the ELCRA does not "facially fail[] to recognize religious freedoms like those asserted by Plaintiff herein," (*Christian Healthcare*, No. 1:22-cv-00787 PageID.871, Doc. 28). But the new expansion of the ELCRA—crafted by the legislature and supported by Defendants to have maximum possible reach (*see, e.g.*, SAC

14

¶¶ 74-79)—makes clear that religious concerns were considered and rejected.

Before this new expansion of the ELCRA, *Christian Healthcare* said that the statute's reach is so "broad" that "[i]t would be impossible for Michigan to disavow application . . . as to any religious entity where the religious freedom inquiry would be so fact-dependent." No. 1:22-cv-00787 PageID.876, Doc. 28. Now with the ELCRA's expansion—premised on maximum application and the specific rejection of religious accommodation language—there is "no reason to assume" that the "newly enacted law [would] not be enforced" against those within its reach. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988); *see also Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987) ("The statutory language of the Ordinance clearly contemplates that facilities such as the one operated by Planned Parenthood would be subject to application of the statute."). Were the assumption otherwise, no religious entity would ever be able to have clarity on its rights on the threat of enforcement. But that would turn the law on its ahead, where "refus[al] to stipulate that [the state] will not enforce the statue" provides a "reasonable" "fear of an enforcement action." *Italian Colors Rest. v.*

*Becerra*, 878 F.3d 1165, 1173 (9th Cir. 2018); *see also Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034-36 (6th Cir. 2022) ("injury-in-fact of an imminent prosecution" found when plaintiff "plausibly alleged that he is 'able and ready' to violate the contested statutes," "surrounding factual circumstances show that a fear of prosecution is plausible," and "[l]ast, defendants have never provided clear assurances that they will *not* prosecute ULC ministers.").

Combine the textual sweep of the newly amended ELCRA with the inadequacy of the ELCRA's protections for St. Joseph's myriad religious policy and personnel issues on human sexuality, discussed *supra*. Then consider "the fact that authority to file a complaint" against St. Joseph "is not limited to a prosecutor or an agency," (SAC ¶ 122 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014)). Take it all together, and the result is a plausible allegation to survive a 12(b)(6) motion to dismiss: "denying prompt judicial review would impose a substantial hardship on petitioners, forcing them to choose between refraining from core [religious exercise] on the one hand, or engaging in that [exercise] and risking costly Commission proceedings and criminal prosecution on the other." *Susan B. Anthony List*, 573 U.S. at 167-68. St. Joseph's

proposed Second Amended Complaint underscores both the necessity of—and its right to—prompt judicial relief. It is therefore not futile.

## CONCLUSION

Rule 15 states that leave to amend should be "freely give[n]." Accordingly, "the leave sought should, as the rules require, be freely given" here. *Parchman*, 896 F.3d at 736 (internal quotation marks and citation omitted). Wherefore, St. Joseph requests that the Court grant leave to submit its proposed Second Amended Complaint.

Dated: March 30, 2023

Respectfully submitted,

/s/ *William J. Haun*
Lori H. Windham
William J. Haun
Nicholas R. Reaves
The Becket Fund for Religious Liberty
1919 Penn. Ave. NW, Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

William R. Bloomfield (P68515)
Catholic Diocese of Lansing
Lansing, Michigan 48933-1122
(517) 342-2522
wbloomfield@dioceseoflansing.org

*Counsel for Plaintiff*

**CERTIFICATE OF COMPLIANCE**

Pursuant to W.D. Mich. L. R. 7.3(b)(i), I hereby certify that the foregoing brief contains 3,087 words as defined by W.D. Mich. L.R. 7.3(b)(ii). The word count was generated using Microsoft Word 2019.

*/s/ William J. Haun*