# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| ST. JOSEPH PARISH ST. JOHNS, | |
| *Plaintiff,* | No. 1:22-cv-1154 |
| v. | |
| DANA NESSEL, in her official capacity as Attorney General of Michigan; JOHN E. JOHNSON, JR., in his official capacity as Executive Director of the Michigan Department of Civil Rights; PORTIA L. ROBERSON, ZENNA FARAJ ELHASON, GLORIA E. LARA, REGINA GASCO-BENTLEY, ANUPAMA KOSARAJU, RICHARD CORRIVEAU, DAVID WORTHAMS, and LUKE R. LONDO, in their official capacities as members of the Michigan Civil Rights Commission, | **PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>*ORAL ARGUMENT REQUESTED* |
| *Defendants.* | |

William R. Bloomfield (P68515)
Catholic Diocese of Lansing
228 N. Walnut Street
Lansing, Michigan 48933
(517) 342-2522
*wbloomfield@dioceseoflansing.org*

William J. Haun
Lori H. Windham
Nicholas R. Reaves
Brandon L. Winchel*
The Becket Fund for Religious
   Liberty
1919 Pennsylvania Ave. NW
   Suite 400
Washington, DC, 20006
Tel.: (202) 955-0095

\* Not a member of the DC Bar;
admitted in California. Practice
limited to cases in federal court.

Fax: (202) 955-0090
*whaun@becketlaw.org*

*Counsel for Plaintiff*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

INTRODUCTION ................................................................................... 1

FACTUAL BACKGROUND ...................................................................... 4

    A. St. Joseph's Catholic Identity and Mission ..................................... 4

    B. Defendants' campaign to redefine "sex" in the ELCRA................... 7

    C. The Michigan Legislature adds "sexual orientation"
       and "gender identity or expression" to the ELCRA. ....................... 9

    D. The amended ELCRA threatens St. Joseph's Catholic
       identity and mission. ...................................................................... 11

PROCEDURAL HISTORY ...................................................................... 15

STANDARD OF REVIEW ....................................................................... 15

ARGUMENT .......................................................................................... 17

I.  St. Joseph has standing and its case is ripe. ..................................... 17

    A. St. Joseph's conduct is arguably affected with a
       constitutional interest. .................................................................... 19

    B. The amended ELCRA arguably proscribes
       St. Joseph's conduct. ...................................................................... 20

    C. St. Joseph faces a credible threat of enforcement. ......................... 29

       1.  Michigan fails to overcome the presumption
          of enforcement. ......................................................................... 31

       2.  Alternatively, St. Joseph meets the *McKay* factors. ................. 38

    D. Granting Michigan's motion would cause
       constitutional conflicts. ................................................................. 44

II. Declaratory and injunctive relief are both appropriate
    remedies for Michigan's constitutional violations............................. 50

CONCLUSION ...................................................................................... 54

i

CERTIFICATE OF COMPLIANCE ......................................................56

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*520 S. Mich. Ave. Assocs., Ltd. v. Devine,*
  433 F.3d 961 (7th Cir. 2006) ................................................................ 32

*Am. Home Assur. Co. v. Evans,*
  791 F.2d 61 (6th Cir. 1986) ................................................................ 54

*AmSouth Bank v. Dale,*
  386 F.3d 763 (6th Cir. 2004) ........................................................... 53-54

*Bostock v. Clayton County,*
  140 S. Ct. 1731 (2020) ...................................................................... 4

*Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co. of
  Pittsburgh,*
  29 F.4th 792 (6th Cir. 2022) .............................................................. 52

*Carson v. Makin,*
  142 S. Ct. 1987 (2022) ...................................................................... 45

*Christian Healthcare Centers v. Nessel,*
  No. 1:22-cv-00787 (W.D. Mich. March 29, 2023) ....................... *passim*

*Cole v. City of Memphis,*
  108 F. Supp. 3d 593 (W.D. Tenn. 2015) ..................................... 53, 54

*Conlon v. InterVarsity Christian Fellowship/USA,*
  777 F.3d 829 (6th Cir. 2015) .............................................................. 45

*Corp. of Presiding Bishop v. Amos,*
  483 U.S. 327 (1987) ................................................................ 46, 48, 49

*County Sec. Agency v. Ohio Dept. of Comm.,*
  296 F.3d 477 (6th Cir. 2002) ............................................................. 51

*Dahl v. Bd. of Trustees of W. Mich. Univ.,*
  15 F.4th 728 (6th Cir. 2021) ............................................................. 47

*Dambrot v. Cent. Mich. Univ.*,
   55 F.3d 1177 (6th Cir. 1995)......................................................33, 34

*Davis v. Colerain Township, Ohio*,
   51 F.4th 164 (6th Cir. 2022) ...................................................... 42

*Dermody v. Presbyterian Church (U.S.A.)*,
   530 S.W.3d 467 (Ct. App. Ky. 2017)......................................... 46

*Doe v. Univ. of Mich.*,
   721 F. Supp. 852 (E.D. Mich. 1989) ....................................35, 36

*Doster v. Kendall*,
   54 F.4th 398 (6th Cir. 2022) ...................................................... 51

*Duquense Univ. of the Holy Spirit v. NLRB*,
   947 F.3d 824 (D.C. Cir. 2020) .................................................... 48

*Elrod v. Burns*,
   427 U.S. 347 (1976)...................................................................... 51

*Fischer v. Thomas*,
   52 F.4th 303 (6th Cir. 2022) ...................................................... 31

*Flynn v. Estevez*,
   221 So.3d 1241 (Fla. Dist. Ct. App. 2017).............................. 46

*Fox v. Saginaw County*,
   35 F.4th 1042 (6th Cir. 2022) .................................................... 51

*Fulton v. City of Philadelphia*,
   141 S. Ct. 1868 (2021)................................................................ 47

*Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*,
   491 F.3d 320 (6th Cir. 2007)................................................16, 17

*Glenn v. Holder*,
   690 F.3d 417 (6th Cir. 2012).................................................42-43

*Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*,
   746 F.2d 323 (6th Cir. 1984)..........................................52, 53, 54

iv

*Hosanna-Tabor v. EEOC,*
   565 U.S. 171 (2012) ........................................................... 19, 36-37, 45

*InterVarsity Christian Fellowship/USA v. Bd. Of Governors*
   *of Wayne State Univ.,*
   No. 19-10375, 2021 WL 1387787 (E.D. Mich.
   Apr. 13, 2021) ............................................................................... 51

*Kallstrom v. City of Columbus,*
   136 F.3d 1055 (6th Cir. 1998) ......................................................... 50-51

*Kentucky Right to Life, Inc. v. Stengel,*
   172 F.3d 48, 1999 WL 16476, (6th Cir. 1999) ................................... 29

*Laird v. Tatum,*
   408 U.S. 1 (1972) ............................................................................ 41

*In re Lubbock,*
   624 S.W.3d 506 (Tex. 2021) ............................................................. 46

*Massachusetts Bay Ins. Co. v. Christian Funeral*
   *Directors, Inc.,*
   759 F. App'x 431 (6th Cir. 2018) ...................................................... 53

*McKay v. Federspiel,*
   823 F.3d 862 (6th Cir. 2016) ......................................................... 30-31

*Morrison v. Board of Educ. of Boyd County,*
   521 F.3d 602 (6th Cir. 2008) ............................................................ 41

*N.H. Right to Life PAC v. Gardner,*
   99 F.3d 8 (1st Cir. 1996) ............................................................. 29, 30

*NLRB v. Catholic Bishop of Chicago,*
   440 U.S. 490 (1979) ................................................................ 45-46, 48

*Ohio Nat. Life Ins. Co. v. United States,*
   922 F.2d 320 (6th Cir. 1990) ....................................................... 15, 17

*Online Merchs. Guild v. Cameron,*
   995 F.3d 540 (6th Cir. 2021) ....................................................... 31, 41

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
   140 S. Ct. 2049 (2020) ................................................. 17, 19, 20, 44-45

*Picard v. Magliano,*
   42 F.4th 89 (2d Cir. 2022) ................................................. 20, 26

*Platt v. Bd. of Comm'rs,*
   769 F.3d 447 (6th Cir. 2014) ................................................. 31

*Polselli v. United States Department of the Treasury-IRS,*
   23 F.4th 616 (6th Cir. 2022) ................................................. 15-16

*Rayburn v. General Conf. of Seventh-Day Adventists,*
   772 F.2d 1164 (4th Cir. 1985) ................................................. 46

*Roman Catholic Archdiocese of N.Y. v. Sebelius,*
   907 F. Supp. 2d 310 (E.D.N.Y. 2012) ................................................. 32

*Rouch World, LLC v. Dep't of C.R.,*
   987 N.W.2d 501 (Mich. 2022) ................................................. *passim*

*Russell v. Lundergan-Grimes,*
   784 F.3d 1037 (6th Cir. 2015) ................................................. 40

*Savoie v. Martin,*
   673 F.3d 488 (6th Cir. 2012) ................................................. 52

