UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ST. JOSEPH PARISH ST. JOHNS,

      Plaintiff,

                                Case No. 1:22-cv-1154

v.

                                HON. JANE M. BECKERING

DANA NESSEL, et al.,

      Defendants.

_____/


**OPINION AND ORDER**


Pursuant to 42 U.S.C. § 1983, Plaintiff St. Joseph Parish St. Johns (St. Joseph) filed this pre-enforcement civil rights action for declaratory and injunctive relief against Defendants Dana Nessel, Michigan's Attorney General; John E. Johnson, Jr., the Executive Director of Michigan's Department of Civil Rights ("the Department" or MDCR); and eight individual members of Michigan's Civil Rights Commission ("the Commission" or MCRC) (collectively, "Defendants").[1]  St. Joseph alleges that the enforcement of certain provisions in Michigan's civil rights law will infringe on its religious mission and thereby violate its rights under the First Amendment to the United States Constitution.  Pending before the Court is Defendants' Motion to Dismiss (ECF No. 43), as well as certain supplemental filings.  Defendants move to dismiss this case under Federal Rule of Civil Procedure 12(b)(1), arguing, in pertinent part, that no case or

---

[1] The case at bar is related to another pre-enforcement civil rights lawsuit brought the same month on behalf of Sacred Heart of Jesus Parish, Grand Rapids, *Sacred Heart of Jesus Parish, Grand Rapids et al. v. Nessel, et al.*, 1:22-cv-1214, alleging similar claims against these same Defendants. Counsel who filed *Sacred Heart* also filed similar claims in August 2022 in *Christian Healthcare Centers, Inc. v. Nessel, et. al.,* 1:22-cv-787, which this Court dismissed in March 2023.  *See* Administrative Order 23-CA-008 (ECF No. 22).

controversy exists for federal jurisdiction.  For the following reasons, the Court agrees and grants the motion to dismiss and closes this case.

## I.  BACKGROUND

### A.  Statutory Framework

St. Joseph's pre-enforcement challenge concerns Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MICH. COMP. LAWS § 37.2101 *et seq.*  A brief description of the law will help to place this case (and this Court's decision) in context.

The ELCRA generally prohibits discrimination by an "educational institution" because of "religion, race, color, national origin, or sex."  MICH. COMP. LAWS § 37.2402.  The Act defines "educational institution" to mean a public or private institution, MICH. COMP. LAWS § 37.2401, although the prohibitions related to religious discrimination expressly do not apply to "religious educational institutions," MICH. COMP. LAWS § 37.2403.

In the employment context, the ELCRA defines "employer" as "a person who has 1 or more employees."  MICH. COMP. LAWS § 37.2201(a).  Under the ELCRA, employers may not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual … because of … sex[.]"  MICH. COMP. LAWS § 37.2202(1)(a).  And employers cannot "print, circulate, post, mail, or otherwise cause to be published a statement, advertisement, notice, or sign relating to employment by the employer … that indicates a preference, limitation, specification, or discrimination, based on … sex[.]"  MICH. COMP. LAWS § 37.2206(1).  As St. Joseph acknowledges (2d Amend. Compl. [ECF No. 40] ¶¶ 75 & 110), the ELCRA provides exemptions for certain types of discrimination, including "sex," where there is a "bona fide occupational qualification reasonably necessary to the normal operation of the business[.]"  MICH. COMP. LAWS § 37.2208.

The public accommodations section of the ELCRA defines "a place of public accommodation" to include an "institution of any kind … whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public." MICH. COMP. LAWS § 37.2301(a).  The ELCRA provides, in pertinent part, that "*[e]xcept where permitted by law*, a person shall not [d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of … sex …." MICH. COMP. LAWS § 37.2302(a) (emphasis added).

Michigan's Department of Civil Rights is charged with receiving, initiating, investigating, conciliating, adjusting, disposing of, issuing charges, and holding hearings on complaints alleging a violation of the ELCRA. MICH. COMP. LAWS § 37.2602(c).  The Commission was established by the Michigan Constitution of 1963 to carry out the guarantees against discrimination articulated in Article 1, § 2. *See* MICH. CONST. 1963, Art. 1, § 2, Art. 5, § 29.  Any person claiming to be aggrieved by unlawful discrimination may file a complaint with the Department to be heard before the Commission, MICH. COMP. LAWS § 37.1605, or the aggrieved individual may bring a civil action in state circuit court, MICH. COMP. LAWS § 37.1606. *See also* MDCR Rule 37.2(m) (broadly defining "person" to include not only individuals but also corporations, associations, or "any other legal or commercial entity").  Importantly, the construction provision of the ELCRA, which applies to employment, public accommodations, and educational institutions, expressly provides that the Act "shall not be construed as preventing the commission from securing civil rights guaranteed by law other than the civil rights set forth in this act." MICH. COMP. LAWS § 37.2705(1).

The ELCRA also provides the Department with authority to make individualized exemptions for employers who make a "sufficient showing" that religion is a bona fide

occupational qualification (BFOQ) "reasonably necessary to the normal operation of the business." MICH. COMP. LAWS § 37.2208.  Alternatively, as noted above, "[a]n employer may have a bona fide occupational qualification on the basis of religion … *without obtaining prior exemption from the commission*, provided that an employer who does not obtain an exemption shall have the burden of establishing that the qualification is reasonably necessary to the normal operation of the business." *Id.* (emphasis added).  St. Joseph concedes that it has not sought a BFOQ exemption (2d Amend. Compl. ¶ 111).

In May 2018, the Commission adopted Interpretive Statement 2018-1, in which it concluded that "sexual orientation" and "gender identity" fall within the meaning of "sex" as used in the ELCRA (2d Amend. Compl. ¶ 56).  The Commission explained in its statement that

> the U.S. 6th Circuit Court of Appeals . . . ruled in the case of *EEOC v R.G. & G.R. Harris Funeral Homes, Inc.* that the same language "discrimination because of . . . sex" when used in federal civil rights law protected a transgender Michigan woman who was gender stereotyped and discriminated against for not behaving like a male[.]

