# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Kelly L. Stephens
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  September 20, 2024

Ms. Katherine Leone Anderson
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260

Mr. Cody Steven Barnett
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176

Mr. John J. Bursch
Alliance Defending Freedom
440 First Street, N.W., Suite 600
Washington, DC 20001

Mr. Frederick W. Claybrook Jr.
655 15th Street, N.W., Suite 425
Washington, DC 20005-5701

Mr. Miles Coleman
Nelson Mullins Riley & Scarborough
2 W. Washington Street, Suite 400
Greenville, SC 29601

Ms. Cassandra A. Drysdale-Crown
Office of the Attorney General of Michigan
P.O. Box 30736
Lansing, MI 48909

Mr. Steven W. Fitschen
National Legal Foundation
524 Johnstown Road
Chesapeake, VA 23322

Mr. William J. Haun
Becket Fund for Religious Liberty
1919 Pennsylvania Avenue, N.W.
Suite 400
Washington, DC 20006

Ms. Tonya C. Jeter
Office of the Attorney General of Michigan
3030 W. Grand Boulevard, Suite 10-200
Detroit, MI 48202

Mr. Eric Nieuwenhuis Kniffin
Kniffin Law
102 S. Tejon Street, Suite 1100
Colorado Springs, CO 80903

Mr. Adam Blake McCoy
Nelson Mullins Riley & Scarborough
2 W. Washington Street, Suite 400
Greenville, SC 29601

Ms. Heather S. Meingast
Office of the Attorney General of Michigan
P.O. Box 30736
Lansing, MI 48909

Mr. Bryan Neihart
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260

Ms. Kimberly K. Pendrick
Office of the Attorney General
of Michigan, Civil Rights and Elections
3030 W. Grand Boulevard, Suite 10-650
Detroit, MI 48202

Mr. Nicholas Robert Reaves
Becket Fund for Religious Liberty
1919 Pennsylvania Avenue, N.W.
Suite 400
Washington, DC 20006

Mr. Jonathan Andrew Scruggs
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260

Mr. Ryan J. Tucker
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260

Mr. Randall L. Wenger
Independence Law Center
23 N. Front Street
Harrisburg, PA 17101

Ms. Lori Halstead Windham
Becket Fund for Religious Liberty
1919 Pennsylvania Avenue, N.W., Suite 400
Washington, DC 20006

Mr. Stephen J. van Stempvoort
Miller Johnson
45 Ottawa Avenue, S.W., Suite 1100
Grand Rapids, MI 49503

       Re:   Case Nos. 23-1769/23-1781/23-1860,
             *Christian Healthcare Centers, et al. v. Dana Nessel, et al.*
             Originating Case No. : 1:22-cv-00787

Dear Counsel,

    The court today announced its decision in the above-styled case.

    Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

              Yours very truly,

              Kelly L. Stephens, Clerk

              Laurie A Weitendorf
              Deputy Clerk

cc:  Ms. Ann E. Filkins

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0220p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CHRISTIAN HEALTHCARE CENTERS, INC. (23-1769);
SACRED HEART OF JESUS PARISH, GRAND RAPIDS,
JERRY HATLEY, ROBIN HATLEY, JOSEPH BOUTELL,
RENEE BOUTELL, PETER UGOLINI, and KATIE UGOLINI
(23-1781); ST. JOSEPH PARISH ST. JOHNS (23-1860),

        *Plaintiffs-Appellants*,

      *v.*

DANA NESSEL, et al.,

        *Defendants-Appellees*.

Nos. 23-1769/1781/1860

_____

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
Nos. 1:22-cv-00787; 1:22-cv-01214; 1:22-cv-01154—Jane M. Beckering, District Judge.

Argued:  June 11, 2024

Decided and Filed:  September 20, 2024

Before:  WHITE, STRANCH, and MURPHY, Circuit Judges.

_____

### COUNSEL

23-1769

**ARGUED:**  Bryan D. Neihart, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, for
Appellant.  Kimberly K. Pendrick, OFFICE OF THE MICHIGAN ATTORNEY GENERAL,
Detroit, Michigan, for Appellees.  **ON BRIEF:**  Bryan D. Neihart, Jonathan A. Scruggs,
ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, John J. Bursch, ALLIANCE
DEFENDING FREEDOM, Washington, D.C., for Appellant.  Kimberly K. Pendrick, Heather S.
Meingast, Tonya C. Jeter, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Detroit,
Michigan, for Appellees.   Steven W. Fitschen, NATIONAL LEGAL FOUNDATION,
Chesapeake, Virginia, Frederick W. Claybrook, Jr., CLAYBROOK LLC, Washington, D.C.,

No. 23-1769/1781/1860    *Christian Healthcare Ctrs., et al. v. Nessel, et al.*    Page 2

Randall L. Wenger, INDEPENDENCE LAW CENTER, Harrisburg, Pennsylvania, Miles E. Coleman, Adam B. McCoy, NELSON MULLINS RILEY & SCARBOROUGH LLP, Greenville, South Carolina, Erin N. Kniffin, ETHICS & PUBLIC POLICY CENTER, Washington, D.C., for Amici Curiae.

23-1781

**ARGUED:** Cody S. Barnett, ALLIANCE DEFENDING FREEDOM, Lansdowne, Virginia, for Appellants. Kimberly K. Pendrick, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Detroit, Michigan, for Appellees. **ON BRIEF:** Cody S. Barnett, ALLIANCE DEFENDING FREEDOM, Lansdowne, Virginia, John J. Bursch, ALLIANCE DEFENDING FREEDOM, Washington, D.C., Ryan J. Tucker, Katherine L. Anderson, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, for Appellants. Kimberly K. Pendrick, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Detroit, Michigan, Cassandra A. Drysdale-Crown, Heather S. Meingast, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. Steven W. Fitschen, NATIONAL LEGAL FOUNDATION, Chesapeake, Virginia, Randall L. Wenger, INDEPENDENCE LAW CENTER, Harrisburg, Pennsylvania, Miles E. Coleman, Adam B. McCoy, NELSON MULLINS RILEY & SCARBOROUGH LLP, Greenville, South Carolina, for Amici Curiae.

23-1860

**ARGUED:** William J. Haun, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., for Appellant. Kimberly K. Pendrick, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Detroit, Michigan, for Appellees. **ON BRIEF:** William J. Haun, Lori H. Windham, Nicholas R. Reaves, Richard C. Osborne, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., for Appellant. Kimberly K. Pendrick, Tonya C. Jeter, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Detroit, Michigan, Heather S. Meingast, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. Stephen J. van Stempvoort, MILLER JOHNSON, Grand Rapids, Michigan, for Amicus Curiae.

STRANCH, J., delivered the opinion of the court in which WHITE, J. and MURPHY, J., joined. MURPHY, J. (pp. 34–37), delivered a separate concurring opinion.

---

## OPINION

---

JANE B. STRANCH, Circuit Judge. In these three related cases, Plaintiffs—Christian Healthcare Centers, a medical service ministry; Sacred Heart of Jesus, a Catholic school joined by several of the school's parents; and St. Joseph Parish St. Johns, a Catholic parish operating a school—challenge aspects of Michigan's antidiscrimination laws. They allege that Michigan's

laws chill their speech and conduct in violation of the First and Fourteenth Amendments.  The district court dismissed each case for want of standing, reasoning that no Plaintiff had shown that Michigan's laws arguably proscribed its speech or conduct and that, in the alternative, there was no credible threat that Michigan would enforce its laws against any Plaintiff.

We agree only in part.  Michigan's laws arguably forbid several of Plaintiffs' pleaded activities.  And although the threat of enforcement analysis is more nuanced, we conclude that two Plaintiffs—Christian Healthcare and Sacred Heart—have plausibly established a credible threat that Defendants will enforce against them at least some of the challenged provisions of Michigan's laws.  Finally, we leave to the district court the task of evaluating Plaintiffs' requests for injunctive relief in the first instance.  All told, the district court's decisions are **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

## I.  BACKGROUND

### A.  Michigan's Laws

Each Plaintiff challenges aspects of Michigan's Elliot-Larsen Civil Rights Act (ELCRA). Mich. Comp. Laws § 37.2101 *et seq.*  Christian Healthcare and Sacred Heart also challenge aspects of the state's Equal Accommodations Act (EAA).  Mich. Comp. Laws §§ 750.146–147. Relevant provisions of these laws and pertinent events concerning their scope are described below.

#### 1.  ELCRA

For just under fifty years, the ELCRA has protected Michiganders from discrimination. *See* Mich. Comp. Laws § 37.2102(1).  The ELCRA's regulations relating to employment, public accommodations, education, and publications are relevant here.

First, the ELCRA prohibits an employer from failing to hire, failing to recruit, firing, or otherwise discriminating against an individual because of enumerated protected characteristics. *Id.* § 37.2202(1)(a).  Employers also may not use hiring applications that elicit information about, or express a preference based on, any protected characteristic.  *Id.* § 37.2206(2)(a), (c). Second, the law prohibits any person from denying an individual the "full and equal enjoyment"

of any goods, services, or facilities "of a place of public accommodation or public service" based on the same characteristics. *Id.* § 37.2302(a). Third, it prevents educational institutions from discriminating with respect to educational benefits, admission, or the institution's terms and conditions because of specified characteristics. *Id.* § 37.2402(a)–(b). Educational institutions also may not attempt to solicit information about these characteristics for admission purposes. *Id.* § 37.2402(c). Fourth, the ELCRA regulates publication of statements concerning its substantive provisions: Employers, places of public accommodation, and educational institutions may not publish statements indicating preferences based on protected characteristics. *See id.* § 37.2206(1) (employers); *id.* § 37.2302(b) (public accommodations); *id.* § 37.2402(d) (educational institutions).