*Scottsdale Ins. Co. v. Flowers,*
   513 F.3d 546 (6th Cir. 2008) ................................................. 53

*Sisters for Life, Inc. v. Louisville-Jefferson County,*
   56 F.4th 400 (6th Cir. 2022) ................................................. 51

*Speech First, Inc. v. Fenves,*
   979 F.3d 319 (5th Cir. 2020) ................................................. 29

*Speech First, Inc. v. Schlissel,*
   939 F.3d 756 (6th Cir. 2019) ................................................. 31, 34, 35, 41, 42

*Susan B. Anthony List v. Driehaus,*
   525 F. App'x 415 (6th Cir. 2013) ................................................. 42

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) .................................................................... *passim*

*Tenn. State Conf. of the N.A.A.C.P. v. Hargett*,
  441 F. Supp. 3d 609 (M.D. Tenn. 2019) ............................................ 32

*Thomas More L. Ctr. v. Obama*,
  651 F.3d 529 (6th Cir. 2011) ............................................................. 32

*Turtle Island Foods, S.P.C. v. Strain*,
  65 F.4th 211 (5th Cir. 2023) ....................................................... *passim*

*United Specialty Ins. Co. v. Cole's Place, Inc.*,
  936 F.3d 386 (6th Cir. 2019) .......................................................... 52-53

*United States v. Ritchie*,
  15 F.3d 592 (6th Cir. 1994) ......................................................... 17, 40

*Virginia v. Am. Booksellers, Ass'n, Inc.*,
  484 U.S. 383 (1988) ..................................................................... 30, 38

*Vittiow v. City of Upper Arlington*,
  43 F.3d 1100 (6th Cir. 1995) ............................................................. 34

*Whole Woman's Health v. Smith*,
  896 F.3d 362 (5th Cir. 2018) ............................................................. 46

*Winget v. JP Morgan Chase Bank, N.A.*,
  537 F.3d 565 (6th Cir. 2008) ............................................................. 35

*Winter v. Wolnitzek*,
  834 F.3d 681 (6th Cir. 2016) ............................................................. 18

*Women's Med. Pro. Corp. v. Baird*,
  438 F.3d 595 (6th Cir. 2006) ............................................................. 50

**Statutes**

42 U.S.C. § 2000e-1 ............................................................................. 21

MCL § 37.2102 .............................................................................. 7, 23

MCL § 37.2201 ................................................................. 21

MCL § 37.2202 ................................................................. 21

MCL § 37.2206 ................................................................. 21

MCL § 37.2301 ........................................................... 22, 25

MCL § 37.2302 ...................................................... 13, 23, 27

MCL § 37.2401 ................................................................. 24

MCL § 37.2403 ................................................................. 24

MCL § 37.2602 ................................................................. 40

MCL § 37.2605 ................................................................. 40

MCL § 37.2801 ................................................................. 41

## Other Authorities

Fed. R. Civ. P. 12 ........................................................... 15

*Parish Mission Statement*, St. Joseph Catholic Church ........................... 5

## INTRODUCTION

Since the mid-1800s, St. Joseph Catholic Church has been a welcome participant in the St. Johns, Michigan, community. The first Mass ever celebrated in the village of St. Johns occurred in a villager's home in 1857, where he welcomed a traveling priest on the way to the St. Johns train depot. As the Catholic community grew, the village school started hosting services. That growing Catholic community led to construction of a church in 1866 where the village's main road and the railroad intersect. A parish school followed in 1924. St. Joseph school now serves over 200 students from kindergarten through sixth grade, while St. Joseph parish continues to be the only Catholic Church in St. Johns, ministering to around 900 families.

Now, however, the State of Michigan is putting St. Joseph to a choice: surrender its Catholic beliefs on human sexuality or be subject to lawsuits and penalties. The newly amended Elliott-Larsen Civil Rights Act ("ELCRA") threatens this exclusion. The ELCRA was amended on March 16 to prohibit discrimination based on sexual orientation and gender identity. And crucial to Defendants here, this change occurred without any religious accommodations that would "reduce [the change's]

1

scope or impact." As Defendant Attorney General Dana Nessel said, the entire point of amending the ELCRA was to "withstand future legal attacks" on Defendants' five-year effort to redefine "sex" discrimination without religious accommodations. Indeed, right now, Defendant Michigan Civil Rights Commission is investigating Catholic Charities of Shiawassee and Genesee Counties—part of the Diocese of Lansing, like St. Joseph—for alleged gender identity discrimination under the ELCRA.

Now St. Joseph—in Defendants' words—"may be subject to the ELCRA as an employer, … as an educational institution," and to some "extent," as a public accommodation. That's because St. Joseph parish is open to all. Anyone can assist at Holy Mass, sign up for catechetical programs, use its recreational fields, or attend events at its gymnasium or Knights of Columbus Hall. St. Joseph recruits, hires, and employs its own parish and school staff, volunteers, along with using "shared time" teachers from area public schools, and staff from the Clinton County RESA program. These staffing choices—like St. Joseph's many policies on life at the school and at the parish—are governed by St. Joseph's Catholic faith. The changes to the ELCRA are now chilling St. Joseph's exercise of its faith on matters of staffing, parish and school policies, and

community service. Accordingly, St. Joseph brought this pre-enforcement challenge.

Defendants now seek to dismiss St. Joseph's pre-enforcement challenge, claiming St. Joseph can "await a future case where the Michigan courts grapple with" religious liberty issues. Wrong. This situation is exactly why pre-enforcement challenges exist.

Defendants' ripeness argument is foreclosed by binding precedent, which makes clear that constitutional ripeness and standing are merged in pre-enforcement challenges. Both are governed by the Supreme Court's test in *SBA List*. And St. Joseph satisfies each step of the *SBA List* analysis. Indeed, Defendants concede two of the three. Defendants agree that St. Joseph "arguably satisfies the first [step]—intent to engage in [constitutionally] protected conduct." They also agree that St. Joseph's conduct "may be subject to the ELCRA." This means the ELCRA "arguably proscribe[s]" St. Joseph's conduct, step two. Their arguments to the contrary are at odds with *SBA List* and circuit decisions nationwide making clear that "arguable" means exactly that. And as to step three (a credible threat of enforcement), Michigan provides no compelling evidence to rebut the presumption of enforcement that comes with

challenging a recently enacted statute. Nor does Michigan fare any better under the Sixth Circuit's *McKay* factors. For all these reasons, St. Joseph has standing, its claims are ripe, and the rest of Michigan's response— questioning St. Joseph's requested forms of relief—fails to make a dent. St. Joseph is therefore entitled to the declaratory and injunctive relief it seeks.

"[T]he promise of the free exercise of religion enshrined in our Constitution … lies at the heart of our pluralistic society." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1754 (2020). You wouldn't know it from Michigan's brief. At no point does Michigan grapple with how its administrative "weigh[ing]" of religious liberty on a "case-by-case basis" comports with the Religion Clauses. The Court should deny Michigan's motion to dismiss.

## FACTUAL BACKGROUND

### A.  St. Joseph's Catholic Identity and Mission

St. Joseph Catholic Church ("St. Joseph") is a Catholic parish in the Roman Catholic Diocese of Lansing, located in St. Johns, Michigan. Second Amended Complaint ("SAC"), PageID.659. St. Joseph is under the authority of the Bishop of Lansing. PageID.669. In its mission statement,

St. Joseph affirms that it is "called to worship God and proclaim God's Word by living the Good News of Our Lord Jesus Christ" and to "accept the responsibility to serve, rather than be served, in our parish, community, and beyond." *Parish Mission Statement*, St. Joseph Catholic Church, https://perma.cc/BD7W-KQDW.

Since 1924, St. Joseph has operated a Catholic elementary school providing a religious education to approximately 200 children each year. PageID.669-670. The Catholic faith lies at the heart of the school's mission and identity. Consistent with this mission, St. Joseph school believes "that a relationship with God should be fully integrated into the life of every student" and that the school exists "to assist parents in the spiritual, social, and intellectual development of their child within the framework of Catholic teachings and moral values." PageID.670. The Catholic faith is thus "interspersed throughout the classroom curriculum," including through weekly Mass, Eucharistic adoration, and liturgical prayer celebrations. PageID.670-671.

In keeping with St. Joseph's religious identity, and as required by the Diocese, all St. Joseph employees (at both the school and parish) must be practicing Catholics, "exemplify the moral teachings of the Catholic

Church," and "not teach, advocate, model, or in any way encourage beliefs or behaviors that are contrary to the teaching of the Catholic Church"— including the Church's teaching on gender, sexuality, and marriage. PageID.671. The Diocese also requires that "all Catholic parishes, schools, … and any subdivision thereof, shall respect the biological sex of the human person as given by God and shall apply all policies and procedures in relation to that person according to that person's God-given biological sex." PageID.673. The Diocese further requires that "[s]tudents [of Diocesan schools] and [their] parents (or legal guardians) shall conduct themselves in accord with their God-given biological sex." PageID.673.