(ECF No. 44 at PageID.817, quoting Interpretative Statement 2018-1).  Accordingly, the Commission found that "continuing to interpret the protections afforded by the phrase 'discrimination because of . . . sex' more restrictively by continuing to exclude individuals for reasons of their gender identity or sexual orientation would itself be discriminatory" (*id.*).  *See generally* MICH. COMP. LAWS § 24.207(h) ("[A]n interpretive statement … in itself does not have the force and effect of law but is merely explanatory.").

Subsequently, three private individuals filed complaints with the Department based on Interpretive Statement 2018-1.  First, Natalie Johnson and Megan Oswalt filed a complaint alleging that Rouch World, LLC, an event center operator, discriminated against them "on the basis of sex" in violation of the ELCRA by denying their April 2019 request to host their same-sex wedding at

its facility.  The owners of Rouch World asserted that hosting the ceremony would violate their religious beliefs.  Second, Marissa Wolfe, a transgender woman, filed a complaint with the Department, alleging that Uprooted Electrolysis, LLC, a hair removal business, had discriminated against her "on the basis of sex" in violation of the ELCRA in denying her services.  The owner of Uprooted Electrolysis perceived the requested services to be centrally connected to Wolfe's transgender identity and asserted that providing the services would violate her religious beliefs. The MDCR investigations were stayed when Rouch World and Uprooted Electrolysis jointly sued the MDCR and its then director in the Michigan Court of Claims, seeking (1) a declaratory judgment that sexual orientation and gender identity were not encompassed by the ELCRA's prohibition of sex discrimination in places of public accommodation and (2) an injunction prohibiting the continued investigation of the complaints filed against plaintiffs and the MDCR's adherence to Interpretive Statement 2018-1.  *See generally Rouch World, LLC v. Dep't of C.R.*, 987 N.W.2d 501, 505–06 (Mich. 2022) (setting forth factual background).

The Michigan Court of Claims held that discrimination "because of sex" under the ELCRA includes discrimination because of an individual's "gender identity," and granted relief in favor of the Department with regard to Uprooted Electrolysis' claim.  *Id.* at 506.  However, on the basis of stare decisis, the court denied summary disposition as to the sexual orientation claim.  *Id.* Regarding Rouch World's and Uprooted Electrolysis' First Amendment free exercise of religion claim, the Court of Claims concluded that the issue "had not been sufficiently briefed to resolve at this juncture."  *See Rouch World, LLC v. Dep't of Civ. Rights*, Case No. 20-000145-MZ, unpublished order of the Court of Claims, entered 12/7/2020, at p. 7 (Defs. Ex. B, ECF No. 44-3 at PageID.864).  The plaintiffs did not seek to appeal the gender-identity ruling.

The Department appealed the decision directly to the Michigan Supreme Court.  In July 2022, the Michigan Supreme Court held that "the denial of 'the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service' on the basis of sexual orientation constitutes discrimination 'because of ... sex' and, therefore, constitutes a violation of the ELCRA under MICH. COMP. LAWS § 37.2302(a)." *Rouch World*, 987 N.W.2d at 519.  The Michigan Supreme Court did not decide whether gender identity was encompassed by the ELCRA—the basis of the complaint against Uprooted Electrolysis—because the issue was not appealed.  *Id.* at 506.  Additionally, the Michigan Supreme Court expressly noted that "[w]hether enforcement under the ELCRA for sexual-orientation and gender-identity discrimination would violate [the] plaintiffs' federal and state constitutional religious liberty protections has not yet been adjudicated below and, accordingly, is also not currently before this Court."  *Id.* at 506 n.5.

On March 16, 2023, Michigan's Legislature amended the ELCRA to add "sexual orientation" and "gender identity or expression" as classes protected from discrimination.  *See* 2023 Mich. Legis. Serv. P.A. 6 (S.B. 4).  The amendment takes effect on the 91st day after final adjournment of the 2023 regular session of the Michigan Legislature, i.e., presumably at some time in March 2024.  Defendants indicate that the Commission has yet to issue a formal policy or interpretive statement following the amendment (ECF No. 44 at PageID.850).

### B.     Factual Background

St. Joseph, a Michigan nonprofit corporation in the Roman Catholic Diocese of Lansing, is a church that operates St. Joseph Catholic School in St. Johns, Michigan (2d. Amend. Compl. ¶¶ 1, 22, 35, & 136).  St. Joseph enrolls just under 200 students each year between kindergarten and sixth grade (*id.* ¶ 37).  St. Joseph is "open to all:  anyone—Catholic or not—is free to attend

Mass" (*id.* ¶ 87).  St. Joseph also participates in sports leagues that make use of its fields and gymnasium, and those leagues are similarly "open to all" (*id.*).  St. Joseph participates in "shared time" arrangements for local public-school teachers to teach St. Joseph students in St. Joseph classrooms, and the Clinton County Regional Educational Service Agency provides St. Joseph with other special services to its students (*id.* ¶¶ 19 & 87).  And St. Joseph is planning to host private tutors at the parish to help the public-school children that attend its parish to improve their reading skills as they prepare for religious sacraments (*id.* ¶ 87).

In accordance with the Diocese of Lansing and in keeping with its Catholic identity, St. Joseph requires parish and school staff to "affirm the tenants [sic] of the Catholic faith" (*id.* ¶ 40).  Every employee at St. Joseph—from kindergarten teachers to part-time bookkeepers—must be practicing Catholics (*id.*).  The Diocese of Lansing's Code of Conduct further requires that employees must "exemplify the moral teachings of the Catholic Church" and "not teach, advocate, model, or in any way encourage beliefs or behaviors that are contrary to the teaching of the Catholic Church," which includes the Church's teaching on gender, sexuality, and marriage (*id.*).  Crucial to St. Joseph's ability to advance its religious mission is its employment of teachers and staff who support and advance that mission (*id.* ¶ 3).