The ELCRA also contains language qualifying its application. Most broadly, it is not to "be construed as preventing the [Michigan Civil Rights] [C]ommission from securing civil rights guaranteed by law." *Id.* § 37.2705(1). Additionally, employers may inquire about protected characteristics or express a preference based on those characteristics where "permitted" to do so "by applicable federal law," *id.* § 37.2206(2); places of public accommodation may be exempted from the ELCRA's regulations "where permitted by law," *id.* § 37.2302; and educational institutions may inquire about protected characteristics in admissions decisions if "required by federal law, rule, or regulation," *id.* § 37.2402(c). The ELCRA's education provisions "related to religion" do not apply to religious schools. *Id.* § 37.2403. Employers may also apply for an exemption from the ELCRA's employment regulations if a certain protected characteristic "is a bona fide occupational qualification," or BFOQ, "reasonably necessary to the normal operation of the business." *Id.* § 37.2208. This BFOQ exemption can be either (1) obtained by application to Michigan's Civil Rights Commission (the Commission), which is empowered to investigate the application and approve exemptions for up to five years, or (2) asserted as an affirmative defense in later proceedings. *Id.*; *see* Mich. Admin. Code R. 37.25.

The ELCRA and Michigan's administrative code set out the Act's enforcement procedures. Any "person"—a statutorily defined term including Michigan and its subagencies, *see* Mich. Admin. Code R. 37.2(p)—who is "aggrieved by unlawful discrimination" may submit an ELCRA complaint to Michigan's Department of Civil Rights (the Department).

*Id.* R. 37.4(1).  Certain commissioners, directors, and agents authorized by the Commission may also file complaints on the public's behalf.  *Id.* R. 37.4(2).  The Department is empowered to investigate filed complaints, including by collecting evidence and requiring witness testimony that is "pertinent to a complaint."  Mich. Comp. Laws § 37.2602(c)–(d); *see also* Mich. Admin. Code R. 37.4(10), 37.14(1).  The Department will issue a charge if, "after investigation," it "determines that there are sufficient grounds" to do so.  *Id.* R. 37.6(1).  A person or entity charged with discrimination must "file a written verified answer"; if they do not, the charge's allegations are considered admitted.  *Id.* R. 37.11(1), (6).  If after a hearing the Commission determines that the ELCRA was violated, it may order monetary and equitable remedies. *See* Mich. Comp. Laws § 37.2605.

The ELCRA has always prohibited discrimination based on sex, religion, and several other characteristics.  In 2018, the Commission adopted Interpretive Statement 2018-1. Through that Statement, the Commission resolved that the ELCRA's phrase "discrimination because of . . . sex" included discrimination based on sexual orientation or gender identity, and instructed the Department to begin processing complaints alleging discrimination on these bases. *See* Michigan Civil Rights Commission, Interpretive Statement 2018-1 (May 21, 2018), https://perma.cc/D32M-9LMJ.

In 2019, two businesses under investigation for alleged ELCRA discrimination regarding gender and sexual orientation sued the Department in Michigan state court.  *See Rouch World, LLC v. Dep't of C.R.*, 987 N.W.2d 501, 505–06 (Mich. 2022).  In a July 2022 decision, the Michigan Supreme Court held that the ELCRA prohibited sexual orientation-based discrimination.  *See id.* at 519.  After *Rouch World*, Michigan amended the ELCRA to codify protections against discrimination based on sexual orientation or gender identity.  In the amended ELCRA, effective as of February 13, 2024, each of the regulations outlined above explicitly bars discrimination because of "sexual orientation" and "gender identity or expression."  *See* Mich. Comp. Laws §§ 37.2102, 37.2202, 37.2206, 37.2302, 37.2402.

### 2. EAA

Michigan's Equal Accommodations Act guarantees Michiganders "full and equal accommodations" at "all . . . places of public accommodation," subject to "conditions and limitations established by law."  Mich. Comp. Laws § 750.146.  The Act prohibits any owner, operator, or employee of a place of public accommodation from (1) denying the accommodations of her facilities based on a person's protected characteristic or (2) publishing communications or advertisements stating that she will do so.  *Id.* § 750.147.  Violations of the EAA are punishable both as criminal misdemeanors and through civil actions brought by an injured party.  *Id.*  Sex and religion are among the enumerated characteristics protected by the Act.  *Id.*

**B.  Plaintiffs and Their Activities**

### 1. Christian Healthcare Centers

Christian Healthcare is a Michigan nonprofit that operates a membership-based medical service ministry in which patients receive a package of services in return for a monthly fee.  The organization integrates Christian faith and prayer into its purpose, mission, and activities.

Although Christian Healthcare "currently treats and has recently treated" transgender patients and has received requests to use pronouns aligned with the gender of those patients, it has not and will not accede to such requests.  Instead, Christian Healthcare either uses pronouns that "accord with the person's biological sex" at birth or works to find "an appropriate and respectful accommodation," which often involves referring to these patients using first or last names.  Additionally, although Christian Healthcare would provide hormones for certain medical conditions, it would not provide hormones to facilitate gender transitions.  It recruits and retains only employees who can profess belief in traditional Christianity, abstain from same-sex relationships and non-marital sex, and agree that sex is an immutable biological reality.  Employees must affirm a series of statements articulating these beliefs yearly.

Finally, Christian Healthcare desires to post both its Membership Agreement and Employment Application online.  Appendices to the Membership Agreement explain that (1) Christian Healthcare's employees ascribe to the organization's previously described faith-

based practices, (2) Christian Healthcare will not provide certain medical procedures, including hormones to facilitate gender transition, that conflict with its faith, and (3) Christian Healthcare will not use pronouns that do not accord with a person's biological sex at birth.    The Employment Application requires prospective employees to state whether they identify as a Christian and if they are in full agreement with each tenet of the Christian Healthcare Statement of Faith.    The Statement of Faith, in turn, asks signatories to affirm, among other things, a belief in the inerrancy of the Bible and an understanding that human beings may not alter their biological sex.    Christian Healthcare further wishes to post on its "Career Opportunities" webpage an application link explaining that any applicants must affirm on a yearly basis not only the organization's Statement of Faith, but also its Values Declaration, Statement of Marriage and Human Sexuality, Philosophy of Wellness and Healthcare, and Code of Conduct.    These additional statements reaffirm Christian Healthcare's commitment to religious-centered healthcare and opposition to same-sex relationships and gender transition.    When it filed its complaint, Christian Healthcare was looking to fill a Biblical Counselor position; applicants for the position would be required to agree with these statements.

Christian Healthcare has averred that but for the laws it challenges, it would post these documents immediately.    Until shortly before it initiated its lawsuit, the organization had posted a previous version of its Membership Agreement and a link to the Employment Application on its website.

### 2. Sacred Heart of Jesus Parish

Sacred Heart of Jesus Parish is located on the west side of Grand Rapids, Michigan.    The parish operates Sacred Heart Academy (or "Sacred Heart" for short), a classical Catholic pre-kindergarten through twelfth-grade school.    Although it accepts non-Catholic students, the school primarily exists to support parents in passing on the Catholic faith through an intentional Catholic community and culture.    Six parents of children at Sacred Heart are also Plaintiffs in Sacred Heart's lawsuit.

Sacred Heart recruits, hires, and retains only employees who can support, live, and model the Catholic faith and doctrine.    On an annual basis, it requires all employees to sign a Faculty

Memorandum of Understanding through which employees affirm that they will not engage in or support sexual activity outside of marriage, same-sex marriage or sexual activity, or what the memo terms "transgenderism."  Employees also must annually affirm an Oath of Fidelity to Catholic doctrine, which includes a promise to maintain observance of ecclesiastical laws. Sacred Heart teaches students that biological sex is immutable, sorts students by biological sex into single-sex "houses," and requires students to wear uniforms, use restrooms, and play on sports teams according to their biological sex at birth.  Although Sacred Heart has students with gender dysphoria, it will not use pronouns inconsistent with a person's biological sex.

Sacred Heart also wishes to post several items on its website.  One is a statement by Sacred Heart's Pastor explaining that the school will continue to require students and employees to follow its view of Catholic doctrine, including in the areas of marriage and human sexuality. Specifically, the statement notes that Sacred Heart teaches its students that every "man and woman[] should acknowledge and accept his [or her] sexual identity," that "procreative," heterosexual marriage is the only appropriate form in which to express sexuality, and that the school will not "affirm any sexual identities that violate Catholic doctrine."  Additionally, Sacred Heart wishes to publicly advertise job applications for an art teacher and athletic coach.  These advertisements would explain, as past applications have, that the applicant must be a "practicing Catholic whose public life is lived in conformity with the moral teachings of the Church," and be able to sign the Memorandum of Understanding and Oath of Fidelity described above.

### 3.  St. Joseph Parish St. Johns

St. Joseph is a Catholic parish in St. Johns, Michigan, that operates a Catholic elementary school.  The school's mission is "to assist parents in the spiritual, social, and intellectual development of their child within the framework of Catholic teachings and moral values."

St. Joseph will only hire employees and enlist volunteers who will "not teach, advocate, model, or in any way encourage beliefs or behaviors that are contrary to the teaching of the Catholic Church."  It requires students and teachers to use uniforms, pronouns, bathrooms, and other single-sex spaces that accord with biological sex at birth; sports teams are also segregated based on birth sex.  In addition, parents must agree that students may not act in an openly

hostile manner toward Catholic doctrine.  St. Joseph opens its facilities in several ways to the public—its Mass is open to all, it allows sports leagues to use its fields and gymnasium, it participates in a "shared time" arrangement with local public-school teachers who teach in St. Joseph classrooms, and it plans to bring in private tutors for the public-school students who attend its parish.  It expects the public who will use its facilities to "respect the Catholic environment."