In January 2023, the Diocese updated it guidelines for hiring Catholic school teachers. PageID.673. These guidelines apply to any new teachers St. Joseph would hire and require that all applicants sign a diocesan agreement confirming that their conduct will be consistent with Catholic teaching. PageID.673-674. St. Joseph complies with these policies.

As required by its religious beliefs, St. Joseph treats men and women, boys and girls, according to their biological sex—including in dress, personal pronouns, participation in sports teams, and use of bathrooms,

6

locker rooms, or other single-sex spaces. PageID.670-675. St. Joseph consistently upholds its Catholic identity and expects all those who make use of its facilities (including private tutors or teachers from the local school district) to respect this Catholic environment. PageID.675.

**B. Defendants' campaign to redefine "sex" in the ELCRA.**

For the past five years, the Attorney General, the Department of Civil Rights, and the Michigan Civil Rights Commission (collectively, "Michigan" or "Defendants") have taken steps to reinterpret and expand the definition of "sex" under Michigan law, without adding religious freedom protections like those in Title VII and the laws of most other states. This campaign happened in three steps, culminating in the passage of an amendment to the ELCRA on March 16, 2023, which added "sexual orientation, gender identity or expression" to the list of protected categories—while omitting any religious accommodation. MCL § 37.2102, as amended by 2023 Mich. Pub. Acts 6.

First, in May 2018, the Commission reinterpreted the ELCRA's prohibition on discrimination "because of sex." PageID.676-677. At the time of the Commission's reinterpretation, the ELCRA prohibited discrimination "because of … sex" by employers, places of public

accommodation, and educational facilities. PageID.676. But the Commission broadened its definition of "sex" to include sexual orientation and gender identity. PageID.676-677. Immediately after reinterpreting "sex," the Commission "began accepting and investigating complaints of discrimination on the basis of gender identity and sexual orientation." PageID.677.

In the wake of this reinterpretation, complaints of sexual orientation and gender identity discrimination surged. "From the time of the Commission's vote through the end of 2019, [the Michigan Department of Civil Rights] ha[d] taken 73 complaints on the basis of sexual orientation and gender identity." PageID.677. In FY2017, the year before the Commission's interpretive statement, there were 299 complaints of sex discrimination. PageID.678. After the Commission attempted to expand—via interpretive statement—the definition of sex discrimination to include sexual orientation and gender identity, the number of sex discrimination complaints increased to 424 in FY2018, 489 in FY2019, 632 in FY2020, 573 in FY2021, and 905 in FY2022 (the highest number on record). PageID.678.

Second, in 2022, Defendants prevailed at the Michigan Supreme Court in an accelerated enforcement action against a family event center with religious objections to same-sex marriage. There, the Michigan Supreme Court reinterpreted the ELCRA, concluding that "discrimination on the basis of sexual orientation necessarily involves discrimination because of sex in violation of the ELCRA." *Rouch World, LLC v. Dep't of C.R.*, 987 N.W.2d 501, 513 (Mich. 2022). But the Court did not decide whether discrimination based on gender identity is also proscribed by the ELCRA. *Id.* at 505-06.

## C. The Michigan Legislature adds "sexual orientation" and "gender identity or expression" to the ELCRA.

Third, following their judicial victory, Defendants continued lobbying the Michigan Legislature to amend the ELCRA to expressly add sexual orientation and gender identity as protected characteristics, without any religious accommodations. In January 2023, for example, the Commission passed a resolution in support of proposed legislation that would amend the ELCRA "without any amendments that would seek to reduce their scope or impact." PageID.685. Defendant Attorney General Nessel also urged passage of the legislation "to help [these new prohibitions] withstand future legal attacks." PageID.685. Nessel has

9

repeatedly disparaged those who, for sincere religious reasons, oppose same-sex marriage and respect biologically based gender norms, calling them "bigots." PageID.682.

The Michigan Senate passed the proposed legislation while rejecting repeated calls for religious accommodations. Senator Jeremy Moss, the lead sponsor, said in a committee hearing, "I don't think it is appropriate to allow the government to let religion discriminate against someone because of their sexual orientation or gender identity." PageID.686-687. And Senator Jeff Irwin rejected calls for a religious accommodation, explaining that a religious exemption "represents a license to discriminate" and "[t]hat's what we've seen from folks time and time again, from folks who have tried to say that they should have a religious exemption from the law that protects people against discrimination, … I just think that's fundamentally wrong." PageID.686. Other senators made similar claims, insisting that religious accommodations should be rejected because "[d]iscrimination is never okay." PageID.686. The expansion of the ELCRA—without any religious accommodations— passed in the Senate on March 1, 2023, and in the House on March 8,

2023. Governor Gretchen Whitmer signed the legislation into law eight days later. PageID.687.

Under the amended ELCRA, it is unlawful to discriminate based on either "sexual orientation" or "gender identity or expression" in employment, public accommodations, and educational facilities. PageID.687. There are no accommodations for religion that cover St. Joseph.

## D. The amended ELCRA threatens St. Joseph's Catholic identity and mission.

The amended ELCRA threatens to impose liability on St. Joseph for abiding by its religious commitments and upholding its religious mission in three areas: employment, public accommodations, and education.

*Employment.* Consistent with its religious identity, St. Joseph only hires people who will follow the Catholic Church's religious beliefs and requires employees to reaffirm that commitment. *Supra* 6-7. Currently, the school needs a new first-grade teacher for the upcoming academic year. PageID.696-697. St. Joseph also wishes to recruit and hire a faith formation employee at the parish, along with private tutors to assist public-school children in its faith formation classes at the parish. PageID.696-697. Candidates for these positions—like all St. Joseph

11

parish and school employees—are expected to abide by St. Joseph's religiously mandated policies. PageID.696.

But St. Joseph risks liability by advertising or recruiting for these openings under the amended ELCRA, which prohibits St. Joseph from even advertising its religious teachings on human sexuality and related job requirements to those it seeks to hire. PageID.695-697. St. Joseph is also prohibited from declining to hire (or discharging) individuals based on their religion or their compliance with Catholic teachings on human sexuality.  PageID.694-695.  The amended ELCRA thus threatens St. Joseph for its religiously mandated hiring practices and chills St. Joseph's ability to make internal religious decisions regarding the hiring of teachers and other religious ministers. PageID.697.

***Public accommodations.*** St. Joseph also arguably falls within the broad definition of a public accommodation under Michigan law because it opens its facilities to the public. PageID.688. For example, St. Joseph's church is open to all; anyone—Catholic or not—is free to attend Mass. PageID.689. St. Joseph also participates in sports leagues that make use of its fields and gymnasium, and those leagues are open to all. PageID.689. And St. Joseph is planning to host private tutors at the

12

parish to help public-school children that attend its parish improve their reading skills as they prepare for Sacraments. PageID.689. Because it engages in the above activities consistent with its Catholic beliefs, St. Joseph faces an imminent threat of liability under the amended ELCRA, which now prohibits public accommodations from denying any individual the "full and equal enjoyment" of its "facilities" because of sex, sexual orientation, or "gender identity or expression." PageID.689; MCL § 37.2302(a).

*Education.* St. Joseph school participates in "shared time" arrangements for local public-school teachers to teach St. Joseph students in St. Joseph classrooms. PageID.689. St. Joseph expects such teachers to respect its Catholic environment by, among other things, dressing and otherwise acting in accord with their biological sex. St. Joseph is also reviewing applications for new families seeking to send their children to its school. PageID.664. Every family that sends a child to St. Joseph school must enter a "Family – School Agreement," in which parents affirm the school's Catholic identity, acknowledge that "openly hostile or persistent defiance of Catholic truths or morality are a violation of what our school stands for," and attest the school's expectation that

families are "to live their lives in a way that supports, rather than opposes, the mission of our school and our faith beliefs." PageID.671-672. St. Joseph also follows the Diocese of Lansing's *Policy on the Human Body*, which requires that "[s]tudents [of Diocesan schools] and [their] parents (or legal guardians) shall conduct themselves in accord with their God-given biological sex." PageID.673.

The amended ELCRA also threatens St. Joseph's ability to recruit and select students in accordance with these religious requirements. For instance, St. Joseph could be sued by public-school "shared time" teachers or private tutors who want to dress or act inconsistently with their biological sex or take down religious imagery in the school's classroom where they teach. Similarly, it is unlawful for educational institutions like St. Joseph to exclude or otherwise discriminate against an enrolled or prospective student based on "sexual orientation," or "gender identity or expression." PageID.699-700. Nor may St. Joseph seek to elicit information about an applicant's religion or willingness to comply with Catholic teaching on human sexuality as part of the school's admission process. PageID.700. In fact, St. Joseph may not even advertise such a preference or limitation. PageID.700. In short, the amended ELCRA

prevents St. Joseph from requiring students and families to agree with Catholic teaching in word and deed and from enforcing its Policy and Code of Conduct, which require the school to have different standards of dress and separate bathrooms, locker rooms, and sports teams for girls and boys. PageID.702-703.