St. Joseph alleges that Michigan's amended civil rights law infringes on and chills its First Amendment right to govern itself according to religious principles, frame its policies and doctrine, create and maintain a parish and school environment that is faithful to its religious beliefs, and select its employees according to those religious principles without government interference (*id.* ¶ 137).  St. Joseph alleges that the "ELCRA's broad provisions impose overlapping non-discrimination requirements on St. Joseph—as an educator, as an employer, and as a public accommodation" (*id.* ¶¶ 11–12).  Specifically, St. Joseph alleges that the newly amended civil

rights law makes it unlawful for St. Joseph to follow "the 2,000-year-old teachings of the Catholic Church, including its teaching that marriage is a lifelong commitment between one man and one woman, that sexual relations are limited to marriage, and that human beings are created as either male or female" (*id.* ¶ 13).  In its educational activities, St. Joseph teaches and practices that "men and women, boys and girls, should be treated according to their biological sex, including in dress, personal pronouns, participation in sports teams, and use of bathrooms, locker rooms, or other single-sex spaces" (*id.* ¶ 52).  Diocese policy requires that "[s]tudents [who attend Diocesan schools] and [their] parents (or legal guardians) shall conduct themselves in accord with their God-given biological sex" (*id.* ¶ 46).

St. Joseph alleges that "the risk of liability" has led it to hold off on hiring or expanding its services (*id.* ¶¶ 14–15).  St. Joseph alleges that also at stake is its ability to rent its facilities and conduct parish activities without being held liable as a public accommodation (*id.* ¶ 18).  St. Joseph does not identify any pending complaint, investigation, or prosecution against it, but St. Joseph alleges that "[w]ith 'sexual orientation' and 'gender identity or expression' protections now enshrined in the ELCRA, St. Joseph faces an immediate threat of enforcement" (*id.* ¶ 129).

### C.  Procedural Posture

St. Joseph initiated this action on December 5, 2022 with the filing of a Complaint (ECF No. 1), which it amended on March 9, 2023 (ECF No. 29) and again on April 7, 2023 (ECF No. 40).  In its Second Amended Complaint, St. Joseph alleges the following five claims pursuant to 42 U.S.C. § 1983 and the First Amendment to the United States Constitution:

I.    Church Autonomy

II.    Free Exercise Clause; General Applicability

III.    Free Exercise Clause; Status and use discrimination

IV.    Free Speech Clause

V.      Free Speech & Assembly Clauses

(ECF No. 40).  St. Joseph seeks injunctive and declaratory relief, and costs and attorney fees (*id.* at PageID.716–718).

Defendants filed a motion to dismiss St. Joseph's Second Amended Complaint (ECF No. 43), to which St. Joseph filed a response (ECF No. 47), and Defendants filed a reply (ECF No. 48).  St. Joseph has also since twice moved for leave to file notice of supplemental authorities (ECF Nos. 50 & 54).  Defendants oppose both motions (ECF Nos. 52 & 57).

## II.  ANALYSIS

### A.  Motion Standard

Defendants' motion to dismiss is filed pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject-matter jurisdiction).  Defendants argue that St. Joseph's Second Amended Complaint remains a panoply of assumptions and conjecture and that St. Joseph cannot show that it has standing to present its claims or that its claims are ripe for review.  Both arguments are properly presented as bases to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1).  *See Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002) ("A court lacks jurisdiction over the subject matter if the claim is not yet ripe for judicial review."); *State by & through Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019) ("If no plaintiff has standing, then the court lacks subject-matter jurisdiction.").

"Rule 12(b)(1) motions to dismiss based upon subject matter jurisdiction generally come in two varieties"—a facial attack or a factual attack.  *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).  "In a facial attack, a 'movant accepts the alleged jurisdictional facts as true and 'questions merely the sufficiency of the pleading' to invoke federal jurisdiction.'" *Polselli v. United States Dep't of the Treasury–Internal Revenue Serv.*, 23 F.4th 616, 621 (6th Cir.) (citations omitted), aff'd sub nom. *Polselli v. Internal Revenue Serv.*, 598 U.S. 432 (2023).  "In a

9

factual attack, a movant presents evidence outside of the pleadings to contest jurisdictional facts alleged in the petitions." *Id.* In reviewing a facial attack, "a trial court takes the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss. On the other hand, when a court reviews a complaint under a factual attack …, no presumptive truthfulness applies to the factual allegations." *Ohio Nat. Life, supra.* While Defendants describe the standard of review for a factual attack (ECF No. 44 at PageID.821), St. Joseph accurately points out that Defendants have not contested the truth of the jurisdictional allegations in the Second Amended Complaint, only their sufficiency (ECF No. 47 at PageID.896). Therefore, the Court likewise analyzes the Second Amended Complaint on its face. *See, e.g., Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc.*, 585 F.3d 917, 919 (6th Cir. 2009); *Lovely v. United States*, 570 F.3d 778, 782 (6th Cir. 2009).

## B. Discussion

### 1. Subject-Matter Jurisdiction

Defendants argue that St. Joseph's lack of standing prevents this Court from exercising jurisdiction over the subject matter of St. Joseph's claims. Subject-matter jurisdiction is the threshold question. Without subject-matter jurisdiction, this Court lacks power to issue any order other than an order to dismiss the case. *Binno v. Am. Bar Ass'n.*, 826 F.3d 338, 344 (6th Cir. 2016). *See also U.S. Fid. & Guar. Co. v. Thomas Solvent Co.*, 955 F.2d 1085, 1087 (6th Cir. 1992) (explaining that where a district court lacks subject-matter jurisdiction, its orders are "void"). If the plaintiff lacks standing, then the court "need not reach the other issues: ripeness, statutory preclusion, and failure to state a claim upon which relief can be granted." *State by & through*

*Tenn. Gen. Assembly*, 931 F.3d at 507.   Consequently, the Court turns first to analyzing

Defendants' Rule 12(b)(1) standing argument, and the Court finds the argument dispositive.[2]

## 2.      Standing

Defendants argue that St. Joseph cannot establish standing where St. Joseph has not

plausibly alleged an injury-in-fact (ECF No. 44 at PageID.835).   Defendants argue that St. Joseph

has not shown that it will imminently suffer an injury where (a) the ELCRA does not facially

proscribe  St.  Joseph  from  exercising  any  constitutionally  protected  religious  rights,  (b)

discrimination based on a protected category is permissible where it is a bona fide occupational

qualification reasonably necessary to the normal operation of the business, and (c) state courts

have recognized and applied the "ministerial exception" to religious employers in ELCRA cases

(*id.* at PageID.836–840).   According to Defendants, St. Joseph conflates being "facially subject to

the statutes, for example as an 'employer' under the ELCRA, with the actual proscription of its

protected activities" (*id.* at PageID.839).   Additionally, Defendants argue that St. Joseph has not

plausibly alleged a credible threat of enforcement by Defendants under the ELCRA where St.