Finally, St. Joseph has stated that it wishes to advertise a job opening for a first-grade teacher that would note, as past advertisements have noted, that an applicant must be a "practicing Catholic with the ability to infuse Catholic faith and teaching throughout the curriculum."  It also provides a Code of Conduct to employees and volunteers specifying that recipients cannot "teach, advocate, model, or in any way encourage beliefs or behaviors that are contrary to the teaching of the Catholic Church."  Finally, St. Joseph suggests that other statements it makes—including statements about homosexuality or transgender status, or other declarations concerning proper attire and roles for members of each sex—could run afoul of Michigan law.

### C.  Procedural History

In August 2022, Christian Healthcare filed a lawsuit alleging that the ELCRA and the EAA violated the First and Fourteenth Amendments of the United States Constitution both facially and as applied to itself.  It also moved to preliminarily enjoin Defendants, Michigan's Attorney General and various Department and Commission members, from enforcing the challenged aspects of the two laws.  Sacred Heart sued in December 2022, alleging the same First and Fourteenth Amendment violations both facially and as applied, and likewise sought a preliminary injunction.  Finally, St. Joseph filed its active complaint on April 7, 2023.  Its complaint differed from Christian Healthcare's and Sacred Heart's because it did not challenge the EAA and alleged only as-applied constitutional violations.[1]  All three cases were filed in the Western District of Michigan.

---

[1]Although Christian Healthcare and Sacred Heart challenged the pre-amendment (but post-Interpretive Statement) ELCRA, while St. Joseph challenged the amended Act, it is undisputed that the Department has been

In each case, Defendants moved to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  Defendants also opposed Christian Healthcare's and Sacred Heart's motions for injunctive relief.

The district court granted each motion to dismiss.  Starting with Christian Healthcare's case, in a March 2023 decision, the court recognized that to have standing to bring a pre-enforcement challenge, a plaintiff must demonstrate that (1) the challenged statutes arguably proscribe its intended conduct and (2) there is a credible threat that the laws will be enforced against the plaintiff.  The court found that Christian Healthcare failed to make either required showing.  As a result, it granted Defendants' motion to dismiss.  In August 2023, the district court entered separate orders dismissing Sacred Heart's and St. Joseph's cases for lack of subject matter jurisdiction by finding that each Plaintiff had failed to satisfy the same criteria for pre-enforcement standing.[2]  In the Christian Healthcare and Sacred Heart cases, the district court also indicated in footnotes that absent dismissal, it likely would have denied each Plaintiff's motion for a preliminary injunction.

Christian Healthcare appeals the dismissal of its case and several ancillary orders.  It requests reversal of the district court's standing determination and the entry of injunctive relief.  Sacred Heart likewise asks us to reverse the district court's jurisdictional dismissal and to grant injunctive relief.  And St. Joseph requests that we reverse the district court's decision in its case and instruct the district court that declaratory and injunctive relief are warranted.

---

processing complaints alleging discrimination based on sexual orientation and gender identity since the Commission adopted Interpretive Statement 2018-1 in May 2018.  The amended ELCRA merely codifies the Interpretive Statement's understanding of the ELCRA.

[2]In all three cases, the district court also indicated that had it not dismissed each complaint for lack of standing, it would have dismissed on ripeness grounds.  We have explained, however, that "in the pre-enforcement First Amendment context, the line between Article III standing and ripeness has evaporated" because the doctrines both pose largely "the same question:  have plaintiffs established a credible threat of enforcement?"  *Miller v. City of Wickliffe*, 852 F.3d 497, 506 (6th Cir. 2017) (cleaned up); *see Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016).  We therefore address the credibility of enforcement below without an additional ripeness analysis.  *See infra* Part II(A)(2).

## II.  ANALYSIS

### A.  Standing

For a federal court to exercise subject matter jurisdiction over a case, a plaintiff must have standing to sue.  *State ex rel. Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019).  This requirement flows from "Article III of the Constitution," which "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting U.S. Const. art. III, § 2).  We review dismissals for lack of standing de novo.  *Ames v. LaRose*, 86 F.4th 729, 731 (6th Cir. 2023).

To establish Article III standing, a plaintiff must allege (1) an injury in fact that is both (2) caused by the defendant's conduct and (3) redressable by a favorable court decision.  *Driehaus*, 573 U.S. at 157–58.  The plaintiff "bears the burden of establishing these elements . . . with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  A plaintiff's burden at the pleading stage is to plausibly assert standing.  *See Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543–44 (6th Cir. 2021).

Standing is plausible in a pre-enforcement challenge when the plaintiff pleads "when, to whom, where, or under what circumstances" its injury will occur.  *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 59 (9th Cir. 2024) (quoting *Unified Data Servs., LLC v. FTC*, 39 F.4th 1200, 1211 (9th Cir. 2022)); *see Ass'n of Am. Physicians*, 13 F.4th at 543–44.  Because "standing is not dispensed in gross," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), a "plaintiff must establish standing for each claim he presses and each statutory provision he challenges."  *Oklahoma v. United States*, 62 F.4th 221, 233 (6th Cir. 2023).  And if a plaintiff cannot establish standing for any claim, a court must dismiss the case for lack of subject-matter jurisdiction.  *See State ex rel. Tenn. Gen. Assembly*, 931 F.3d at 519.

Because Defendants pursue a facial jurisdictional challenge to Sacred Heart's and St. Joseph's complaints, we treat the allegations in those pleadings as true.  *See Ass'n of Am. Physicians*, 14 F.4th at 543–44.  And although the parties have litigated the jurisdictional challenge to Christian Healthcare's complaint as factual, we likewise accept the veracity of

Christian Healthcare's pleading because the parties do not dispute the "relevant facts" for purposes of the motion to dismiss. *See Memphis Biofuels, LLC v. Chickasaw Nation Indus.*, 585 F.3d 917, 919 (6th Cir. 2009).

These cases involve standing's injury-in-fact element. An alleged injury is constitutionally sufficient only if it is "actual or imminent, not 'conjectural' or 'hypothetical.'" *Driehaus*, 573 U.S. at 158 (quoting *Lujan*, 504 U.S. at 560). Allegations of future injury, specifically, must be "certainly impending" such that there is a "'substantial risk' that the harm will occur." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 n.5 (2013)).

One difficult and "recurring issue" is "determining when the threatened enforcement of a law creates an Article III injury." *Id.* In *Driehaus*, the Supreme Court explained that a plaintiff "subject to such a threat" need not wait for "an actual arrest, prosecution, or other enforcement action" to challenge the law. *Id.* Instead, a threat of enforcement is "sufficiently imminent" to constitute an injury in fact if the plaintiff alleges (1) an intent "to engage in a course of conduct" arguably "affected with a constitutional interest," (2) that this conduct is arguably "proscribed by a statute," and (3) that there is "a credible threat" of the statute's enforcement against the plaintiff. *Id.* at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

Defendants concede the first element of this test, and we agree that each Plaintiff has alleged an intent to engage in conduct arguably affected with a constitutional interest. That leaves two questions: whether Plaintiffs have plausibly alleged that (1) their "intended future conduct is 'arguably . . . proscribed by the statute' they wish to challenge," *id.* at 162 (quoting *Babbitt*, 442 U.S. at 298) (brackets omitted), and (2) there is a "substantial" or "credible threat of enforcement" of the statute against them, *id.* at 164, 167.

### 1. Arguable Proscription

Conduct is arguably proscribed by a statutory provision if, on "a *plausible* interpretation of the statute," the conduct is forbidden. *Kentucky v. Yellen*, 54 F.4th 325, 337 (6th Cir. 2022). We proceed by mapping each Plaintiff's pleaded conduct onto Michigan's laws.

### a.  Plaintiffs' Conduct, ELCRA, and the EAA

*Employment.*  Each Plaintiff is a covered employer under the ELCRA.  *See* Mich. Comp. Laws § 37.2201(a).  Christian Healthcare requires all employees to sign yearly belief statements. Both current and prospective employees must affirm that Jesus Christ led a "sinless life," that "human beings are not at liberty to alter their biological sex," and that sexual activity may occur only within marriages between one man and one woman.  In additional statements, employees are required to aver "Jesus Christ as Lord and Savior over all areas of life" and affirm that they will "strive to apply biblical discernment in matters related to marriage, family, and human sexuality consistent with the Statement on Marriage and Human Sexuality."  The Statement on Marriage and Human Sexuality, in turn, requires employees to agree that homosexuality, gay marriage, and attempts to change one's sex are inconsistent with biblical commands, and to affirm that the employee will not use pronouns inconsistent with a patient's biological sex at birth or facilitate a patient's attempt to alter their sex.  When it filed its complaint, Christian Healthcare was seeking to fill a Biblical Counselor position; applicants for the position would have to be in "full agreement" with these statements.

Sacred Heart "annually requires all employees to" both "sign its memorandum of understanding" on Catholic doctrine and "to publicly swear an oath of fidelity to Catholic doctrine, including on marriage and sexuality."  By signing the Memorandum of Understanding, each employee "agrees that as a condition of employment" she will "not advocate, encourage, or counsel beliefs or practices that are inconsistent with the Catholic faith," which the Memorandum defines to include "same-sex sexual activity[,] preparing for or entering into a same-sex marriage," and "engaging in or supporting . . . transgenderism, or sex reassignment." And by additionally swearing the Oath of Fidelity, each employee promises to "follow and foster the common discipline of the entire Church" and to "maintain the observance of all ecclesiastical laws."  In proposed public advertisements for its open art teacher and coach positions, Sacred Heart would state that any applicant must be a "practicing Catholic whose public life is lived in conformity with the moral teachings of the Church" who is willing "to sign the 'Faculty Memorandum of Understanding' and swear the 'Oath of Fidelity.'"