## PROCEDURAL HISTORY

On April 7, 2023, this Court granted St. Joseph leave to file its SAC, which added claims directly challenging the amended provisions of the ELCRA and explained how these new provisions confirmed the imminent threat of enforcement against St. Joseph. Michigan moved to dismiss the SAC under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction on May 5, 2023.

## STANDARD OF REVIEW

Michigan purports to "attack the factual basis of the Court's jurisdiction." PageID.821. But a factual attack is where "facts presented to the district court give rise to a factual controversy" over jurisdiction, requiring the court to "weigh the conflicting evidence." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990); *see also Polselli v. United States Department of the Treasury-IRS*, 23 F.4th 616,

15

621 (6th Cir. 2022) ("In a factual attack, a movant presents evidence outside of the pleadings to contest jurisdictional facts alleged in the petitions."). But here, Michigan does not introduce evidence that disputes the jurisdictional facts. Instead, it claims that St. Joseph "fails to allege sufficient facts" regarding jurisdiction. PageID.837; *see also* PageID.841. This is a facial attack on the sufficiency of St. Joseph's allegations, not a factual challenge to jurisdiction.

Regardless, factual attacks are limited to situations where "the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim." *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). Here, Michigan's motion *does* implicate the merits. Michigan contends that St. Joseph "fail[s] to allege sufficient facts" on standing and ripeness (*e.g.*, PageID.837; *accord* PageID.831), because "the ELCRA does not deny religious freedoms, rather those freedoms must be weighed on a case-by-case basis"—and it's "speculative" to conclude how the Defendants will weigh St. Joseph's religious liberty. PageID.845; *see also* PageID.841-844. But St. Joseph's First Amendment claims turn on whether the ELCRA's "case-by-case," administrative "weigh[ing]" approach to religious liberty is permitted by

a religious organization's "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). Because this question "also implicates an element of the cause of action," the district court must employ the same "safeguard[s]" as when analyzing a Fed. R. Civ. P. 12(b)(6) motion: the complaint's allegations are presumed as true and all allegations are construed in the light most favorable to the nonmovant. *Gentek*, 491 F.3d at 330; *see also Ohio Nat. Life Ins. Co*, 922 F.2d at 325; *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).

## ARGUMENT

### I.  St. Joseph has standing and its case is ripe.

St. Joseph has shown all that is required for standing and ripeness in a pre-enforcement challenge. In such a case, St. Joseph does not need to have experienced "an actual arrest, prosecution, or other enforcement action" to establish standing. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("*SBA List*"). Rather, all St. Joseph must allege is (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest;" (2) that its intended conduct is "arguably

17

proscribed" by the challenged law; and (3) that "there exists a credible threat of prosecution thereunder." *Id.* at 159-64. As the same is true for ripeness, it is "analyzed together" with standing "in challenges of this sort." *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016).[1]

Here, St. Joseph satisfies the three *SBA List* steps, confirming it has standing to seek forward-looking relief and that its claims are ripe. *First*, St. Joseph's conduct is undisputedly affected with a constitutional interest: St. Joseph is engaged in religious worship and education, conduct at the heart of the First Amendment's protection for religious exercise. Michigan does not disagree. *Second*, the amended ELCRA arguably proscribes St. Joseph's conduct. On its face, the ELCRA now prohibits "discrimination" based on sexual orientation and gender identity and expression. St. Joseph's sincere religious beliefs, however, require it to make distinctions on these grounds that are forbidden by the

---

[1]   Despite arguing them separately, Michigan agrees that standing and ripeness distill to this same, single question. *See, e.g.*, Page ID.837 (standing "comes down to whether Plaintiff can show a credible threat of investigation or charge"); PageID.824 (ripeness "focuses on how imminent the threat of prosecution is and whether the plaintiff has sufficiently alleged an intention to refuse to comply with the statute"). So does this Court. *See Christian Healthcare Centers v. Nessel*, No. 1:22-cv-00787 PageID.866 n.2 ("While the Court has not separately addressed ripeness, the analysis would likely lead to the same result.").

statute. St. Joseph's conduct is thus arguably proscribed. *Third*, St. Joseph has shown a credible threat of enforcement in two ways: (1) since the challenged provisions of the ELCRA were recently added, courts presume that the government will enforce its newly enacted laws; and (2) St. Joseph easily satisfies the other test (the "*McKay* factors") this Court uses to determine a credible threat of enforcement. Either way, St. Joseph faces a credible threat of enforcement and has satisfied the third *SBA List* step. This is all that is necessary to confirm standing and to deny Michigan's 12(b)(1) motion.

### A. St. Joseph's conduct is arguably affected with a constitutional interest.

St. Joseph meets the first *SBA List* step—*i.e.*, it engages in "a course of conduct arguably affected with a constitutional interest" *SBA List*, 573 U.S. at 159. The Free Exercise Clause "protects a religious group's right to shape its own faith and mission through its appointments." *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 188 (2012). The Establishment Clause "prohibits government involvement in such ecclesiastical decisions." *Id.* at 189. What's more, "[t]he religious education and formation of students is the very reason for the existence of most private religious schools," including St. Joseph's school. *Our Lady*, 140 S. Ct. at 2055. Hence, St.

19

Joseph has "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.* at 2060.

Such decisions are detailed in the SAC. *See, e.g.*, PageID.694-697 (hiring teachers, school and parish staff, and counting on volunteers to uphold the Catholic mission); PageID.663 (catechetical instruction); PageID.665 (celebrating sacraments); PageID.699-703 (ensuring school activities comport with Catholic identity); PageID.665, 692-693 (insisting on Catholic identity with "shared time" and RESA staff). Indeed, Michigan agrees that St. Joseph "arguably satisfies the first factor—intent to engage in protected conduct." *See* PageID.837. This first *SBA List* step is met.

## B. The amended ELCRA arguably proscribes St. Joseph's conduct.

The second *SBA List* step is also met. That step asks whether St. Joseph's conduct is "*arguably* proscribed by the [law]." 573 U.S. at 162 (cleaned up & emphasis added). Importantly, *SBA List* "makes clear that courts are to consider whether the plaintiff's intended conduct is '*arguably* proscribed' by the challenged statute, not whether the intended conduct is *in fact* proscribed." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022); *see also Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 218

20

(5th Cir. 2023) ("Tofurky's interpretation may not be the *best* interpretation, the test doesn't require that."). Rather, all St. Joseph must show is that "the Act arguably sweeps broadly enough to capture [St. Joseph's] conduct." *Strain*, 65 F.4th at 217.

Here, St. Joseph's conduct is arguably proscribed by the amended ELCRA in at least three ways.

**1. *Employer.*** The ELCRA defines "employer" as "a person who has 1 or more employees." MCL § 37.2201(a). It states that employers may not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual … because of … sex[.]" MCL § 37.2202(a). And employers cannot "print, circulate, post, mail, or otherwise cause to be published a statement, advertisement, notice, or sign relating to employment by the employer … that indicates a preference, limitation, specification, or discrimination, based on … sex[.]" MCL § 37.2206. Unlike Title VII, the amended ECLRA does not exempt religious employers. *Cf.* 42 U.S.C. § 2000e-1(a).

St. Joseph employs more than one employee and is therefore subject to the ELCRA. PageID.693. St. Joseph requires that employees comply with Catholic teaching on human sexuality and gender. PageID.671-672.

21

It also publicizes that fact, so potential employees are aware of these expectations. PageID.695-696. This means St. Joseph treats employees according to biological sex, not gender identity. PageID.671-672, 694-695. It also means St. Joseph cannot hire a prospective employee who is in a same-sex relationship. PageID.671-672, 694-695. This is all arguably proscribed by the ELCRA.

**2. *Public accommodation.*** The ELCRA defines public accommodation to include an "institution of any kind … whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public." MCL § 37.2301(a). St. Joseph's church is open to the public. PageID.689. So are its recreational facilities, including its parish meeting rooms, sports fields, and gymnasium. PageID.689. So is St. Joseph's Knights of Columbus Hall. PageID.690. Those facilities are used for public events. PageID.689-692. This means St. Joseph may arguably be deemed a public accommodation.

If St. Joseph were treated like a public accommodation, it would be vulnerable to myriad lawsuits. For example, the ELCRA applies to "the full and equal utilization of public accommodations, public service, and

educational facilities without discrimination because of … sex." MCL § 37.2102. And it is illegal for any "public accommodation" to "[d]eny an individual the full and equal enjoyment of [its] goods, services, facilities, privileges, advantages, or accommodations … or public service because of … sex[.]" *Id.* § 37.2302(a). On top of that, treating St. Joseph as a public accommodation would prohibit it from "publish[ing] a statement … that indicates" its religious teachings on human sexuality in relation to its "goods, services, facilities, privileges, advantages, or accommodations." MCL § 37.2302(b). Also prohibited are any statements that "indicate[]" "an individual's patronage of or presence … is," among other things, "unwelcome" because of St. Joseph's religious teachings on human sexuality. *Id.*

These layers of liability mean that many aspects of St. Joseph's religious exercise are now arguably proscribed under the amended ELCRA. For example: St. Joseph cannot both uphold its Catholic identity and allow biological women to use its male bathrooms. Nor can it allow biological males to play in female sporting events on its fields. PageID.689-690. The pastor can't certify biological women as Godfathers or men as Godmothers. PageID.692. Same-sex weddings cannot be

23

performed or celebrated. PageID.689-690. Modesty at Mass is upheld by considering a person's sex based on biology, not the subjective perception of his or her sex. PageID.692. Catechetical instruction, sermons, and sacramental preparation that any member of the public hears would be spoken in line with the Catholic Church's teachings—not Michigan's—on human sexuality. PageID.691-692. Yet any of these actions would either deny "the full and equal utilization" of St. Joseph's facilities, goods, or services or constitute "statements" affirming now-verboten views on human sexuality.