Joseph's allegations are "wholly speculative" and presume, without evidence, that Defendants will

not appropriately consider religious exemptions provided by other laws (*id.* at PageID.840–845).

Defendants conclude that without either the execution or threat of any investigation or enforcement

action under any of the challenged provisions of the amended ELCRA against St. Joseph by any

---

[2] While the Court has not separately addressed ripeness, the analysis would likely lead to the same
result.   Ripeness "shares a foundation in Article III's case-and-controversy requirement," *Miller
v. City of Wickliffe, Ohio*, 852 F.3d 497, 503 (6th Cir. 2017); *see also Doster v. Kendall*, 54 F.4th
398, 415 (6th Cir. 2022), and often "boil[s] down to the same question[,]" *MedImmune, Inc. v.
Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007).   As the Sixth Circuit has held, "a claim does not
become ripe at the first whiff of governmental insensitivity or whenever a government official
takes an adverse legal position against someone, even if one potential response is to curtail
protected activities."  *Ky. Press Ass'n, Inc. v. Ky.*, 454 F.3d 505, 540 (6th Cir. 2006).

Defendant, "there is nothing for this Court to review to determine if Plaintiff will suffer a harm in some still unknown circumstance in this case" (*id.* at PageID.848).

In response, St. Joseph argues that its conduct as an employer, public accommodation, and educational institution is proscribed by an "arguable interpretation" of the amended ELCRA, which is all that St. Joseph must show (ECF No. 47 at PageID.900–909).  St. Joseph emphasizes that in amending the ELCRA, the Michigan Legislature "omitted" "religious freedom protections," and St. Joseph asserts that "[t]here are no accommodations for religion that cover St. Joseph" (*id.* at PageID.887, 890–891).  Next, St. Joseph argues that it faces a credible threat of enforcement because courts presume that a newly enacted law will be enforced, and St. Joseph has shown "ongoing" enforcement in the Diocese of Lansing as well as a "massive spike in sex discrimination cases" (*id.* at PageID.909–920).  Last, St. Joseph points out that the ELCRA contains a provision allowing any member of the public to initiate an enforcement action, an especially important feature where the Department refuses to disavow enforcement of the ELCRA against St. Joseph (*id.* at PageID.920–923).

In reply, Defendants emphasize that while the Michigan Legislature did not add any additional provision in the ELCRA for religious exemptions, neither did it remove the protections already contained therein (ECF No. 48 at PageID.953).

Defendants' argument has merit.

Section 1983 makes "liable" "[e]very person" who "under color of" state law "subjects, or causes to be subjected," another person "to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]"  42 U.S.C. § 1983.  Section 1983 does not confer substantive rights but merely provides a statutory vehicle for vindicating rights found in the United States

Constitution.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Dibrell v. City of Knoxville, Tenn.*, 984 F.3d 1156, 1160 (6th Cir. 2021).

The United States Supreme Court has "repeatedly reiterated" that "[a]llegations of *possible* future" constitutional violations are not a sufficient basis for federal jurisdiction.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10 (2013) (emphasis in original) (citation omitted) (rejecting Article III standing when the plaintiffs relied on a "highly speculative fear" that the government would decide to target their communications in the future).  Article III, § 2 of the United States Constitution provides that the judicial power of the federal courts "extends only to 'Cases' and 'Controversies.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016), as revised (May 24, 2016) (quoting U.S. CONST. Art. III, § 2).  "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."  *Id.* at 338.  The doctrine "ensure[s] that federal courts do not exceed their authority" and "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Id.*  "The standing doctrine delineates the boundary between justiciable cases and controversies and those disputes that are not appropriately resolved through judicial process."  *Kiser v. Reitz*, 765 F.3d 601, 606 (6th Cir. 2014).

The "irreducible constitutional minimum of standing" requires a plaintiff to show it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Daunt v. Benson*, 956 F.3d 396, 417 (6th Cir. 2020) (quoting *Spokeo*, 578 U.S. at 338).  For purposes of standing, an injury means the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent.'" *Id.* (quoting *Lujan*, 504 U.S. at 560).  Each of the standing elements "must be supported ... with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.  When a case is at the pleading stage, as here, the plaintiff must

plausibly allege facts demonstrating each element of standing. *Spokeo*, 578 U.S. at 338. *See also*

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction

bears the burden of establishing the [standing] elements[.]").

"[A]llegations of '*possible* future injury' are not sufficient" to establish standing. *Galaria*

*v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388 (6th Cir. 2016) (quoting *Clapper*, 568 U.S. at

409). Hence, "a recurring issue in [] cases is determining when the threatened enforcement of a

law creates an Article III injury." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)

(*SBA List*). The difference between an abstract question and a "case or controversy" is "one of

degree." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 297 (1979). The Supreme

Court has held that "[w]hen an individual is subject to such a threat, an actual arrest, prosecution,

or other enforcement action is not a prerequisite to challenging the law." *Id.* at 158–59 (citing,

e.g., *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]here threatened

action by government is concerned, we do not require a plaintiff to expose himself to liability

before bringing suit to challenge the basis for the threat.")). Instead, the Supreme Court has

permitted "pre-enforcement review under circumstances that render the threatened enforcement

sufficiently imminent." *Id. Cf. Whole Woman's Health*, 142 S.Ct. at 539 (Thomas, J., concurring

in part and dissenting in part) ("[T]here is no freestanding constitutional right to pre-enforcement

review in federal court[.]").