St. Joseph requires all employees to be practicing Catholics and to sign a Code of Conduct affirming that they will "exemplify the moral teachings of the Catholic Church" in their "personal and professional" lives. Additionally, under updated hiring guidelines, St. Joseph alleges that any applicant—including for its first-grade teacher position, which was open at the time its active complaint was filed—would be asked whether they could "uphold the teachings of the Catholic Church in [their] public and private life." Finally, St. Joseph's standard advertisement for open positions states that any candidate "should be a practicing Catholic with the ability to infuse Catholic faith and teaching throughout the curriculum."

By favoring Christians and those who can readily agree with statements connected to the Christian faith, each Plaintiff's employment practices represent discrimination "because of religion." Mich. Comp. Laws § 37.2202(a). Additionally, each Plaintiff has alleged that it "elicits or attempts to elicit information concerning the religion" of prospective employees, which is proscribed by a separate ELCRA provision. *Id.* § 37.2206(2)(a).

Christian Healthcare further requires employees and applicants to affirm statements critical of homosexuality, gay marriage, and alteration of biological sex, while Sacred Heart mandates that employees and applicants not encourage same-sex sexual activity or sex reassignment. The Supreme Court has described penalties on "homosexual conduct" as an "invitation" to engage in discrimination against "homosexual persons," *Lawrence v. Texas*, 539 U.S. 558, 575 (2003), and the same at least arguably follows for the issue of gender identity. As a result, Christian Healthcare's and Sacred Heart's employment requirements arguably discriminate against gay and transgender employees and prospective employees "because of . . . sexual orientation [and] gender identity." Mich. Comp. Laws § 37.2202(1)(a). St. Joseph's complaint, by contrast, lacks any assertion that employees or prospective employees have ever been or will ever be asked about sexual orientation or gender identity. As a result, St. Joseph has not alleged any conduct that arguably represents employment discrimination based on those characteristics.

*Public Accommodations and Education.* The ELCRA defines a place of public accommodation as "an educational . . . [or] health . . . facility, or institution of any kind . . . whose goods, services, facilities, privileges, advantages, or accommodations are extended,

offered, sold, or otherwise made available to the public." Mich. Comp. Laws § 37.2301(a). The EAA also applies to "places of public accommodation" but does not define this term. *See id.* § 750.146. We conclude that each Plaintiff is arguably covered by the public-accommodation laws. *See Kentucky*, 54 F.4th at 337. The ELCRA also defines an "educational institution" to which its educational provisions apply as "a public or private" educational entity, Mich. Comp. Laws § 37.2401; those provisions inarguably apply to Sacred Heart and St. Joseph unless they fall within an exception.

Relevant to these provisions, Christian Healthcare will not use a transgender patient's preferred pronouns, and will instead use either pronouns that accord with birth sex or alternative forms of address like first or last names. Similarly, Sacred Heart will not "affirm any individual's 'preferred pronouns' inconsistent with biological sex" at birth, and St. Joseph "teaches and practices" that "personal pronouns" must be used in accordance with each person's "biological sex." Christian Healthcare has additionally pleaded that although it will provide hormones for certain medical conditions, it will not provide hormones to facilitate gender transitions. Sacred Heart and St. Joseph have alleged that they require students to wear uniforms, use restrooms and other single-sex spaces, and play on sports teams that accord with biological sex. Finally, St. Joseph has alleged that it allows the use of its facilities for sports leagues, participates in a "shared time" arrangement with local public school teachers who teach in St. Joseph classrooms, and plans to bring in private tutors—and that when it opens its spaces in these ways, it expects the public to "respect the Catholic environment."

These policies at least arguably deny to transgender individuals the privilege, enjoyed by cisgender individuals, of using pronouns, dressing, using restrooms, and playing on sports teams in accordance with their gender identity. *See* Mich. Comp. Laws § 37.2302(a) (proscribing the denial of "the full and equal enjoyment of the . . . privileges" of a place of public accommodation); *id.* § 750.147 (similar); *id.* § 37.2402(b) (proscribing discrimination in the "privileges of the [educational] institution" against any student or prospective student because of that student's protected characteristics); *see also Rouch World*, 987 N.W.2d at 513 (reasoning that discrimination occurs when a person or entity "intentionally treat[s] individuals differently because of" a protected characteristic). Indeed, Michigan through its Attorney General has

previously taken a litigating position in at least one *amicus* brief that several of these activities can constitute discrimination under federal antidiscrimination law.  And although Sacred Heart and St. Joseph, as religious institutions, are not subject to the ELCRA's educational regulations "related to religion," *id.* § 37.2403, that exemption would arguably not apply to policies treating individuals differently based on other protected characteristics, such as gender identity.  In sum, each Plaintiff has alleged an intent to engage in activities that arguably constitute prohibited discrimination based on transgender status as defined by the accommodation and education provisions of Michigan's laws.

*Publication.*  Each Plaintiff has provided certain specific statements that it alleges it would publish but for the regulations it challenges.  Christian Healthcare desires to post its Membership Agreement and Employment Application online.  Appendices to the Membership Agreement explain, among other things, that the organization will not provide hormones to facilitate gender transition or use pronouns that do not accord with a person's biological sex at birth.  The Employment Application (and other links that Christian Healthcare desires to post on its "Career Opportunities" webpage) would reference statements affirming the organization's belief in the inerrancy of the Bible, faith in Jesus Christ, opposition to same-sex marriage and gender transition, and unwillingness to provide procedures that conflict with these beliefs.

Sacred Heart alleges that it would post (1) its Pastor's statement explaining the school's commitment to requiring students and employees to follow its view of Catholic doctrine, including in the areas of marriage and human sexuality, and its refusal to "affirm any sexual identities that violate Catholic doctrine," and (2) job applications that would require applicants to be practicing Catholics and to affirm that they would not encourage same-sex relationships or transgender-related activity.  Finally, St. Joseph pleads that it wishes to (1) advertise job openings that would require applicants to be practicing Catholics capable of infusing Catholic faith into their work, and (2) require clergy, employees, and volunteers to abide by the Code of Conduct's requirement not to "teach, advocate, model, or in any way encourage beliefs or behaviors that are contrary to the teaching of the Catholic Church."  Because it does not affect our conclusion on standing, we assume without deciding that St. Joseph's distribution of the

Code of Conduct to employees and volunteers arguably constitutes publication within the ELCRA's meaning.  *See* Mich. Comp. Laws §§ 37.2206(2)(c), 37.2302(b).

All three of the Plaintiffs' job postings explicitly seek out Christians and thereby constitute "post[ed] . . . statement[s] . . . relating to employment . . . that indicate[] a preference . . . based on religion."  Mich. Comp. Laws § 37.2206(1).  Christian Healthcare's and Sacred Heart's employment applications also arguably constitute "discrimination[] based on . . . sexual orientation [and] gender identity" because they reference the need for a prospective employee to oppose same-sex marriage and gender transition.  *Id.*  Christian Healthcare's proposed public statements on hormones and pronouns arguably constitute "post[ed] . . . statement[s]" indicating that certain "privileges" of public accommodations will not be made available to individuals "because of . . . gender identity," *id.* § 37.2302(b); Sacred Heart's proposed letter indicating that the school will not affirm certain sexual identities or permit same-sex relationships arguably constitutes discrimination based on gender identity and sexual orientation both in its role as a public accommodation, *see id.* §§ 37.2302(b), 750.147, and as an educational institution, *see id.* § 37.2402(d).  Finally, St. Joseph's Code of Conduct—which applies to both employees and volunteers—arguably constitutes a publication indicating a religious preference in employment and in a place of public accommodation.  *See id.* §§ 37.2206(1), 37.2302(b).

St. Joseph additionally suggests that the publication clause of the ELCRA's public-accommodation provision proscribes certain additional oral statements it makes.  The ELCRA's text, however, does not allow any place of public accommodation to "[p]rint, circulate, post, mail, or otherwise cause to be published a [discriminatory] statement, advertisement, notice, or sign."  *Id.* § 37.2302(b).  This provision can only be reasonably read to proscribe written communications—those that can be printed, circulated, posted, or mailed—rather than oral statements.  *See Fischer v. United States*, 144 S. Ct. 2176, 2183–85 (2024) (holding that the term "otherwise" in a federal statute is often determined with reference to "guidance from whatever examples come before it").  Oral communications are not arguably proscribed by this provision.

In summary, both Christian Healthcare and Sacred Heart have sufficiently alleged an intent to publicize employment-related statements arguably constituting discrimination based on religion, sexual orientation, and gender identity, which are arguably proscribed by the

publication clause of the ELCRA's employment provision. They also intend to publicize statements arguably constituting gender-identity-based discrimination that are arguably proscribed by the publication clauses of the ELCRA's public-accommodation provision and by the EAA; Sacred Heart's statements also arguably constitute sexual-orientation-based discrimination. Because Sacred Heart is a school, its statements are also arguably proscribed by the publication clause of the ELCRA's education provision. Finally, St. Joseph has sufficiently alleged an intent to publicize statements arguably constituting discrimination based on religion, which are arguably proscribed by the publication clauses of the ELCRA's employment and public-accommodation provisions.