**3. *Educational facilities.*** Finally, St. Joseph's use of its "educational facilities" is also arguably proscribed. The amended ELCRA defines "educational facilities" as "a public or private institution … and includes an … elementary or secondary school." MCL § 37.2401. St. Joseph runs a private religious elementary school. Religious educational facilities are exempt from the nondiscrimination provisions "related to religion." MCL § 37.2403. But there is no facial exemption from the nondiscrimination provisions "related to *sex*." That ELCRA phrase was newly amended—and poses a new threat to St. Joseph's Catholic conduct. This means St. Joseph faces liability for maintaining separate bathroom

and locker room facilities for boys and girls, assigning children to sports teams by biological sex, and maintaining separate dress codes for boys and girls. In all these activities, St. Joseph goes by a child's biological sex, not gender identity. PageID.675, 702-703. The same is true for names and pronouns. PageID.675. This conduct is arguably proscribed by the ELCRA.

**4.** ***Michigan concedes the ELCRA applies to St. Joseph.*** Michigan concedes that "as a church and private school, [St. Joseph] may be subject to the ELCRA as an employer … and as an educational institution." PageID.838. Michigan further concedes that, to the "extent" St. Joseph is offering its "services or facilities … 'to the public,'" then St. Joseph is also subject to the ELCRA as a public accommodation. *See* PageID.838 (quoting MCL § 37.2301(a)); *supra* 22-23 (identifying the "extent").

Michigan's concessions confirm all that St. Joseph must show: "the Act arguably sweeps broadly enough to capture [St. Joseph's] conduct." *Strain*, 65 F.4th at 217. St. Joseph's conduct is thus "'*arguably* proscribed' by the law," satisfying the second *SBA List* step. *See* 573 U.S. at 162 (emphasis added).

Michigan's only response is to point to a distinction that is rejected by *SBA List* and multiple circuits. Michigan claims St. Joseph is "conflat[ing] it being facially subject to the statutes … with the actual proscription of its protected activities." PageID.839. On this basis, Michigan claims that the new ELCRA provisions will be "construed with other laws," including constitutional law, "and that the current version of the ELCRA has been interpreted accordingly." PageID.840. Michigan's distinction between St. Joseph's conduct being "facially subject" to ELCRA but not "actual[ly] proscri[bed]" is an unsupported maneuver around a clear rule. The clear rule is "*arguably* proscribed." And St. Joseph meets that test.

*SBA List*—and several circuits—all reject the argument that a plaintiff's conduct is only "proscribed by statute" when it is "in fact proscribed under the best interpretation of the statute or under the government's own interpretation of the statute." *Picard*, 42 F.4th at 98. This was what the *SBA List* respondents argued (and what the Sixth Circuit held before being reversed)—*i.e.*, that "SBA's fears of enforcement are misplaced because" SBA "can only be liable for making a statement 'knowing' it is false," and "SBA[] insiste[d] that its speech is factually

true." 573 U.S. at 163. The Supreme Court disagreed. "Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate the law." *Id.* Under *SBA List*, all St. Joseph must show is that its conduct is proscribed by an *arguable* interpretation of the ELCRA, not even "the best interpretation." *Strain*, 65 F.4th at 218. Identifying that interpretation is not hard.

St. Joseph's arguments are based on the plain text of the statute. Michigan's arguments are based upon an assumption that the statute as written won't apply to St. Joseph. Michigan attempts to argue otherwise by claiming that the ELCRA's public accommodations provisions allow for discrimination "where permitted by law." PageID.819 (quoting MCL § 37.2302). But this provision has no application to holding St. Joseph liable as an employer or as a school. Even as a public accommodation, this wouldn't stop either Michigan or a private complainant from construing "law" to only include—as Michigan does—"Michigan cases interpreting Michigan law." PageID.833; *see also* PageID.833-834 (chiding St. Joseph, three times, for "cit[ing] to no Michigan cases"). So even if St. Joseph's rights are acknowledged by U.S. Supreme Court

decisions, Sixth Circuit decisions, or analogous federal court decisions, Michigan's logic would arguably allow prosecutions to proceed anyway.

Enforcement can happen at any time, either because Michigan decides to apply the law as Defendants publicly said they would—without exceptions—or due to a private complaint. For example, while St. Joseph may be able to privilege Catholics in school admission, *see* PageID.839, that gives the school no protection from a lawsuit claiming, for example, that a biological boy should be able to wear skirts as part of the school uniform. Or that a family would be expected to uphold St. Joseph's Catholic expectations in word and deed at home, as well as at school. *See* PageID.671-672 (discussing family-student agreement). Or in another example, a public school "shared time" teacher at St. Joseph, or a Clinton County RESA staff member, could bring an ELCRA claim against St. Joseph for insisting he use restrooms and wear clothing that accords with his biological sex. Because of his "shared time" or RESA status, St. Joseph could not seek the "bona fide occupational qualification" (BFOQ) exemption presently touted by Michigan, *see* PageID.820, 839, since this

person is not a St. Joseph employee.[2] The same would be true for parish volunteers. It is, to say the least, *arguable* that either Michigan—or a private complainant—will take Michigan at its word that the ELCRA covers St. Joseph and sue accordingly. That's all St. Joseph must show to satisfy the second *SBA List* step.

## C.  St. Joseph faces a credible threat of enforcement.

St. Joseph satisfies the third *SBA List* step—a credible threat of enforcement—for two independent reasons.

First, courts "assume a credible threat of prosecution in the absence of compelling contrary evidence" "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes." *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996) (analyzing Supreme Court precedent); *accord Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (collecting cases from the Third, Fourth, Seventh, and Ninth Circuits); *Kentucky Right to Life, Inc. v. Stengel*, 172 F.3d 48, 1999 WL 16476, at *3 (6th Cir. 1999) (agreeing that lack of enforcement "against Plaintiffs," when a statute covers their conduct, is

---

[2]  And regardless of employment status, there are constitutional problems with conditioning St. Joseph's autonomy on a government permission slip good for five-year increments. *See infra* 44-49.

"insufficient to make the threat of prosecution incredible" (citing *Gardner*)). This Court has observed "that the phrase 'enforcement presumption'" does not exist "within caselaw issued by either the Supreme Court or the Sixth Circuit." *Christian Healthcare*, 1:22-cv-00787 PageID.867 n.3. But more important than phrasing is the concept of an enforcement presumption, which is "ma[d]e clear" from multiple Supreme Court decisions. *See, e.g.*, *Gardner*, 99. F.3d at 14-15 (analyzing four Supreme Court decisions and a D.C. Circuit decision); *cf., e.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."). Moreover, the presumption applies to recently enacted legislation—like the amended ELCRA—which was not at issue in *Christian Healthcare*.

Second, St. Joseph satisfies the *McKay* factors. Under *McKay*, the Sixth Circuit finds "a credible threat of prosecution where plaintiffs allege a subjective chill *and* point to some combination of the following factors: (1) a history of past enforcement against the plaintiffs or others … (2) enforcement warning letters … and/or [(3)] a provision allowing any member of the public to initiate an enforcement action."

*McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016). The court also (4) "take[s] into consideration a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." *Id.* These factors are "not exhaustive, nor must each be established." *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021). Accordingly, St. Joseph need not show past enforcement or threats against it specifically. *Id.* at 551 (citing *Platt v. Bd. of Comm'rs*, 769 F.3d 447, 452 (6th Cir. 2014)). Rather, "past enforcement against others" may be considered. *See Fischer v. Thomas*, 52 F.4th 303, 308 (6th Cir. 2022). And an investigation is itself sufficient to support a credible threat. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019).

Here, St. Joseph meets both the enforcement presumption and the *McKay* factors. Either is reason enough to find a credible threat of enforcement, thereby satisfying the *SBA List* step three.