In the Sixth Circuit, "[t]he government's future enforcement of the law counts as an

'impending' injury if a court can answer 'yes' to two questions: Does a plaintiff seek to engage

in conduct that the law 'arguably' prohibits? And has the plaintiff shown a 'credible threat' that

the government will enforce it against the plaintiff?" *Doster v. Kendall*, 54 F.4th 398, 416 (6th

Cir. 2022) (internal citations omitted). The Court therefore turns to examining whether St. Joseph

14

has plausibly alleged facts demonstrating, for purposes of standing, that (1) its intended conduct is proscribed by the ELCRA and (2) there exists a credible threat of prosecution under the ELCRA.

### a.   Is St. Joseph's Intended Conduct Arguably Proscribed by the Statute?

St. Joseph may fall within the purview of the ELCRA as an employer, MICH. COMP. LAWS § 37.2201(a); an educational institution, MICH. COMP. LAWS § 37.2401; and potentially a "place of public accommodation," depending on whether the full and equal enjoyment of services or facilities denied to a person are services or facilities that St. Joseph extends "to the public," MICH. COMP. LAWS § 37.2301(a).  Defendants point out that they do not have authority or oversight over the public programs or funding St. Joseph references in its Second Amended Complaint, nor are these programs administered under the ELCRA (ECF No. 44 at PageID.832 n.6 & 843 n.9).

Assuming that St. Joseph falls within the purview of the ELCRA, the ELCRA provides that it will be interpreted in accordance with other applicable laws.  The amended ELCRA added civil rights protections for individuals based on sexual orientation and gender identity and expression, but the ELCRA maintains the provisions that allow for consideration of other laws, including those guaranteeing religious freedoms.  Specifically, the construction provision of the ELCRA, in its current and amended form, provides that it "shall not be construed as preventing the commission from securing civil rights guaranteed by law other than the civil rights set forth in this act."  MICH. COMP. LAWS § 37.2705(1).  Additionally, the ELCRA prohibits discrimination by a place of public accommodation "[e]xcept where permitted by law," MICH. COMP. LAWS § 37.2302, and expressly provides for BFOQs for religious exemptions related to employment where "reasonably necessary to the normal operation of the business or enterprise," MICH. COMP. LAWS § 37.2208.

St. Joseph opines that Defendants are "conditioning First Amendment protection on whether an investigation first reveals 'actionable discrimination'" (ECF No. 47 at PageID.917–918).  However, the First Amendment does not exempt schools from certain aspects of the laws. "[R]eligious institutions [do not] enjoy a general immunity from secular laws[.]"  *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060.

Conversely, citing *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995), St. Joseph argues that there is no reason to expect that First Amendment protections will not be compromised (ECF No. 47 at PageID.913–915).  *Dambrot* was an overbreadth challenge and is not on point.  In *Dambrot*, the Sixth Circuit rejected the university's argument that the plaintiff's concerns were abated simply because the university policy also contained language claiming not to reach constitutionally protected activity.  55 F.3d at 1182–83.  More to the point is the Michigan Supreme Court's repeated standard in reviewing statutes, that "'statutes are presumed to be constitutional, and [courts] have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent.'"  *In re Certified Questions from United States Dist. Ct., W. Dist. of Michigan, S. Div.*, 958 N.W.2d 1, 7, 51 (Mich. 2020) (quoting *People v. Skinner*, 917 N.W.2d 292, 297 (Mich. 2018), quoting *In re Sanders*, 852 N.W.2d 524, 529 (Mich. 2014), in turn citing *Taylor v. Smithkline Beecham Corp.*, 658 N.W.2d 127, 130 (Mich. 2003)).

In the employment context, for example, Michigan courts have determined that the ministerial exception, a "nonstatutory, constitutionally compelled exception to the application of employment-discrimination and civil rights statutes to religious institutions and their 'ministerial' employees," with "roots in the Establishment and Free Exercise of Religion clauses of the First Amendment," "exists in Michigan" and "generally bars inquiry into a religious institution's underlying motivation for a contested employment decision."  *Weishuhn v. Cath. Diocese of*

*Lansing*, 756 N.W.2d 483, 486 (Mich. Ct. App. 2008).  The ministerial exception is grounded in Supreme Court cases holding that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school."  *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, ___ U.S. ___; 140 S. Ct. 2049, 2064 (2020) (relying on *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012)).  The Supreme Court has observed that "[a]mong other things, the Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion."  *Id.* at 2060.

Several employment-related cases demonstrate that courts have interpreted the ELCRA in conjunction with constitutional and statutory religious exemptions.  First, in *McLeod v. Providence Christian School*, 408 N.W.2d 141, 151 (Mich. Ct. App. 1987), the parochial school sought to have provisions of the ELCRA struck down as unconstitutional under the First Amendment's Free Exercise Clause as applied to the school, which had a policy of not employing on a full-time basis women with preschool age children.  The Michigan Court of Appeals accepted the defendant's claim that the ELCRA's prohibition against employment discrimination on the basis of sex has an effect on this belief.  The appellate court was "not persuaded, however, that the provisions of the act constitute an undue burden on defendant's religious beliefs."  *Id.*  The panel reasoned that "[s]tatutes or regulations which unduly interfere with an individual's religious belief generally present the individual with a 'hard choice,'" but the ELCRA "does not, by its own terms, put defendant to such a 'hard choice.'"  *Id.*  The panel pointed out that although the "defendant contend[ed] that its religious belief constitutes a bona fide occupational qualification, defendant has not applied to the commission for such an exemption."  *Id.*  The panel concluded that the

defendant "seeks to have the statute declared unconstitutional as it applies to defendant without having first availed itself of the statute's available safeguards." *Id.* at 344–45.