### b.  Relevance of Exemptions

Defendants do not dispute Plaintiffs' factual claims regarding the core coverage of the ELCRA and the EAA. Instead, they point to limiting language in both laws. Both statutes, Defendants note, contain language instructing that they should not be applied where doing so would otherwise violate applicable law. *See* Mich. Comp. Laws § 37.2705(1) (requiring that the ELCRA not be construed to prevent the "securing" of "civil rights guaranteed by law"); *id.* § 37.2206 (permitting employers to inquire about or express a preference based on protected characteristics where "permitted" to do so "by applicable federal law"); *id.* § 37.2302 (allowing, "where permitted by law," exemptions from the ELCRA's public-accommodation regulations); *id.* § 37.2402(c) (permitting educational institutions to inquire about protected characteristics in admissions decisions if "required by federal law, rule, or regulation"); *id.* § 750.146 (subjecting the EAA to "conditions and limitations established by law"). Defendants argue that because these provisions make clear that the ELCRA and the EAA give way to protections created by other laws, including the federal Constitution, the challenged statutes do not arguably proscribe Plaintiffs' existing or intended First Amendment-related conduct.

Defendants' argument mirrors one raised and rejected in *Driehaus*. The defendants there contended that the challenged statute, which prohibited certain false statements, did not arguably proscribe proposed speech that the plaintiffs believed to be true. *Driehaus*, 573 U.S. at 152, 163. But the Supreme Court held that where the law at issue swept broadly and "cover[ed] the subject matter of [the plaintiffs'] intended speech," it arguably proscribed that speech notwithstanding

any potential defense based on the speech's alleged truthfulness. *Id.* at 162. Here, the ELCRA and the EAA's exemptions reflect the intention of Michigan's legislature that its antidiscrimination laws be applied with reference to other legal protections and defenses. But as in *Driehaus*, the language of exemptions within the ELCRA and the EAA is not so clear that it renders the laws obviously inapplicable to Plaintiffs' conduct—as is necessary to defeat standing.

As for Defendants' reliance on the BFOQ exemption for employment discrimination based on characteristics "reasonably necessary to the normal operation of the business," *see* Mich. Comp. Laws § 37.2208, that exemption is relevant only to the claims challenging the ELCRA's employment provisions. Even as to those claims, without knowing what facts would be presented to support a BFOQ application regarding a specific position, let alone how the Commission would evaluate those facts, we cannot conclude that the ELCRA's BFOQ exemption categorically removes Plaintiffs from the scope of its employment regulations.

Finally, Michigan caselaw also supports the arguable application of the state's antidiscrimination laws to Plaintiffs' conduct. Michigan's courts have sometimes held that defenses based on religious exercise are sufficient to defend against ELCRA actions. *See, e.g.*, *Assemany v. Archdiocese of Detroit*, 434 N.W.2d 233, 234, 238 (Mich. Ct. App. 1988). But such defenses are not always successful. *See, e.g.*, *McLeod v. Providence Christian Sch.*, 408 N.W.2d 146, 147, 150–52 (Mich. Ct. App. 1987). Rather than demonstrating that Plaintiffs' conduct is certainly exempt from the ELCRA and the EAA, these cases reinforce that in some situations, Michigan's laws can apply to religiously motivated conduct. Even Defendants' briefing, which explains that they cannot disavow enforcement of the laws against Plaintiffs' existing and intended conduct because the applicability of any exemption is a "fact dependent" question, suggests that it is not "clear, based on the statute alone," whether Plaintiffs' conduct is proscribed by the challenged laws. *Kentucky*, 54 F.4th at 337. Based on governing precedent and the parties' representations, the exemptions in the ELCRA and the EAA do not render the laws clearly inapplicable to Plaintiffs' speech and conduct.

### 2. Credible Threat of Enforcement

Although a plaintiff need not expose itself to actual arrest or prosecution to bring a pre-enforcement challenge to a statute, *see Driehaus*, 573 U.S. at 158, "mere allegations of a 'subjective chill' on protected speech are insufficient to establish an injury-in-fact." *McKay v. Federspiel*, 823 F.3d 862, 868–69 (6th Cir. 2016) (quoting *Berry v. Schmitt*, 688 F.3d 290, 296 (6th Cir. 2012)). Beyond chilled speech—which Plaintiffs have plainly alleged here—several factors inform our analysis of whether a threat of enforcement is sufficiently credible to support a claim for pre-enforcement prospective relief:

> (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) the "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff."

*Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (quoting *McKay*, 823 F.3d at 869). "These *McKay* factors are not exhaustive, nor must each be established." *Id.*; *see also Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (noting that the *McKay* factors are not "a laundry list"). At bottom, our inquiry distills to whether "surrounding factual circumstances" plausibly suggest a credible fear of enforcement. *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034 (6th Cir. 2022).

#### a. Enforcement History

The first *McKay* factor is whether there is "a history of past enforcement" of the statute "against the plaintiffs or others." 823 F.3d at 869. A threat of enforcement is most credible "when the *same conduct* has drawn enforcement actions or threats of enforcement in the past." *Plunderbund Media, LLC v. DeWine*, 753 F. App'x 362, 367 (6th Cir. 2018) (emphasis added) (quoting *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014)); *see also Driehaus*, 573 U.S. at 164 (noting that "past enforcement against the same conduct is good evidence that the threat of enforcement is" credible). However, to establish standing, a plaintiff need not always show that the statute has been enforced previously against the precise conduct it wishes to undertake. *See Block v. Canepa*, 74 F.4th 400, 410-11 (6th Cir. 2023).

The parties agree that there has been no past enforcement of the ELCRA or the EAA against the Plaintiffs themselves.  And Christian Healthcare and Sacred Heart have identified no relevant history of the EAA's enforcement against anyone.  Plaintiffs allege general facts regarding the past enforcement of the ELCRA:  that the Department handled more than 12,000 ELCRA complaints submitted against businesses and public accommodations between 2011 and 2022, including nearly 4,000 from 2020–2022, and that it processed 73 complaints alleging discrimination based on sexual orientation or gender identity in the 18 months after Interpretive Statement 2018-1's adoption.  Finally, Plaintiffs point to the Department's actions and litigation in *Rouch World* as a specific example of ELCRA enforcement regarding these categories of discrimination.

Through motions for judicial notice or to supplement the appellate record, Christian Healthcare and Sacred Heart attempt to raise additional facts regarding enforcement actions that occurred after each Plaintiff's complaint was filed.  Sacred Heart and St. Joseph likewise note post-complaint events in their appellate briefing.  "Standing," however, "is to be determined as of the time the complaint is filed."  *Ohio v. Yellen*, 53 F.4th 983, 994 (6th Cir. 2022) (quoting *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004)).  This rule "admits of no . . . exception; if a plaintiff lacks standing at the time the action commences," it is not entitled "to a federal judicial forum."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000).  Plaintiffs' argument to the contrary relies on cases involving *mootness*, an issue not presented here.  *See, e.g.*, *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 683 (9th Cir. 2023) (en banc).  Accordingly, our equitable discretion to take judicial notice or to expand the record, *see Abu-Joudeh v. Schneider*, 954 F.3d 842, 848 (6th Cir. 2020), does not permit the use of post-complaint events to retroactively generate standing.  We therefore deny Christian Healthcare's and Sacred Heart's motions for judicial notice or to supplement the appellate record.  *See* No. 23-1769 ECF 19, 43, 64; No. 23-1781 ECF 22, 37, 47.

Turning back to the pleaded facts, they demonstrate that although Michigan, its subagencies, and certain Commission-authorized individuals may file ELCRA complaints and thereby start the enforcement process, *see* Mich. Admin. Code R. 37.2(p), 37.4(1)–(2), citizen-initiated complaints are the method by which the Department's ELCRA investigations

and enforcement proceedings are initiated in practice.  *See, e.g.*, *Rouch World*, 987 N.W.2d at 505.  The allegations also suggest that the Department actively enforces the ELCRA, including its prohibitions of discrimination based on sexual orientation and gender identity.  Even though Plaintiffs have not provided the most probative evidence—a history of specific enforcement actions against their proposed conduct—the evidence that Michigan "does prosecute violations of" the ELCRA is relevant to the credibility of enforcement.  *See Block*, 74 F.4th at 410 (emphasis omitted).  Additionally, given the short duration of the ELCRA's application to sexual orientation and gender claims, "it makes sense that there would be at best limited evidence of a history of enforcement" in those categories.  *Online Merchs.*, 995 F.3d at 550.

### b.  *Warning Letters*

It is undisputed that no "enforcement warning letters" have been "sent to the plaintiffs regarding their specific conduct."  *McKay*, 823 F.3d at 869.

### c.  *Statutory Attributes*

The third factor asks whether there is "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action."  *Id*.  As discussed, the ELCRA permits any "person" who is "aggrieved by unlawful discrimination" to file a complaint.  Mich. Admin. Code R. 37.4(1).  Statutes that allow "any person" to "file a complaint" make enforcement more likely because the law's initiation is not limited to "a prosecutor or an agency."  *Driehaus*, 573 U.S. at 164; *see Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 452 (6th Cir. 2014).

By contrast, the EAA may be enforced only by Michigan's Attorney General and through private civil lawsuits.  *See* Mich. Comp. Laws § 750.147.  Sacred Heart suggests that the EAA's private right of action should be treated, like a citizen-complaint provision, as a statutory attribute increasing the risk of enforcement.  But injuries (and potential injuries) are only constitutionally sufficient where a plaintiff can "tie his injury 'to [a] defendant.'"  *In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 87 F.4th 315, 320 (6th Cir. 2023) (quoting *Fox v. Saginaw County*, 67 F.4th 284, 293 (6th Cir. 2023)); *see also TransUnion LLC*, 594 U.S. at

423 (holding that to have standing, the plaintiff must have suffered an injury caused by a defendant in the case).  The Supreme Court has explained that where a private defendant does not intend to sue a plaintiff under a given law, that plaintiff "cannot establish 'personal injury fairly traceable to [that defendant's] allegedly unlawful conduct.'"  *Whole Woman's Health v. Jackson*, 595 U.S. 30, 48 (2021) (quoting *California v. Texas*, 593 U.S. 659, 668–69 (2021)).  Any threat of injury from the civil-enforcement aspect of the statute is not traceable to the defendants here, and does not represent a statutory attribute increasing the risk of enforcement by these defendants.