### 1. Michigan fails to overcome the presumption of enforcement.

Michigan admits that the amendments to the ELCRA are recently enacted and that St. Joseph belongs to a class that is facially restricted by the policy. *See* PageID.839 ("facially subject to the statutes"). Accordingly, this Court should "assume a credible prosecutorial threat

31

absent compelling evidence to the contrary." *Strain*, 65 F.4th at 218. As Michigan cannot identify any compelling contrary evidence, "[n]othing here compels a different conclusion." *Id.*

*Attempt 1: the new ELCRA is not in effect.* Michigan's first attempt to rebut the presumption of enforcement is squarely foreclosed by the Sixth Circuit. Specifically, Michigan argues that the amended ELCRA is "not in effect and will (likely) not go into effect until a year from now." PageID.824. But "[i]n settings like this one, the Supreme Court has permitted plaintiffs to challenge laws well before their effective date." *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 537 (6th Cir. 2011), *abrogated on other grounds by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012). Many other courts agree.[3]

---

[3]   *See, e.g., Tenn. State Conf. of the N.A.A.C.P. v. Hargett*, 441 F. Supp. 3d 609, 626 (M.D. Tenn. 2019) ("The courts routinely consider pre-enforcement challenges filed in the period between a law's passage and its effective date."); *Roman Catholic Archdiocese of N.Y. v. Sebelius*, 907 F. Supp. 2d 310, 325 (E.D.N.Y. 2012) ("[W]hen determining whether an injury is sufficiently imminent for Article III standing purposes, courts focus 'on the probability of harm, not its temporal proximity.'" (quoting *520 S. Mich. Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006))).

**Attempt 2: the new ELCRA will be construed "accordingly."**
Michigan next claims it will interpret the ELCRA "accordingly" with the
First Amendment. *See* PageID.839-840. But the Sixth Circuit has
rejected the argument that policies with "broad scope"—like the amended
ELCRA—are saved from a pre-enforcement First Amendment challenge
simply because the policy also contains language claiming not to "reach
constitutionally protected [activity]." *Dambrot v. Cent. Mich. Univ.*, 55
F.3d 1177, 1183 (6th Cir. 1995). Rather, "[t]he broad scope of the policy's
language presents a realistic danger [Michigan] could compromise the
protection afforded by the First Amendment." *Id.* (cleaned up).

And here, the facts are worse than *Dambrot*. That's because the
amended ELCRA was enacted expressly, as Defendants urged, without
religious accommodations. *See* PageID.685. By contrast, the university
policy in *Dambrot* had express accommodation language: "[t]he
University will not extend its application of discriminatory harassment
so far as to interfere impermissibly with individuals rights to free
speech." 55 F.3d at 1183. Michigan cannot point to any language in the
ELCRA making such an express promise. The closest it comes is the
ELCRA's "permitted by law" language. Yet, as explained, *supra* 27-28,

33

that language is not only more generic than the language in *Dambrot* (which was still insufficient); it also has narrower application (only to the ELCRA's public accommodations provisions) and is construed by Michigan even more narrowly (with "law" meaning only "Michigan cases interpreting Michigan law"). What matters here is that Defendants sought to expand the ELCRA "without any amendments that would seek to reduce their scope or impact," including any religious liberty accommodations. PageID.685. And Michigan has already acknowledged that St. Joseph's conduct is "facially subject to the [ELCRA]." PageID.839.

This acknowledgement, plus Defendants' ELCRA advocacy, obviate this Court's prior observation that the pre-amendment ELCRA does not "facially fail[] to recognize religious freedoms like those asserted by Plaintiff herein." *Christian Healthcare*, 1:22-cv-00787 PageID.871. With the ELCRA amendments, all Defendants offer is a litigation promise "that the [law] would be enforced in a particular way"—a promise the Sixth Circuit has "decline[d] to accept." *Dambrot*, 55 F.3d at 1183 (citing *Vittiow v. City of Upper Arlington*, 43 F.3d 1100 (6th Cir. 1995)); *see also Speech First*, 939 F.3d at 770 (holding that a First Amendment challenge

34

to University speech policy was not moot, despite University's claim that the speech policy "specifically affirmed students' free speech rights"); *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 864 (E.D. Mich. 1989) (refusing to credit University "repeated[] argu[ment] that the Policy did not apply to speech that is protected by the First Amendment").

What's more, Michigan is now investigating a civil rights complaint in the Diocese of Lansing for gender identity discrimination under ELCRA. Specifically, the Civil Rights Commission ordered Catholic Charities of Shiawassee and Genesee Counties—which, like St. Joseph, is part of the Diocese of Lansing—to produce documents and respond to a gender identity discrimination complaint under the amended ELCRA. *See* Ex. A.[4] This complaint "initiates the formal investigative process, which itself is chilling [to First Amendment activity] even if it does not result in a finding of responsibility or criminality." *Speech First*, 939 F.3d at 765.

The Catholic Charities complaint includes the Commission's "Description of Options" and the "Acknowledgment of MDCR Complaint

---

[4]   *See Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008) (finding no error "in looking to "public records, including judicial proceedings, in addition to the allegations in the complaint" when "resolv[ing] a 12(b)(6) motion" (cleaned up)).

Process," both of which detail how this investigation will proceed. Ex. A. Nothing in these documents explain that the Commission would "ever decline[] to pursue a complaint … because the alleged harassing conduct was protected by the First Amendment. Nor is there evidence that the [Commission] ever informed an accused [person] … that the complained of conduct might be protected." *Doe*, 721 F. Supp. at 866. Rather, the Commission's process is "constitutionally indistinguishable from a full blown prosecution." *Id.* at 864.

Indeed, Michigan admits that "the scope of the MDCR's investigation will depend on whether the facts support that actionable discrimination occurred." *See Christian Healthcare*, 1:22-cv-00787 PageID.1073. Only then will the Commission decide whether Catholic Charities is "eligible for an exemption from applicable nondiscrimination laws based on its religious beliefs." *Christian Healthcare*, 1:22-cv-00787 PageID.1073. In short, Michigan is conditioning First Amendment protection on whether an investigation first reveals "actionable discrimination." This undercuts Michigan's claim "that the [new ELCRA] d[oes] not apply to [religious exercise] protected by the First Amendment." *Doe*, 721 F. Supp. at 864; *see also Hosanna-Tabor*, 565 U.S. at 194-95 (conditioning ministerial

36

exception on whether the "asserted religious reason for firing … was pretextual" "misses the point," because the decision "is the church's alone").

***Attempt 3: Michigan can't disavow enforcement.*** Finally, Michigan cannot bring forth compelling contrary evidence because it refuses to disavow enforcement against St. Joseph—or any religious organization. Indeed, Michigan considers it a virtue that "[d]isavowal is inapplicable in this context" because, to Michigan, *every* religious liberty claim "must be weighed on a case-by-case basis." *See* PageID.845. This is not the law, as it makes the investigatory process its own punishment. *See infra* 44-49.

Setting that constitutional concern aside for a moment, Michigan's wait-and-see response is "insufficient to make the threat of prosecution incredible," because the ELCRA's new prohibitions—as Michigan admits—facially cover St. Joseph. Because of that coverage, "nothing binds the Commission[] here—[it] could change [its] mind and decide [St. Joseph's conduct] do[es] violate the statute." *Strain*, 65 F.4th at 218. Michigan's myopic claim—that St. Joseph can facially violate the ELCRA, *see* PageID.839, and "await a future case where the Michigan

courts grapple with the [First Amendment issues] the Michigan Supreme Court left unanswered in *Rouch World*," PageID.835—is not compelling contrary evidence. It's a promise that there will be another *Rouch World*. And it dares St. Joseph to be the defendant.

"The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise." *Am. Booksellers*, 484 U.S. at 393. The newly amended ELCRA will be (and is being) enforced. The presumption thus attaches, and St. Joseph therefore satisfies the *SBA List* step three. Michigan's motion should therefore be denied.

## 2. Alternatively, St. Joseph meets the *McKay* factors.

St. Joseph also meets the standard for a credible threat of enforcement under the *McKay* factors. This is an alternative basis for St. Joseph to satisfy *SBA List* step three, and for the Court to deny Michigan's motion.

***History of enforcement.*** Here, there is not only a history of *past* enforcement toward others. There's *ongoing* enforcement against Catholic Charities in the Diocese of Lansing. *Supra* 35. This contradicts Michigan's claim—made to this Court two days later—that "neither the Commission nor the Department has … responsively initiated … a

38

complaint or an investigation of … any other religious ministry or provider[] based on … the ELCRA prohibit[ing] discrimination on the basis of sexual orientation and gender identity." PageID.826; PageID.829, 831 (similar).

Moreover, Michigan's carefully worded denial leaves out *Rouch World*. There, the Commission enforced the ELCRA against a family-run "event center" because "hosting and participating in a same-sex wedding ceremony would violate the [family's] sincerely held religious belief that marriage is a sacred act of worship between one man and one woman." *Rouch World*, 987 N.W.2d at 505. That is a history of enforcement related to a religious ceremony, against someone with a religious objection.