In *Porth v. Roman Catholic Diocese*, 532 N.W.2d 195, 200 (Mich. Ct. App. 1995), the Michigan Court of Appeals held that the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, also barred the application of the ELCRA to a policy of the church-operated school to employ only Catholics as teachers.  In *Assemany v. Archdiocese of Detroit*, 434 N.W.2d 233, 238 (Mich. Ct. App. 1988), the Michigan Court of Appeals held that the Free Exercise Clause of the First Amendment barred the application of the ELCRA to the diocese's decision about which organist to employ.  In *Weishuhn*, 756 N.W.2d at 488–89 & 500, the Michigan Court of Appeals remanded a math teacher's challenge under the ELCRA to his alleged retaliatory termination for the trial court to consider application of the "ministerial exception," an exception that the panel indicated has its "roots in the First Amendment's guarantees of religious freedom."  Last, in *Ciurleo v. St. Regis Parish*, 214 F.Supp.3d 647, 652–53 (E.D. Mich. 2016), the district court similarly concluded that the ministerial exception barred the plaintiff-teacher's ELCRA claim against her parish employer where her duties of giving daily religious instruction and leading morning prayers "are the hallmark of religious exercises through which religious communities transmit their received wisdom and heritage to the next generation of believers."

In summary, St. Joseph fails to plausibly allege that the ELCRA arguably proscribes its intended conduct where the statute provides that it is to be construed with other laws, and has been so interpreted.  As exemplified by the caselaw, the ELCRA does not proscribe activity otherwise protected by the First Amendment.  Additionally, the ELCRA expressly provides a form of redress for St. Joseph's concerns about its hiring practices that St. Joseph has not utilized.  That this Act "might" be applied against St. Joseph in the future is "the exact sort of hypothetical and speculative

18

dispute that Article III proscribes from federal-court dockets." *Miller v. City of Wickliffe, Ohio*, 852 F.3d 497, 507 (6th Cir. 2017) (holding that the business owners lacked standing under Article III to bring a pre-enforcement challenge to an ordinance). "The mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 293 (6th Cir. 1997) (citation omitted).

### b.      Does a Credible Threat of Prosecution Exist?

Even assuming arguendo that St. Joseph's proposed conduct is proscribed by the ELCRA, St. Joseph must still show "a credible threat of prosecution" in order to establish a requisite injury-in-fact.  The Sixth Circuit has stated that "[t]o identify a credible threat of enforcement, the first and most important factor is whether the challenged action chills speech." *Fischer*, 52 F.4th at 307 (citing *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016)).  Here, St. Joseph has alleged how St. Joseph has curtailed some activities in order to avoid investigation or prosecution. *See, e.g.,* 2d Amend. Compl. ¶ 14 (describing St. Joseph's decisions to hold off on hiring or expanding its services).

However, "allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; 'the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.'" *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) (citation omitted).  The "chilling effect" associated with a potentially unconstitutional law "'on the books'" is insufficient to "justify federal intervention" in a pre-enforcement suit. *Whole Woman's Health v. Jackson*, ___ U.S. ___, 142 S. Ct. 522, 538 (2021) (quoting *Younger v. Harris*, 401 U.S. 37, 51 (1971) (a chilling effect "has never been considered a sufficient basis, in and of itself, for prohibiting state action")). *See also Plunderbund Media,*

*L.L.C v. DeWine*, 753 F. App'x 362, 366–67 (6th Cir. 2018) (holding that where "some other indication of imminent enforcement" is lacking, "mere allegations of a 'subjective chill' on protected speech are insufficient to establish an injury-in-fact for pre-enforcement standing purposes.") (citation omitted).

Instead, the Supreme Court requires "proof of a more concrete injury and compliance with traditional rules of equitable practice." *Whole Woman's Health, supra. See, e.g., Whole Woman's Health*, 142 S.Ct. at 537–38 (determining that the petitioners had plausibly alleged that the state law has "already had a direct effect on their day-to-day operations" and identified provisions of the state law that appeared to impose a duty on the licensing-official defendants to bring disciplinary actions against them if they violated the law); *MedImmune*, 549 U.S. at 128 (determining that there was "no dispute that the [Article III case-or-controversy] standards would have been satisfied if the petitioner had taken the final step of refusing to make royalty payments under the 1997 license agreement"); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (where the plaintiff was "twice warned to stop handbilling that he claims is constitutionally protected" and was "told by the police that if he again handbills at the shopping center and disobeys a warning to stop he will likely be prosecuted," the Court held that "in these circumstances, it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights").[3]

---

[3] St. Joseph also points this Court's attention to the Supreme Court's June 30, 2023 decision in *303 Creative LLC v. Elenis*, ___ U.S. ___; 143 S. Ct. 2298 (2023) (ECF No. 55-1).  St. Joseph opines that the Supreme Court "confirmed" the Tenth Circuit's standing analysis and that the Supreme Court's decision "confirms St. Joseph's standing here" (ECF No. 55 at PageID.1073, 1076).  The Supreme Court's decision in *303 Creative* contains no discussion of standing, let alone any modification of the standing doctrine described in its prior cases.  The Supreme Court indicated that "no party" in *303 Creative* challenged the holding of the Tenth Circuit that Lorie Smith, the owner of 303 Creative LLC, had standing to sue.  143 S. Ct. at 2310.  And the Supreme Court quoted the Tenth Circuit's finding that Colorado had "a history of past enforcement against nearly

In *McKay*, the Sixth Circuit held that when plaintiffs rely on allegations of subjective chill, they must also "point to some combination of the following factors" to show the potential of enforcement:  "(1) a history of past enforcement against the plaintiffs or others," (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct," and/or (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action."  823 F.3d at 869 (internal citations omitted).  The Sixth Circuit noted that it had "also taken into consideration a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff."  *Id.*[4]

The Sixth Circuit has applied the *McKay* factors in three recent cases.  First, in in *Online Merchants Guild v. Cameron*, 995 F.3d 540, 550–52 (6th Cir. 2021), the Sixth Circuit applied the *McKay* factors and determined that the plaintiff had standing to bring its pre-enforcement action where (1) there was at least "some" evidence of past enforcement actions, (2) the defendant sent the plaintiff a subpoena and civil investigatory demand (CID), (3) the statute contains a citizen-enforcement provision, and (4) the defendant had not disavowed enforcement but "vigorously litigated enforcement" of the subpoena and CID in state court.  Second, in *Fischer*, 52 F.4th at 307–09, the Sixth Circuit applied the *McKay* factors and likewise determined that the plaintiffs had standing to bring their pre-enforcement action where (1) the defendant previously investigated

---

identical conduct," 143 S. Ct. at 2310, an allegation that St. Joseph has not plausibly made here, for the reasons stated *supra*.  As Defendants point out (ECF No. 57 at PageID.1154), *303 Creative* instead provides "additional authority relative to Defendants' enforcement of the ELCRA."