### d.  Disavowal

The final *McKay* factor considers a defendant's "refusal to disavow enforcement of the challenged statute."  823 F.3d at 869.  Because "the issue of disavowal" is intertwined with factual determinations, it can be "nuanced."  *Id.* at 870.  For instance, an entity's assertion that it intends to enforce its laws in the abstract—and not against the specific conduct that the plaintiff plans to undertake—does not meaningfully increase the risk of enforcement.  *See Davis v. Colerain Township*, 51 F.4th 164, 174 (6th Cir. 2022).  But where a defendant refuses to disavow enforcement "against a particular plaintiff" with respect to the plaintiff's specific conduct, our precedent treats enforcement as more credible.  *McKay*, 823 F.3d at 869.

Defendants have not disavowed enforcement against the specific conduct that the Plaintiffs allege they want to undertake, contending that disavowal is impossible because the "religious freedom inquiry" is "fact dependent."  It is indeed unrealistic to expect a defendant to disavow a law's enforcement as applied to "fluid and future facts" that are unclear at this time.  *Hoye v. City of Oakland*, 653 F.3d 835, 859 (9th Cir. 2011).  By contrast, refusing to disavow is less understandable—and enforcement more credible—where there is not "a single additional fact that would be required to adjudicate the present action."  *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 929 (5th Cir. 2023).  We turn now to applying these rules to each Plaintiff's specific claims.

### e. Evaluating Plaintiffs' Claims

Because a plaintiff must plausibly assert standing "for each claim he presses and each statutory provision he challenges," *Oklahoma*, 62 F.4th at 233, we evaluate Plaintiffs' claims independently, starting with Christian Healthcare and Sacred Heart's challenges to the Attorney General's potential enforcement of the EAA. Neither Plaintiff has alleged a single fact about the Attorney General's enforcement of the EAA, let alone her enforcement as applied to discrimination based on sexual orientation or gender identity. No warning letter has been issued to either Plaintiff regarding the law. The Attorney General also has disavowed ever threatening anyone with a criminal action under the EAA, and she could find no caselaw showing that any of her predecessors has ever brought a criminal prosecution under this law. Unlike the ELCRA, the EAA also contains no citizen-complaint provision raising the likelihood of enforcement. And although Michigan's Attorney General has declined to disavow the EAA's enforcement, she has publicly opined that the EAA is "not applicable to Sacred Heart" because the law's text specifically covers only "public educational institutions" rather than private ones. Mich. Comp. Laws § 750.146. And she has found it "unclear" whether the EAA covers Christian Healthcare because the law also does not specifically mention medical facilities. At day's end, "some combination" of the *McKay* factors are typically required to demonstrate a credible threat of enforcement. *Online Merchs.*, 995 F.3d at 550 (quoting *McKay*, 823 F.3d at 869); *see also Davis*, 51 F.4th at 174 (noting that refusal to disavow is "just one data point among many on the question whether a credible threat of enforcement exists"). The "factual circumstances" here are not sufficient to "show that a fear of prosecution" under the EAA "is plausible." *Nabors*, 35 F.4th at 1034. Accordingly, we affirm the district court's dismissal of Christian Healthcare's and Sacred Heart's EAA claims.

The ELCRA analysis is more nuanced. Plaintiffs' pleadings and briefing reveal Defendants' failure to disavow enforcement, some enforcement history, and a key statutory aspect—the citizen-complaint provision—making enforcement more credible. On the other hand, there have been no warning letters issued to Plaintiffs or allegations that the Department has previously enforced the ELCRA against Plaintiffs' specific conduct. With factors pointing both directions, the question of Plaintiffs' standing to challenge the ELCRA appears close.

Plaintiffs disagree, asking us to jettison the fact-bound approach embodied by the *McKay* factors and to instead assume a credible threat of enforcement through an "enforcement presumption." We have, however, repeatedly and recently applied *McKay* in pre-enforcement challenges—it is settled circuit law. *See, e.g.*, *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1022–23 (6th Cir. 2024); *Fischer*, 52 F.4th at 307; *Online Merchs.*, 995 F.3d at 550. *McKay*, moreover, was drawn from the Supreme Court's language in *Driehaus*, which relied on a fact-intensive analysis that established the factors we consider. *See Driehaus*, 573 U.S. at 164–65. The *McKay* factors properly apply here.

In these cases, "applying the law of standing cannot be made easy." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 384 (2024). They are particularly difficult because Plaintiffs' pleadings indicate that Defendants generally do not initiate ELCRA enforcement actions on their own; the Department instead responds to citizen complaints. Thus, enforcement credibility hinges on the answers to two questions: (1) How likely is anyone to file a complaint against a Plaintiff for its conduct, and (2) if such a complaint were filed, what is the likelihood that Defendants' actions in response would cause a cognizable injury? We turn to the specific claims in each case.

Christian Healthcare

Christian Healthcare asserts standing to challenge potential enforcement of the ELCRA's public-accommodation provision, employment provision, and the publication clauses of each. Assessing the likelihood of a complaint based on Christian Healthcare's pronoun, hormone, and employment policies, or the publication of those policies, is challenging, and best undertaken "by comparing the allegations of the particular complaint to those made in prior standing cases." *All. for Hippocratic Med.*, 602 U.S. at 384 (quoting *Allen v. Wright*, 468 U.S. 737, 751–52 (1984)).

The Supreme Court has stated its "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414. Where standing turns on the actions of a non-governmental third party—here, a citizen filing a complaint alleging discrimination that would, in turn, initiate the ELCRA investigatory

process—the plaintiff must show that the third party will likely act "in predictable ways." *All. for Hippocratic Med.*, 602 U.S. at 383 (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)). A similar question regarding third-party behavior was presented in a case involving a wedding website designer's standing to challenge Colorado's antidiscrimination law. *See 303 Creative LLC v. Elenis*, 6 F.4th 1160, 1173–75 (10th Cir. 2021), *rev'd on other grounds*, 600 U.S. 570 (2023). In *303 Creative*, the plaintiff intended to personally design custom wedding websites but did not want to offer her design services for same-sex weddings. *Id.* at 1169–70. Relying on the typical reluctance of courts to assume facts regarding third-party conduct, Colorado argued that standing was precluded because it required "guesswork" regarding whether a gay couple would actually seek the plaintiff's services and then "file a charge of discrimination" through the statute's citizen-complaint provision. *See id.* at 1173 (cleaned up). The Tenth Circuit rejected that position, finding it not "imaginary or speculative" that a complaint (and enforcement) would result from the plaintiff's proposed conduct. *Id.* (quoting *Driehaus*, 573 U.S. at 165). Although the Supreme Court did not provide a fulsome standing analysis, it accepted the Tenth Circuit's conclusions on that issue. *See 303 Creative*, 600 U.S. at 581–83.

The analysis of *303 Creative* indicates that where an entity (a) broadcasts to the public speech or conduct that is arguably proscribed by a state antidiscrimination law, (b) any member of the public can file a complaint, and (c) factual circumstances do not otherwise indicate that a complaint is unlikely, it is plausible that a complaint will be filed regarding the publicized speech or conduct.

Applying that framework, Christian Healthcare has alleged an intention to arguably violate the ELCRA's public-accommodation provision by stating on its website that it will not use preferred pronouns or provide hormones to facilitate gender transition. It is at least plausible that an "aggrieved" person, Mich. Admin. Code R. 37.4, would file a complaint stating that the public-accommodation publication provision had been violated because Christian Healthcare had "post[ed] . . . a statement" indicating that its full "services" and "privileges" would not be provided to a transgender patient. Mich. Comp. Laws § 37.2302(b). And it is also plausible that such a person would ask Christian Healthcare to confirm that it would not offer hormones to facilitate gender transition or use preferred pronouns—and then, upon confirmation, file a

complaint alleging they had been denied service.  *Id.* § 37.2302(a).   In fact, Christian Healthcare's complaint suggests that it "has served and currently serves patients who identify as transgender."   And the complaint adds that it has not used these patients' preferred pronouns, instead calling them by "their preferred first or last names."   Put into the language of the governing standards, it is plausible that Christian Healthcare would face a complaint related to its conduct that arguably violates the substantive and publication clauses of the ELCRA's public-accommodation provisions.  *Id.* § 37.2302.

As for its challenge to the ELCRA's employment provision and the publication clause of that provision, Christian Healthcare has averred that absent the ELCRA, it would "immediately begin publicizing" its Biblical Counselor position, which was open when Christian Healthcare filed its complaint.  It alleges such publication would state that any prospective employee would have to be "in full agreement with" the Statement of Faith's assertions regarding, among other things, the immutability of sex and disapproval of same-sex activity and relationships.  Christian Healthcare has further alleged an intent to solicit applications online for "un-posted positions" with a link to its Employment Application—which, in turn, requires applicants to state whether they agree with the Statement of Faith. An aggrieved person could plausibly file a complaint that each posting "indicates a preference," "elicits or attempts to elicit information," and "expresses a preference" based on sexual orientation and gender identity.  Mich. Comp. Laws § 37.2206(1), (2)(a), (2)(c).   And if Christian Healthcare informed a potential applicant that it intended to enforce its requirements for a position related to sexual orientation and gender identity, it is plausible that the person would file a complaint alleging that she had been discriminated against "with respect to employment" because of those characteristics.  *Id.* § 37.2202(1)(a).