A history of enforcement is also illustrated by the massive spike in sex discrimination cases after the Commission issued its interpretive statement redefining "sex" to include sexual orientation and gender identity. After that interpretive statement, and before *Rouch World* was even decided, the Commission admitted to "73 complaints on the basis of sexual orientation and gender identity" "through the end of 2019" alone. PageID.677 (cleaned up). And just last year—with *Rouch World* decided in July—"the highest number [of sex discrimination complaints] on

record" were filed. PageID.678. Michigan tries to spin these numbers, but it can't dispute them.[5] On a motion to dismiss, these allegations are more than sufficient, "especially where the agency tasked with enforcing the statute receives complaints on a relatively frequent basis. Given Defendants' historical conduct, there is certainly a credible threat that [Plaintiff] could be prosecuted under the statute." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1049 (6th Cir. 2015).

**Provision allowing public enforcement.** "The credibility of that threat is bolstered by the fact that the authority to file a complaint with the Commission" extends to "any person." *SBA List*, 573 U.S. at 164 (internal quotation marks omitted). Indeed, that's already happened to Catholic Charities. *Supra* 35. Under the ELCRA, the Department and the Commission must investigate those complaints and, if they determine a violation has occurred, the Commission "shall" issue a cease-and-desist order and any other penalties it deems necessary. *See* MCL §§

---

[5]   For example, Michigan speculates that the rise in sex discrimination claims is attributable to "the women's 'Me Too' movement." PageID.827. But as this is a facial attack, where the complaint's "material allegations" "must [be] construed in the light most favorable to the nonmoving party," Michigan's spin is as irrelevant as it is implausible. *Ritchie*, 15 F.3d at 598.

37.2602, 37.2605. This is important here, where the Commission has expanded the ways in which people may file complaints. PageID.684. Moreover, the ELCRA allows "[a] person alleging a violation of this act [to] bring a civil action" for damages and injunctive relief. MCL § 37.2801. The Sixth Circuit has already held that such private enforcement provisions support a credible threat of enforcement, because they "increase[] the likelihood that [plaintiffs] will have to defend against" lawsuits under the statute. *Online Merchs. Guild*, 995 F.3d at 551.

***Failure to disavow enforcement.*** Here, as explained above, Michigan refuses to disavow enforcement. *Supra* 37-38. This further supports St. Joseph's credible threat of enforcement.

Michigan attempts to diminish its failure to disavow enforcement by stringing together inapplicable cases, most of which predate *SBA List* and don't apply the correct legal standard. For example, *Laird v. Tatum* failed to identify government action that was "proscriptive[] or compulsory" in nature. 408 U.S. 1, 11-14 (1972). And while Michigan relies on *Morrison v. Board of Educ. of Boyd County*, 521 F.3d 602 (6th Cir. 2008) (PageID.846), the Sixth Circuit distinguished *Morrison* in *Speech First*. As *Speech First* explained, *Morrison* dealt with a policy that

41

was not "likely to apply [the plaintiff] in the future since the school board changed the rule shortly after litigation commenced." *Speech First*, 939 F.3d at 766 (discussing *Morrison*). Here, however, as Michigan admits, "religious freedoms" under the amended ELCRA "must be weighed on a case-by-case basis" (PageID.845) and St. Joseph should simply "await a future case where the Michigan courts grapple" with religious liberty claims under the amended ELCRA, PageID.835. Michigan, therefore, expects the amended ELCRA to apply to religious organizations. That's objectively chilling to St. Joseph's religious exercise. *See Speech First*, 939 F.3d at 765 (discussing policies that "objectively chill speech").[6]

Michigan next tries to claim disavowal is unnecessary, citing *Davis v. Colerain Township*, 51 F.4th 164, 174 (6th Cir. 2022). But there, disavowal was unnecessary because the plaintiff failed to properly establish at summary judgment—not the pleading stage—that her future speech would be prohibited by a rule banning "inappropriate or offensive" comments in a limited public forum. *Id.* at 172. And in *Glenn v. Holder,*

---

[6]   *Morrison*'s precedential value is suspect since it is one of the cases that the Sixth Circuit relied upon in *SBA List*—which was then reversed by the Supreme Court. *See Susan B. Anthony List v. Driehaus*, 525 F. App'x 415, 419 (6th Cir. 2013), *rev'd and remanded*, 573 U.S. 149 (2014) (citing *Morrison*).

plaintiffs' conduct was not arguably proscribed because they had "not alleged any actual intent to 'willfully cause[ ] bodily injury,' the conduct proscribed by the Act." 690 F.3d 417, 421 (6th Cir. 2012).

Here, by contrast, the SAC details how St. Joseph's current conduct is arguably proscribed. *Supra* 20-29. And Michigan's only response is to draw an artificial distinction between St. Joseph's conduct being "facially subject to [ELCRA's prohibitions]" and "the actual proscription of [St. Joseph's] protected activities." PageID.839. This distinction relies on a misunderstanding of the governing law, as explained. *Supra* 33-35 (discussing how *Dambrot* is fatal to Michigan's arguments).

***

St. Joseph has alleged everything it needs to establish pre-enforcement standing under *SBA List*. No one disputes that St. Joseph engages in constitutionally protected conduct (step 1). St. Joseph's conduct is, in multiple ways, arguably proscribed by the newly expanded ELCRA (step 2). And St. Joseph has alleged a credible threat of enforcement (step 3). It also satisfies the *McKay* factors (another way to show step 3). Michigan's motion to dismiss should be denied.

43

**D. Granting Michigan's motion would cause constitutional conflicts.**

While the foregoing is sufficient to deny Michigan's motion, the motion should also be denied for an additional reason: the motion's standing and ripeness arguments turn on a deep misunderstanding of St. Joseph's constitutional protections.

Michigan's motion rests on the incorrect assumption that it is free to define the scope of St. Joseph's First Amendment protections. Hence Michigan invites St. Joseph to "request a declaratory ruling" if its "unsure of how the Commission will apply ... *Rouch World* or the new amendments." PageID.835. Or invoke the BFOQ process to exempt its employees, including those that qualify as First Amendment ministers. PageID.839. Or await actual harms to St. Joseph's Catholic identity, because under the ELCRA, Michigan "must ... weigh[]" every religious freedom claim "on a case-by-case basis." PageID.845. The problem with these attempts at reassurance is that they miss a fundamental point: under the U.S. Constitution, it isn't Michigan that gives St. Joseph permission to exercise its religion.

Contrary to Michigan's arguments, the First Amendment guarantees St. Joseph a "sphere" of "independence" and "autonomy" to make

"internal management decisions that are essential to the institution's central mission." *Our Lady*, 140 S. Ct. at 2060. Such decisions are "the church's alone," and therefore not subjected to either government permission slips or judicial second-guessing. *See Hosanna-Tabor*, 565 U.S. at 194-95. "This constitutional protection is not only a personal one; it is a structural one that categorically prohibits federal and state governments from becoming involved in religious leadership disputes." *Conlon v. InterVarsity Christian Fellowship/USA*, 777 F.3d 829, 836 (6th Cir. 2015). While a "component" of that "sphere" is the ministerial exception, *Our Lady*, 140 S. Ct. at 2060, church autonomy is broader than that.

Church autonomy protects religious institutions from government processes that "would also raise serious concerns about state entanglement with religion and denominational favoritism." *Carson v. Makin*, 142 S. Ct. 1987, 2001 (2022) (citing, *inter alia*, *Our Lady*, 140 S. Ct. at 2068-69). Those processes include state governmental inquiries that "scrutinize[e] whether and how a religious school pursues its educational mission." *Id.* That's because "[i]t is not only the conclusions that may be reached by the [Defendants] which may impinge on rights

45

guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979).

Because "[f]ear of potential liability might affect the way an organization carried out what it understood to be its religious mission," courts nationwide decline to subject religious organizations to government scrutiny of their religious missions "on pain of substantial liability." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 336 (1987).[7]

---

[7] *See e.g.*, *Whole Woman's Health v. Smith*, 896 F.3d 362, 373-74 (5th Cir. 2018) (striking discovery order which would reveal the Catholic bishops' internal communications and interfere in decision-making); *Rayburn v. General Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) ("There is the danger that churches, wary of EEOC or judicial review of their decisions, might make them with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments of who would best serve the pastoral needs of their members."); *In re Lubbock*, 624 S.W.3d 506, 517 (Tex. 2021) ("Although tort law imposes a duty not to defame or intentionally inflict emotional distress upon others, a civil suit that is inextricably intertwined with a church's directive to investigate its clergy cannot proceed in the courts."); *Flynn v. Estevez*, 221 So.3d 1241, 1243 (Fla. Dist. Ct. App. 2017) ("[C]hurch autonomy doctrine [] precluded [civil courts] from wading into the religious controversy between the Diocese and a Catholic parent seeking admission of his non-immunized son to first grade."); *Dermody v. Presbyterian Church (U.S.A.)*, 530 S.W.3d 467, 474 (Ct. App. Ky. 2017) ("we cannot provide Dermody the relief he seeks without excessive government entanglement into … what constitutes unethical conduct by one of that church's ministers," nor can we "avoid the doctrine by recasting the statements of which he complains").