[4] In support of the proposition that it does *not* bear the burden of showing the potential of enforcement, St. Joseph points this Court's attention to the Second Circuit's June 21, 2023 decision in *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130 (2d Cir. 2023) (ECF No. 50-2), and the Fifth Circuit's June 20, 2023 decision in *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023) (ECF No. 50-3).  The multi-factor analysis set forth in the Sixth Circuit's decision in *McKay*, not decisions from the Second or Fifth Circuits, binds this Court.  In any event, both cases are also factually distinguishable for the reasons set forth in Defendants' responses (ECF Nos. 52 & 57).

one of the two plaintiffs, (2) the defendant sent the plaintiffs warning letters, (3) the provision at issue contained a citizen-enforcement provision, and (4) the defendant had refused to disavow enforcement of the challenged provision.

Third, in *Doster*, 54 F.4th 398, the Sixth Circuit applied the *McKay* factors and determined that the plaintiffs-service members had standing to bring their pre-enforcement action to challenge the Air Force's future enforcement of a mandate to take a COVID-19 vaccine.  The Sixth Circuit determined that the Air Force had a "history of enforcing" the mandate against "others" who refused to comply and had "administratively separated 236 active-duty Airmen" near the time of this suit.  *Id.* at 416.  Additionally, the secretary of the Air Force had issued a memorandum "warning" service members of the sanctions for not complying, indicating that those who refused to get vaccinated after the Air Force had denied an exemption would "be subject to initiation of administrative discharge."  *Id.*  Last, each of the plaintiffs in *Doster* had filed a written request for a religious exemption.  While some of the plaintiffs' requests were still outstanding, the Air Force had approved just 25 of the over 7,500 then-existing requests, and its approvals were limited to individuals who agreed to leave the Air Force within a year.  *Id.*

The Court turns to examining whether St. Joseph has likewise identified a combination of relevant factors in this case that would support the conclusion that its challenge to the ELCRA is borne of a live controversy, and not an attempt to obtain an advisory opinion.

### (1)  History of Enforcement

The first *McKay* factor weighs against St. Joseph.  St. Joseph has operated its school since 1924 (2d Amend. Compl. ¶ 2), and even though the Commission adopted the relevant Interpretive Statement in May 2018, St. Joseph's Second Amended Complaint alleges *no* history of enforcement of the ELCRA against St. Joseph or another religious school.  St. Joseph references

73 investigations based on sexual orientation or gender identity discrimination but does not allege

that any of those 73 complaints were leveled against a church or a religious school, like St. Joseph.

*See* 2d Amend. Compl. ¶¶ 58 & 128.   Additionally, St. Joseph identifies no Michigan cases

interpreting Michigan law as prohibiting a religious employer who meets the BFOQ criteria from

asking prospective employees about whether they can follow and effectively communicate certain

beliefs; seeking, recruiting, and hiring employees who agree with certain religious beliefs; or

posting employment opportunities that indicate a desire to hire employees who share certain

beliefs.

In its response to Defendants' motion, St. Joseph repeatedly references the MDCR's

investigation of Catholic Charities of Shiawassee and Genesee Counties ("the charity") (ECF No.

47 at PageID.882, 915–916, 918–919).   The investigation is not referenced in St. Joseph's Second

Amended Complaint, although courts can look to public records when resolving Rule 12 motions,

without converting the motion to one for summary judgment.   *See, e.g., Gavitt v. Born*, 835 F.3d

623, 640 (6th Cir. 2016); *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir.

2008).   The investigation simply does not support any present or imminent threat of enforcement

of the ELCRA against St. Joseph.[5]   The catalyst for the investigation is a private individual's April

---

[5] To the extent St. Joseph also argues that the MDCR's investigation demonstrates how the
investigation process itself is "chilling to First Amendment activity" because "the investigatory
process [is] its own punishment" (ECF No. 47 at PageID.915–917), the argument does not help
St. Joseph advance the analysis in its favor.   "[A]llegations of a subjective chill are not an adequate
substitute for a … threat of specific future harm[.]"   *Laird*, 408 U.S. at 13–14.   *See also Whole
Woman's Health*, 142 S. Ct. at 538 (holding that the "chilling effect" associated with a potentially
unconstitutional law "'on the books'" is insufficient to "justify federal intervention" in a pre-
enforcement suit); *Younger*, 401 U.S. at 51 (holding that a chilling effect "has never been
considered a sufficient basis, in and of itself, for prohibiting state action").   Merely alleging that
the amended ELCRA has (or will have) a chilling effect does not satisfy any of the *McKay* factors,
factors that are intended to help demonstrate a potential of enforcement *outside of* a litigant's
subjective opinions.