*303 Creative*'s reasoning, however, does not support the plausibility of a complaint resulting from several of Christian Healthcare's other activities.   For instance, because requirements for currently filled positions are not communicated to the public, the only people who could be aggrieved by those requirements are persons serving in the positions.  Christian Healthcare has not alleged that any employee belongs to a category—as a non-Christian, gay person, or transgender individual—to which Christian Healthcare's relevant preferences apply, has ever indicated any intent to engage in conduct proscribed by Christian Healthcare's

employment rules, or has ever complained about those rules. Similarly, although the Membership Agreement and Employment Application express religious preferences to the public, Christian Healthcare states that the documents were posted on its website until recently without complaint—even though the ELCRA has always prohibited religious-based discrimination. Hypothesizing that a current employee would complain about employment rules, or that anyone would complain that Christian Healthcare has engaged in religious discrimination, would require too much "speculation about . . . third parties" acting contrary to past practice. *See Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). Where no one has ever complained about Christian Healthcare's religious discrimination and no employee has suggested discomfort with employment rules, the "factual circumstances" suggest that a complaint on these bases is exceedingly unlikely. *Nabors*, 35 F.4th at 1034. Drawing on "judicial experience and common sense," we decline to theorize a complaint regarding these activities. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Turning to the likelihood of injury in the event a complaint is submitted, Defendants have not disavowed enforcement of any potential complaint alleging discrimination based on Christian Healthcare's activities. The Department's position that it lacks sufficient facts to disavow enforcement as to Christian Healthcare's proposal to solicit applications for "un-posted" positions is appropriate. As our precedent emphasizes, government officials are not required to disavow enforcement of statutes "in the *abstract*." *Davis*, 51 F.4th at 174. The Department's unwillingness to do so regarding unspecified employment roles does not suggest a credible threat of enforcement.

In contrast, because Christian Healthcare has amply described their pronoun and hormone policies, requirements for the Biblical Counselor position, and the proposed communications about each item, there do not appear to be any "additional fact[s] that would be required to adjudicate" the Department's response to a complaint related to these activities. *Braidwood Mgmt.*, 70 F.4th at 929. Nor have Defendants provided sufficient details concerning the ELCRA's enforcement to determine that the statutory process reduces the risk of injury. For example, it is unclear exactly what, if any, standards Michigan applies to determine whether a person was "aggrieved by unlawful discrimination" such that she could submit a complaint.

*See* Mich. Admin. Code R. 37.4(1).  The Department has not clarified where or how it considers defenses—including constitutional defenses—in its investigative and adjudicatory process, or how it would view a respondent's assertion of a constitutional right to not participate in an investigation.  *See Seattle Pac. Univ.*, 104 F.4th at 57–58.  And a charge's issuance upon "sufficient grounds," Mich. Admin. Code R. 37.6(1), does not provide clear guidance regarding what conduct qualifies.

Discovery has not yet commenced, and our conclusions regarding standing "would have little bearing on the question of standing if a more developed factual record" casts doubt on whether Christian Healthcare "faces a credible threat of enforcement."  *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 99 (2d Cir. 2024).  But at this pleading stage, it is plausible that a complaint would lead to a cognizable injury.  Christian Healthcare has thus established standing to challenge the ELCRA's public-accommodation provision, employment provision, and the publication clauses of each provision.

Finally, because we find that Christian Healthcare has established standing, we deny as moot its appeal of the district court's denials of its motion for reconsideration and to supplement the record on reconsideration.

<u>Sacred Heart</u>

The credible threat analysis is substantially similar for Sacred Heart.  Relevant to Sacred Heart's challenges to the ELCRA's public-accommodation provision, education provision, and the publication clauses of each, it has alleged that (a) it will not affirm transgender students' preferred pronouns, (b) it separates "houses," restrooms, uniforms, and sports teams by biological sex at birth, and (c) but for the ELCRA, it would post a statement on its website stating that "a person's sexual identity is determined at conception" and that the school does not support sexuality outside of opposite-sex relationships.  Through these allegations, Sacred Heart has sufficiently asserted its intent to publicize speech and conduct to the public that are arguably proscribed by the gender and sexual-orientation clauses of the ELCRA's public accommodation and education provisions.  *See* Mich. Comp. Laws §§ 37.2302, 37.2402.  It is plausible that a member of the public would file a complaint with the Department regarding Sacred Heart's

activities.  Indeed, Sacred Heart has alleged that it has students with gender dysphoria.  And given Defendants' choice not to disavow enforcement or otherwise indicate how they would view such a complaint, it is credible that enforcement would follow.

For its challenge to the ELCRA's employment provision and the publication clause of that provision, Sacred Heart has alleged that it seeks to hire an art teacher and an athletic coach, and that but for the ELCRA, it would post advertisements for the positions stating that any applicant must be willing to sign the Faculty Memorandum of Understanding and Oath of Fidelity.  These documents require applicants to agree not to encourage same-sex sexual activity, same-sex relationships, or transgender-related behavior and activity.  Taken together, Sacred Heart has sufficiently alleged an intent to publicly post speech and employment policies arguably proscribed by the gender and sexual-orientation clauses of the ELCRA's employment provision and that provision's publication clause.  *See* Mich. Comp. Laws §§ 37.2202, 37.2206.  Based on the ELCRA's citizen-complaint provision and Defendants' refusal to disavow enforcement, Sacred Heart plausibly faces a credible threat of enforcement.[3]  In sum, Sacred Heart has established standing to challenge the ELCRA's public accommodation, employment, and education provisions, and the publication clauses of each provision.

St. Joseph

St. Joseph challenges the ELCRA's public accommodation, employment, and education provisions, as well as the publication clauses of each provision.  It alleges an intent to engage in conduct that, as described above, is arguably proscribed by the ELCRA's prohibitions of discrimination based on gender identity or sexual orientation.  For instance, it teaches that students must use pronouns that align with biological sex at birth, requires students to follow sex-specific uniform, sports team, and other policies, and expects the public to use its facilities in accordance with birth sex.  And St. Joseph alleges that the "moral teachings" with which

---

[3]For the same reasons as Christian Healthcare, Sacred Heart has not plausibly shown that any current employee would complain about its employment practices, or that anyone would complain about its publications regarding religious practice.  It therefore has not established standing through these pleaded activities.  *See Dep't of Com.*, 588 U.S. at 768.

teachers and volunteers must agree include "the Church's teaching on gender, sexuality, and marriage between one man and one woman."

St. Joseph, however, has not alleged that it intends to communicate or currently communicates its beliefs or policies regarding gender identity or sexual orientation to the public. For example, although St. Joseph has explained its "expectation" that the public will use its spaces in accordance with biological sex at birth, it has not alleged that its sex-specific rules are ever communicated outwardly. Similarly, although St. Joseph alleges that "moral teachings" in the Code of Conduct given to teachers and volunteers include teachings regarding gender identity and sexual orientation, the Code does not reference these items.

Without an allegation that its policies regarding gender identity and sexual orientation are ever publicly communicated, members of the public would be unaware of St. Joseph's policies that arguably discriminate on those bases. Perhaps St. Joseph's teachers, students, and parents may learn about these policies when the school "teaches and practices" differences in biological sex—although St. Joseph has been vague about exactly how this occurs. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (noting that it is the plaintiff's burden to "clearly . . . allege facts demonstrating" standing (internal citation omitted)). Unlike Christian Health and Sacred Heart, however, St. Joseph makes no allegation that it has ever provided any services to transgender individuals or individuals with gender dysphoria. In fact, St. Joseph has not alleged that any teacher, student, or parent (a) is either gay or transgender, (b) intends to participate in conduct proscribed by St. Joseph's beliefs and policies., or (c) has ever complained about those policies. Absent such allegations, any ELCRA complaint based on these categories is too hypothetical to support St. Joseph's standing.

St. Joseph has also alleged that it intends to publicly communicate its religious preferences through (1) a job posting requiring any applicant to be a practicing Catholic, and (2) the Code of Conduct, which requires signatories to align their behavior with the Catholic Church. But these precise religious beliefs have been communicated in the past without drawing any kind of inquiry, let alone an ELCRA complaint. Given that the ELCRA has always prohibited religion-based discrimination, there is no plausible explanation as to why documents that have not drawn a complaint of religious discrimination in the past would suddenly draw one

in the future.  St. Joseph's entire case, moreover, is directed at the amended ELCRA's provisions regarding sexual orientation and gender identity—not the law's longstanding prohibition on religious discrimination.

In sum, St. Joseph's pleadings and briefing do not establish the necessary factual predicate to plausibly conclude that anyone would file a complaint regarding its proposed speech and conduct.  Because there is also no plausible threat that Defendants will enforce the ELCRA absent a complaint, we affirm the dismissal of St. Joseph's case.

### B.  Injunctive Relief

Because the district court dismissed Christian Healthcare's and Sacred Heart's cases for lack of standing, it was not empowered to consider the entry of injunctive relief.  *See State ex rel. Tenn. Gen. Assembly*, 931 F.3d at 519.  Christian Healthcare and Sacred Heart nonetheless ask this court to enter that relief before remanding the cases.  We are, however, "a court of review, not first view."  *Taylor v. City of Saginaw*, 11 F.4th 483, 489 (6th Cir. 2021) (quoting *United States v. Houston*, 792 F.3d 663, 669 (6th Cir. 2015)).  In line with that principle, we "generally 'cannot consider an issue not passed on below.'"  *St. Marys Foundry, Inc. v. Emps. Ins. of Wausau*, 332 F.3d 989, 995 (6th Cir. 2003) (quoting *Hormel v. Helvering*, 312 U.S. 552, 556 (1941)).