That pain is acute when governments "evaluate[] whether to grant religious exemptions 'on an individual basis.'" *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 734 (6th Cir. 2021). Such systems "invite the government to decide which reasons for not complying with the policy are worthy of solicitude," increasing the chances of denominational favoritism and entanglement. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021) (cleaned up). So when church autonomy is not at issue (and courts simply decline to subject religious organizations to secular interference), courts still subject systems of individualized assessment to strict scrutiny, "regardless whether any exceptions have been given" to them. *Id.*

Here, by granting Michigan's motion to dismiss, the court would obviate St. Joseph's church autonomy protections, and turn systems of individualized assessment into reasons for more, not less, judicial deference. For example, if St. Joseph wants to avoid liability for "sex" discrimination under the ELCRA's employment provisions, the church would need to apply for BFOQ exemptions for nearly all of its parish and school staff—including catechetical instructors, its principal and school administrators, and its religion teachers. *See* PageID.839 (reassuring

47

St. Joseph that it can seek BFOQ exemptions, "[a]nd the state courts have recognized and applied the 'ministerial exception'"). Even if St. Joseph received these BFOQ exemptions, they're only good for five years each. *See* PageID.666, 698-699. Only an artificially narrow definition of "entanglement" could exclude scrutinizing—at five-year increments— how a church and parish school understands the religious mission of its respective employees. *See Catholic Bishop*, 440 U.S. at 502-03 (declining to exercise jurisdiction over the "terms and conditions of employment" for teachers, as it would involve the NLRB in "nearly everything that goes on" at religious schools); *Duquense Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 835 (D.C. Cir. 2020) ("[T]rolling through the beliefs of the University, making determinations about its religious mission and whether certain faculty members contribute to that mission … is no business of the State." (cleaned up)).

What's more, part of the point of the church autonomy doctrine—made clear in the above-cited cases—is avoiding the chill to religious exercise that will come from having to regularly justify a church's religious tenets to secular governments "on pain of substantial liability." *See, e.g.*, *Amos*, 483 U.S. at 336. Here, that chill reaches the myriad ways that the

amended ELCRA's definition of "sex" discrimination affects St. Joseph's religious exercise *outside* the BFOQ context—like its family-student policies, the use of its facilities, or how it can uphold Catholic identity in relation to "shared time" teachers and RESA staff. Michigan's "solution" to chilling St. Joseph's religious exercise is telling St. Joseph to either (1) "request a declaratory ruling" from the Commission or (2) await a lawsuit and see how the Commission "weigh[s]" St. Joseph's religious freedom "on a case-by-case basis." *See* PageID.835, 845. Both are cold comfort. Either "solution" will cause St. Joseph "to predict which of its activities a secular [bureaucracy] will consider religious"—with a government investigation or civil liability to follow if it guesses wrong. *Amos*, 483 U.S. at 336. "The line is hardly a bright one," *id.*, especially so in systems of individualized assessments. As such, the resulting chill to St. Joseph's religious exercise "understandably" remains. *Id.*

In short, granting Michigan's motion to dismiss not only puts the Court crosswise with standing and ripeness law—it puts Michigan crosswise with St. Joseph's First Amendment protections. The only way to avoid these conflicts is to deny Michigan's motion.

49

## II. Declaratory and injunctive relief are both appropriate remedies for Michigan's constitutional violations.

St. Joseph seeks both preliminary and permanent injunctions prohibiting Defendants from enforcing the ELCRA in a manner that would require St. Joseph to hire employees, admit students, or "administer its parish or school in any manner" that violates St. Joseph's First Amendment rights. PageID.717. St. Joseph also asks this Court to declare that the First and Fourteenth Amendments protect "St. Joseph's ability to maintain religious policies and codes of conduct for employees of any kind, students, and families" and "St. Joseph's freedom to participate equally in public benefit programs." PageID.716-717. Both declaratory and injunctive relief are appropriate remedies for Michigan's violation of the First Amendment.

***Injunctive Relief.*** When a government actor violates the First Amendment, injunctive relief is proper. Indeed, because violations of the First Amendment are inherently irreparable, injunctive relief is necessary. "Under well-settled law, a party is *entitled* to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer 'continuing irreparable injury' for which there is no adequate remedy at law." *Women's Med. Pro. Corp. v. Baird*, 438 F.3d 595, 616 (6th

Cir. 2006) (emphasis added) (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998)). What is more, "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Fox v. Saginaw County*, 35 F.4th 1042, 1047 (6th Cir. 2022) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Doster v. Kendall*, 54 F.4th 398, 428 (6th Cir. 2022) (applying same rule to RFRA). Accordingly, "[o]nce the court has determined that a First Amendment violation has occurred, the [injunction] factors weigh heavily in favor of issuing an injunction." *InterVarsity Christian Fellowship/USA v. Bd. of Governors of Wayne State Univ.*, No. 19-10375, 2021 WL 1387787, at *34 (E.D. Mich. Apr. 13, 2021).

Indeed, the Sixth Circuit has confirmed that "success on the merits 'will often be determinative,'" as the injunction analysis will "essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights." *Id.* (quoting *Cnty. Sec. Agency v. Ohio Dep't of Com.*, 296 F.3d 477, 485 (6th Cir. 2002); *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 403 (6th Cir. 2022) ("[A]s in many First

Amendment cases, the key inquiry is the first one: Who is likely to prevail on the constitutional claim?").

Should this Court rule for St. Joseph on the merits, an injunction protecting St. Joseph's rights is therefore both appropriate and necessary.

***Declaratory relief***. When determining whether declaratory relief is appropriate, the Sixth Circuit applies the five *Grand Trunk* factors. *See Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984). These factors are:

> (1) [W]hether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata"; (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Savoie v. Martin*, 673 F.3d 488, 495-96 (6th Cir. 2012). The Sixth Circuit "has never assigned weights to the *Grand Trunk* factors when considered in the abstract and the factors are not always considered equally." *Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 29 F.4th 792, 797 (6th Cir. 2022) (cleaned up). "Instead, the relative weight of the

52

underlying considerations of efficiency, fairness, and federalism will depend on facts of the case." *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 396 (6th Cir. 2019) (cleaned up).

Applied here, the *Grand Trunk* factors favor declaratory relief. Regarding the first two factors, declaratory relief would conclusively settle the key legal dispute between the parties: whether the amended ELCRA violates St. Joseph's First Amendment rights. *See Cole v. City of Memphis*, 108 F. Supp. 3d 593, 604 (W.D. Tenn. 2015) (finding declaratory relief appropriate when "a single declaration" that the challenged conduct is "unconstitutional … would provide a common answer" to all the legal claims); *Mass. Bay Ins. Co. v. Christian Funeral Directors, Inc.*, 759 F. App'x 431, 438 (6th Cir. 2018) (finding the second factor satisfied when the declaratory judgment "squarely clarifies" "the only legal relationship presented to the Court").

"The third [*Grand Trunk*] factor is meant to preclude jurisdiction for 'declaratory plaintiffs who file their suits mere days or weeks before the … 'natural plaintiff' and who seem to have done so for the purpose of acquiring a favorable forum.'" *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 558 (6th Cir. 2008) (quoting *AmSouth Bank v. Dale*, 386 F.3d 763,

788 (6th Cir. 2004)). Here, there is no "race to the courthouse": St. Joseph *is* the natural plaintiff. *See Cole*, 108 F. Supp. 3d at 605.

The fourth factor—friction with state courts—is similarly a non-issue. There are no state law claims and no competing state case. *See Am. Home Assur. Co. v. Evans*, 791 F.2d 61, 64 (6th Cir. 1986).

Finally, the fifth *Grand Trunk* factor (whether there is a better and more effective alternative forum) also favors declaratory relief. "[T]he federal forum is well-suited to declare the constitutionality" of the amended ELCRA and "[t]his is not a case where a state court judgment or indemnity action would provide a 'better or more effective' remedy for the [State's] constitutional violations." *Cole*, 108 F. Supp. 3d at 606.

For the reasons above, declaratory relief is an appropriate remedy.

## CONCLUSION

For all these reasons, Defendants' motion should be DENIED in its entirety.

Date: June 2, 2023

Respectfully submitted,

/s/ *William J. Haun*
Lori H. Windham
William J. Haun
Nicholas R. Reaves
Brandon L. Winchel*
The Becket Fund for Religious Liberty
1919 Penn. Ave. NW, Suite 400
Washington, DC 20006
Tel.: (202) 955-0095
Fax: (202) 955-0090
*whaun@becketlaw.org*

William R. Bloomfield (P68515)
Catholic Diocese of Lansing
228 N. Walnut Street
Lansing, Michigan 48933
(517) 342-2522
*wbloomfield@dioceseoflansing.org*

* Not a member of the DC Bar;
admitted in California. Practice
limited to cases in federal court.

*Counsel for Plaintiff*

55

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the word limit of L. Civ. R. 7.2(b)(i) because, excluding the parts exempted by L. Civ. R. 7.2(b)(i), it contains 10,553 words. The word count was generated using Microsoft Word 2019.

/s/ *William J. Haun*
William J. Haun
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
Tel.: (202) 955-0095
Fax: (202) 955-0090
whaun@becketlaw.org