13, 2023 discrimination complaint against the charity (Ex. A, ECF No. 47-1 at PageID.941).  The charity is apparently affiliated with the Catholic Church, but the complaint otherwise bears no similarities to the case at bar.  First, the charity is neither a church nor a private religious school, like St. Joseph.  Second, the complaint against the charity alleges gender identity discrimination in housing, an alleged violation of Article 5 of the ELCRA, MICH. COMP. LAWS § 37.2501 *et seq.*, and/or the federal Fair Housing Act, 42 U.S.C. § 3601 et seq., neither of which are at issue in this case.  The MDCR's actions of providing the complaint to the charity and ordering the charity to provide a response to the complaint are consistent with its statutory mandate to not only "receive" but also "investigate, conciliate, adjust, dispose of, issue charges, and hold hearings on complaints alleging a violation of [the ELCRA]," MICH. COMP. LAWS § 37.2602(c) (ECF No. 47-1 at PageID.938, 942–945).  In short, the mere fact that an individual filed a complaint against a charity and the Department ordered a response does not serve to demonstrate "a history of past enforcement against the plaintiffs or others."  *McKay*, 823 F.3d at 869.

### *(2)  Enforcement Warning Letters*

Not surprisingly then, the second *McKay* factor also weighs against St. Joseph.  St. Joseph has not identified anything akin to a warning letter regarding the conduct outlined in their Second Amended Complaint.   St. Joseph has not provided evidence of any comments by the Commissioners or MDCR staff named as Defendants to establish that they have made any threat of enforcement, let alone a credible threat.  And St. Joseph's attempts to rely upon amicus briefs that Attorney General Nessel has joined or her efforts on behalf of the LGBTQ+ community do not demonstrate a "clear threat of prosecution" against St. Joseph.  As Defendants emphasize, the Attorney General has no investigative or enforcement power authority under the ELCRA (ECF No. 44 at PageID.827–829, 841–842).  In any event, Defendants do not deny that, consistent with

current legal precedent, they have interpreted the ELCRA's "because of sex" provision to include protection for gender identity and sexual orientation.  The issue in this case is whether, in applying this provision, Defendants have refused to concomitantly consider constitutional and statutory religious exemptions such that St. Joseph faces a credible threat of prosecution.

### (3)  Statutory Attributes

The third *McKay* factor also weighs against St. Joseph.  St. Joseph opines that the likelihood that it will have to defend against a lawsuit is increased because the ELCRA authorizes "any person" to bring a discrimination suit under the Act and may proceed simultaneously before the Commission and any state circuit court (ECF No. 47 at PageID.920–921), but these statutory attributes are not compelling where the ELCRA also provides that such a suit may not be premised on discrimination that is "permitted by law."  MICH. COMP. LAWS § 37.2302(a).  As Defendants point out (ECF No. 44 at PageID.844), the scope of an investigation, any determination that actionable discrimination occurred, and any determination regarding grounds to issue a charge, *see* Mich. Admin. Code R. 37.6, is dictated by the facts and applicable laws, including constitutional law, which the ELCRA incorporates.  Hence, unlike the service members in *Doster* who faced a looming "Hobson's choice" between compliance with the Air Force vaccine mandate and adherence to their religious beliefs, St. Joseph has not demonstrated that application of these statutes presents a hard choice.  Indeed, the Michigan Court of Appeals in *McLeod* determined that the opposite was true because religious freedoms must be weighed against governmental interests based on the particular facts of each case.  408 N.W.2d at 151 (holding that the ELCRA "does not, by its own terms, put defendant to such a 'hard choice'").  *See also Porth, supra*; *Assemany, supra*; *Weishuhn, supra*.

To the extent that the fourth "disavowing" question from *McKay* is relevant, the Court agrees with Defendants that it would be "impossible" for Defendants to disavow application of the ELCRA to St. Joseph, where the religious freedom inquiry is fact-specific and "there is no actual set of facts" in this case (ECF No. 44 at PageID.845).  *See, e.g., Davis v. Colerain Twp., Ohio*, 51 F.4th 164, 174 (6th Cir. 2022) (determining that the fact that the police department had not "disavowed enforcement" of its Facebook Rule "does nothing to show that [the plaintiff] plans to engage in speech that might arguably fall within the rule").  In sum, application of the *McKay* factors powerfully supports the conclusion that St. Joseph has not plausibly alleged a credible threat of enforcement.

c.      **Summary**

In summary, the ELCRA does not fail to recognize religious freedoms like those asserted by St. Joseph herein.  Even assuming arguendo that either of these acts "might" be applied against St. Joseph's intended conduct in the future, St. Joseph has not plausibly alleged a credible threat of enforcement against it, and mere allegations of a "subjective chill" are alone insufficient to establish an injury-in-fact for standing purposes.  The Court concludes that St. Joseph has not demonstrated Article III standing sufficient to invoke federal-court jurisdiction, and any decision from this Court regarding how the statutes might apply to St. Joseph would be advisory.

"Article III's case-or-controversy requirement provides a critical separation-of-powers check on the judiciary that we may not disregard simply because we think a legal question—'First Amendment or otherwise'—is important."  *Davis*, 51 F.4th at 173.   Rather, "[m]atters of great public interest are precisely the kinds of issues that demand the federal courts to be most vigilant in this area—vigilant that the powers they exercise are powers the Constitution gives them and vigilant that they exercise those powers in disputes with the 'clear concreteness provided when a

26

question emerges precisely framed and necessary for decision from a clash of adversary argument.'" *Fialka-Feldman v. Oakland Univ. Bd. of Trustees*, 639 F.3d 711, 715 (6th Cir. 2011) (citation omitted).

When a court lacks subject-matter jurisdiction, "the only function remaining to the court is that of announcing the fact and dismissing the cause." *State by & through Tenn. Gen. Assembly*, 931 F.3d at 519 (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868)). *See also Davis*, 51 F.4th at 176 (indicating that dismissal for lack of subject-matter jurisdiction is without prejudice); FED. R. CIV. P. 58 (providing for entry of judgment).

### III.  CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** Plaintiff's motions for leave to file notice of supplemental authorities (ECF Nos. 50 & 54) are GRANTED to the extent that the Court has taken notice of these authorities; no supplemental briefing will be permitted.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss (ECF No. 43) is GRANTED, and this action is DISMISSED for lack of subject-matter jurisdiction.

Dated:  August 22, 2023                                   /s/ Jane M. Beckering
                                                    JANE M. BECKERING
                                                    United States District Judge

27