It is appropriate to permit the district court to balance the relevant injunction factors—likelihood of success on the merits, danger of irreparable harm, balance of the equities, and the public interest—in the first instance.  *See James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024).  Evaluation of the cases' merits will require a thoughtful and detailed analysis that may differ by Plaintiff and by claim.  *Cf. Emilee Carpenter*, 107 F.4th at 99–101, 107–13 (rejecting the defendants' motion to dismiss a plaintiff's free speech claim, but granting the motion to dismiss free association, free exercise of religion, establishment clause, vagueness, and overbreadth claims).  The district court will also need to determine whether each Plaintiff has made the "'clear showing' that [it] is 'likely' to establish each element of standing" necessary to receive a preliminary injunction, *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008))—a higher threshold than the one

applicable at the pleading stage.  And balancing the injunction factors is a task we are better equipped to review than perform.  *See Platt*, 769 F.3d at 453–54 (discussing the discretion afforded to a district court's weighing of the injunction factors).

In remanding the motions, we emphasize that although the district court stated in footnotes that it would have rejected Christian Healthcare's and Sacred Heart's injunction motions had it reached them, that conditional conclusion does not constitute law of the case because the court dismissed the cases for want of standing.  *See State ex rel. Tenn. Gen. Assembly*, 931 F.3d at 519.  Starting from a clean slate, the district court should undertake a full analysis of Plaintiffs' motions for injunctive relief.

### III. CONCLUSION

"As important as the question[s] we decide today are ones we do not."  *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2087 (2024).  We express no view regarding the merits of any claim, the appropriate resolution on remand of the motions for preliminary relief, or what conclusions might be warranted concerning any issue after discovery.  We hold only that (a) no Plaintiff has established standing to challenge the EAA, (b) Christian Healthcare has plausibly established standing to challenge the ELCRA's public-accommodation provision, employment provision, and the publication clauses of each provision, (c) Sacred Heart has plausibly established standing to challenge the same provisions, the ELCRA's education provision, and the publication clause of that provision, and (d) St. Joseph has failed to plausibly establish standing. The district court's orders are **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED** for further proceedings consistent with this opinion.

---

**CONCURRENCE**

---

MURPHY, Circuit Judge, concurring.  I agree that we should reverse in part because Christian Healthcare Centers and Sacred Heart of Jesus Parish have alleged enough in their complaints to plead their standing under Article III of the Constitution.  I write to flag a distinction between this standing question and a merits question that the parties must eventually confront.

Christian Healthcare and Sacred Heart seek to engage in specific activities and speech, but they fear that the Michigan Department of Civil Rights will find that these activities and speech violate Michigan's Elliott-Larsen Civil Rights Act (ELCRA).  Christian Healthcare, a faith-based medical provider, will not refer to transgender patients by the pronouns associated with their gender identities and instead seeks to use the patients' "preferred first or last names." Christian Healthcare Compl., R.1, PageID 51–52.  Christian Healthcare also refuses to offer treatment to help patients "transition to the opposite biological sex[.]"  *Id.*, PageID 52.  And it seeks to fill an open Biblical Counselor position using hiring criteria that require applicants to abide by religiously motivated standards of conduct.  *Id.*, PageID 23–24, 55.  Lastly, Christian Healthcare seeks to post its Membership Agreement and Employment Application online.  *Id.*, PageID 11, 49, 54–55.

Sacred Heart, a parish-run school, does not want to "affirm" the gender identity of students and staff if that identity conflicts with their biological sex.  Sacred Heart Compl., R.1, PageID 16.  So it will not use "'preferred pronouns' inconsistent with biological sex[.]"  *Id.*  It also separates its students based on biological sex for such things as restroom usage and sports participation.  *Id.*, PageID 15–16.  Sacred Heart next seeks to fill specific positions (an art teacher and athletic coach) using religiously motivated hiring criteria.  *Id.*, PageID 37–38, 49.  And it seeks to post certain statements on its website about its faith-based rules for students and staff.  *Id.*, PageID 38, 43.

Christian Healthcare and Sacred Heart sued to eliminate the uncertainty over whether the Department may lawfully enforce the challenged provisions of ELCRA against their specifically proposed conduct and speech. They sought both a declaratory judgment that the feared enforcement would violate the First and Fourteenth Amendments and an injunction barring this enforcement. We now hold that they have plausibly alleged their standing to raise these claims.

Yet the parties should not overread this holding. To establish standing to raise a constitutional challenge to a law's enforcement, litigants need only show that the law "*arguably*" prohibits their "intended future conduct[.]" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (emphasis added) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). In my view, the Department's refusal to disclose its position on how ELCRA applies to the specifically alleged conduct and speech goes a long way toward meeting this requirement. As my colleagues note, the Department has not identified "a single additional fact that would be required" for it to take a position on whether ELCRA applies to the specific conduct and speech. *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 929 (5th Cir. 2023). Yet I find its current position vague and contradictory. The Department asserts that Christian Healthcare's and Sacred Heart's proposed activities do not even arguably fall within ELCRA, but it then refuses to say that it will not enforce the law against the same activities. If the conduct and speech do not even arguably fall within the law, how could the Department in good faith try to enforce the law against that conduct and speech? Given that these cases remain at the pleading stage, I would resolve this Department-created uncertainty in the light most favorable to the plaintiffs' standing. *See Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022). Again, though, we decide only that ELCRA arguably prohibits Christian Healthcare's and Sacred Heart's proposed activities—not that it does prohibit those activities. And I see many arguments as to why ELCRA permits them.

That fact leaves an order-of-operations question unclear. After a court finds that a party has standing to pursue a constitutional challenge because a state law *arguably* covers its conduct, when (and how) should the court decide whether the law *actually* covers the conduct? I would think federal courts must reach this state-law question as part of the merits analysis. The courts should not resolve a significant constitutional question about whether a state official may enforce

a state law against certain conduct based on the mere *assumption* that the state law applies to that conduct. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). Rather, basic principles of constitutional avoidance suggest that the state statutory question should come before the federal constitutional question. *See Braidwood*, 70 F.4th at 940 n.60; *see also Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009). Indeed, even if both parties agree on the statutory question, I have suggested that courts have discretion to reject such stipulations about the meaning of a law. *See Calcutt v. FDIC*, 37 F.4th 293, 339 (6th Cir. 2022) (Murphy, J., dissenting).

But who "wins" if the district court finds that Christian Healthcare's and Sacred Heart's proposed conduct and speech fall outside ELCRA? I see two possible scenarios. On the one hand, plaintiffs often argue in the alternative that a statute does not apply to their conduct and that, if the statute does apply, its enforcement would violate the Constitution. *See, e.g.*, *Braidwood*, 70 F.4th at 921. This strategy gives them "two shots" at achieving their end goal. *Cf.* Jeffrey S. Sutton, *51 Imperfect Solutions* 7–8 (2018). An injunction against enforcement of a law on statutory grounds or on constitutional grounds will give plaintiffs the same relief—just under different legal theories. And the declaratory remedy exists just as much to allow courts to resolve questions about the meaning of a statute as it does to resolve questions about the meaning of the Constitution. *See MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 126–30, 135–36 (2007); Edwin Borchard, *Declaratory Judgments* 341–49 (1934). That is why the Fifth Circuit could resolve a somewhat similar suit against a federal agency's enforcement of a federal law without reaching any constitutional questions. *See Braidwood*, 70 F.4th at 940 n.60. Here, however, Christian Healthcare and Sacred Heart seem to assert only constitutional claims—not alternative claims that the state law does not even reach their conduct. Perhaps this choice follows from looming sovereign-immunity issues over whether a federal court may enjoin state officials (or even issue declaratory relief against them) on state-law grounds. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 739–41 (5th Cir. 2020); *Benning v. Bd. of Regents of Regency Univs.*, 928 F.2d 775, 778 (7th Cir. 1991); *but cf. Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 612–14 (6th Cir. 2020) (per curiam).

On the other hand, government officials sometimes defend against constitutional challenges on the ground that a challenged law does not cover the plaintiffs' conduct. *See Am. Booksellers Ass'n*, 484 U.S. at 393–97; *Majors v. Abell*, 317 F.3d 719, 723 (7th Cir. 2003). If true, the plaintiffs' constitutional claims would seemingly fail not because their constitutional theories lack merit but because the relevant statute does not reach their conduct. So there is nothing to enjoin or declare illegal. In some sense, then, that litigation loss might qualify as a real-world win for the plaintiffs too. The law is not enjoined. But it also does not apply to the conduct that they want to undertake. *Cf. Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 435–37 (6th Cir. 2024).

At day's end, it seems to me that courts must somehow decide this state-law question ahead of the federal constitutional one. The Department, Christian Healthcare, and Sacred Heart thus must at some point disclose their positions on the actual (not just arguable) meaning of ELCRA.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 23-1769/1781/1860

CHRISTIAN HEALTHCARE CENTERS, INC. (23-1769);
SACRED HEART OF JESUS PARISH, GRAND RAPIDS,
JERRY HATLEY, ROBIN HATLEY, JOSEPH BOUTELL,
RENEE BOUTELL, PETER UGOLINI, and KATIE
UGOLINI (23-1781); ST. JOSEPH PARISH ST. JOHNS
(23-1860),

       Plaintiffs - Appellants,

       v.

DANA NESSEL, et al.,

       Defendants - Appellees.

```
┌─────────────────────────────────┐
│            FILED                │
│         Sep 20, 2024            │
│     KELLY L. STEPHENS, Clerk    │
└─────────────────────────────────┘
```

Before:  WHITE, STRANCH, and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THESE CASES were heard on the records from the district court and were argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgments of the district court are AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____
Kelly L. Stephens, Clerk